# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

| | | |
|---|---|---|
| CITIZENS COMMUNICATIONS COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 07-xxx |
| | ) | |
| v. | ) | |
| | ) | |
| BARRETT PAVING MATERIALS, INC., BEAZER EAST, INC., CENTERPOINT ENERGY RESOURCES CORPORATION, DEAD RIVER COMPANY, GUILFORD TRANSPORTATION INDUSTRIES, INC., HONEYWELL INTERNATIONAL, INC., MAINE CENTRAL RAILROAD COMPANY, NORTH AMERICAN UTILITY CONSTRUCTION COMPANY, UGI UTILITIES, INC., and UNITED STATES ARMY CORPS OF ENGINEERS, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | | |

## COMPLAINT

Pursuant to the Federal Rules of Civil Procedure and the prior orders of this Court in Civil Case No. 02-0183, Plaintiff Citizens Communications Company hereby files this Complaint against the Defendants named below, and states as follows:

## PARTIES

1. Citizens Communications Company ("Citizens"), the Plaintiff in this action, is a Delaware corporation having its principal place of business in Stamford, Connecticut.

2. Defendant Barrett Paving Materials, Inc. ("Barrett Paving") is a Delaware corporation, having its principal place of business in Roseland, New Jersey.

3. Defendant Beazer East, Inc. ("Beazer East") is a Delaware corporation having its principal place of business in Pittsburgh, Pennsylvania.

4. Defendant CenterPoint Energy Resources Corp. ("CenterPoint") is a Delaware corporation having its principal place of business in Houston, Texas.

5. Defendant Dead River Company ("Dead River") is a Maine corporation having its principal place of business in Bangor, Maine.

6. Defendant Guilford Transportation Industries, Inc. ("Guilford") is a Delaware corporation believed to have its principal place of business in Portsmouth, New Hampshire.

7. Defendant Honeywell International Inc. ("Honeywell") is a Delaware corporation having its principal place of business in Morristown, New Jersey.

8. Defendant Maine Central Railroad Company ("MEC") is a Maine corporation having its principal place of business in North Billerica, Massachusetts.

9. Defendant North American Utility Construction Company ("NAUCC") is a New York corporation with an unknown principal place of business.

10. Defendant UGI Utilities, Inc. ("UGI") is a Pennsylvania corporation having its principal place of business in Reading, Pennsylvania.

11. Defendant United States Army Corps of Engineers (the "Corps") is an agency of the United States Government.

## STATEMENT OF THE CASE

12. This action arises, in part, under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq.*

13. In this action, Citizens is seeking contribution, indemnity and recovery for costs incurred in connection with the environmental cleanup in the portion of the Penobscot River known as Dunnett's Cove, pursuant to 42 U.S.C. §§ 9607, 9613, and any other relevant sections of CERCLA, as well as Maine law.

14. Each of the Defendants' liability stems from its actions and omissions, and in some cases the actions and omissions of its predecessors or subsidiaries, in the State of Maine. Each of the Defendants is accordingly subject to personal jurisdiction in this Court.

15. This Court has subject matter jurisdiction over this Complaint pursuant to 28 U.S.C. §§ 1331, 1332, and 42 U.S.C. § 9613(b).

16. Releases or damages attributable to each and every Defendant occurred in the District of Maine, making venue appropriate in this Court pursuant to 42 U.S.C. § 9613(b).

**FACTS**

**A.  Facts Common To All Defendants**

17. On or about November 22, 2002, the City of Bangor, Maine (the "City") filed a Complaint against Citizens in Civil Action No. 02-0183, alleging that Citizens was responsible for certain tar and poly-aromatic hydrocarbon ("PAH") contamination in Dunnett's Cove.

18. In response to the City's Complaint, Citizens incurred significant response costs investigating the contamination in Dunnett's Cove.

19. On April 11, 2007, the City, Citizens and the Maine Department of Environmental Protection ("DEP") signed a Consent Decree that resolves the City's and Citizens' liability to the State of Maine for contamination in the Dunnett's Cove area of the Penobscot River.

20. The Court entered the Consent Decree as a partial final judgment in Case No. 02-0183 on or about June 5, 2007. On or about July 20, 2007, the Court denied various motions for reconsideration of its decision to enter the Consent Decree as a final judgment.

21. The Consent Decree provides that the City will perform a response action to address contamination in Dunnett's Cove, and that Citizens will pay $7.625 million toward the response costs of that action.

22. Citizens made its payment pursuant to the Consent Decree on or about July 31, 2007.

23. The costs incurred and amounts paid by Citizens represent more than Citizens' equitable share of liability for the costs of cleaning up Dunnett's Cove.

24. The costs incurred and to be incurred by the City represent more than the City's equitable share of liability for the costs of cleaning up Dunnett's Cove.

**B. Facts Specific To Defendant Honeywell International Inc.**

25. The tar and asphalt plant in Bangor, Maine, presently owned by Barrett Paving (the "Barrett Plant") has been in operation since approximately 1937 and continues to operate at the present time.

26. The Barrett Plant is located on the Penobscot River, at the southern end of Dunnett's Cove.

27. The Barrett Plant was owned and/or operated by a division of Allied Chemical Corporation or its predecessors ("Allied Chemical") from approximately 1937 until 1979.

28. The Barrett Plant received, produced, stored and/or distributed tar and asphalt for road paving and other purposes during the period it was owned and/or operated by Allied Chemical.

29. The portion of the Penobscot River closest to the Barrett Plant contains elevated amounts of PAHs.

30. The land underneath the Penobscot River in the area closest to the Barrett Plant contains various tar formations, including "Hershey's Kiss" formations that are likely the result of episodic spills into the river from the surface of the water.

31. Sewers historically located in or near the Barrett Plant drained directly and without treatment into the Penobscot River.

32. Tidal action of the Penobscot River causes contamination from the Barrett Plant to be flushed into the river.

33. On information and belief, soil at the Barrett Plant is contaminated with substances that contain PAHs.

34. On information and belief, barges that were regularly used to deliver large amounts of tar and tar-containing materials to the Barrett Plant released hazardous substances into Dunnett's Cove during the period the Barrett Plant was owned and/or operated by Allied Chemical.

35. On information and belief, hazardous substances and hazardous wastes from the Barrett Plant were released into Dunnett's Cove through sewers, overland flow of water and/or tidal action during the period the Barrett Plant was owned and/or operated by Allied Chemical.

36. In or about 1985, Allied Chemical Corp. (renamed Allied Corp. in or about 1981) merged with the Signal Companies; the resulting entity's name was changed to AlliedSignal in or about 1991.

37. In or about 1999, AlliedSignal merged with Honeywell Inc. to form Honeywell International Inc.

38. Honeywell International Inc. is the successor to the liabilities of Allied Chemical Corp. and its predecessors, including liabilities related to the operation of the Barrett Plant.

**C.  Facts Specific To Defendant Barrett Paving Materials, Inc.**

39. Barrett Paving acquired the Barrett Plant in or about 1979.

40. The Barrett Plant has received, produced, stored and/or distributed tar and asphalt for road paving and other purposes during the period it has been operated by Barrett Paving.

41. On one or more occasions since Barrett Paving has owned and operated the Barrett Plant, materials containing PAHs were released from the Barrett Plant into the Penobscot River.

42. On information and belief, barges that were and are regularly used to deliver large amounts of tar and tar-containing materials to the Barrett Plant have released hazardous substances into Dunnett's Cove during the period the Barrett Plant has been owned and/or operated by Barrett Paving.

43. On information and belief, hazardous substances and hazardous wastes from the Barrett Plant have been released into the Penobscot through sewers, overland flow of water and/or tidal action during the period the Barrett Plant has been owned and/or operated by Barrett Paving.

**D.    Facts Specific To Defendant Beazer East, Inc.**

44. Pursuant to one or more agreements with Citizens, including an agreement dated September 26, 1955, Koppers Company, Inc. ("Koppers") agreed to purchase all of the tar produced at the Bangor Gas Works.

45. Pursuant to one or more agreements with Citizens, including a September 26, 1955 lease agreement, Koppers leased a portion of the Bangor Gas Works' property, upon which Koppers conducted various tar-related operations.

46. Koppers purchased large quantities of tar from Citizens and conducted tar operations on the MGP Site, as provided for in the 1955 agreements.

47. Koppers controlled, managed, and directed various activities related to tar produced at the Bangor Gas Works.

48. On information and belief, Koppers also conducted tar operations at the Maine Central Railroad Rail Yard and otherwise on the banks of the Penobscot River.

49. Koppers was and is responsible for all tar that it purchased from Citizens or from any other entity, including any owner of the Bangor Gas Works.

50. Through a merger and a name change, Koppers became Beazer East, Inc.

51. Beazer East is successor to the liabilities of Koppers Company, Inc.

**E.     Facts Specific To Defendant Dead River Company**

52. From the late 1800s until approximately 1987, coal distribution and storage yards (the "Coal Yards") operated on the banks of Dunnett's Cove.

53. In addition to being the home of coal storage and distribution operations, the Coal Yards at various times held tanks and/or barrels containing oil, gas and/or other petroleum-related products.

54. Various parties, including Bacon, Robinson & Co., J.F. Woodman & Co., Hinks Coal Co. and Stickney & Babcock Fuel Co., owned one or more of the Coal Yards at various times.

55. Hinks Coal Co. merged into Stickney & Babcock Fuel Co. in or about 1969.

56. Stickney & Babcock Fuel Co. acquired J.F. Woodman & Co. in or about 1972.

57. Through transactions in or about 1975 and 1976, Dead River Company acquired Bacon, Robinson & Co. and Stickney & Babcock Fuel Co., as well as the Coal Yards themselves; Dead River Company retained ownership of the Coal Yards until in or about 1980.

58. Dead River Company is the successor to Bacon, Robinson & Co., J.F. Woodman & Co., Hinks Coal Co. and Stickney & Babcock Fuel Co, and is therefore responsible for each of their liabilities.

59. The subsurface materials, consisting mainly of fill, at the former site of the Coal Yards contains elevated levels of PAH, as well as subsurface ash, coal and slag.

60. In 2004, contractors working at the former site of the Coal Yards discovered a substantial deposit of coal tar underground behind the bulkhead between the Coal Yards and Dunnett's Cove.

61. The tar and other materials containing PAHs found in the subsurface of the Coal Yards entered Dunnett's Cove through tidal action and subsurface and surface erosion.

62. Sewers historically located in the Coal Yards drained directly and without treatment into the Penobscot River.

63. Significant fires occurred at the Coal Yards on several occasions during their history, including a catastrophic fire in 1949 that destroyed substantially all of the facility; such fires caused substantially increased amounts of poly-aromatic hydrocarbons (otherwise known as PAHs).

64. During the fires at the Coal Yards, coal and coal byproducts were released into the Penobscot River.

65. Thousands of tons of water were used to extinguish the several fires at the Coal Yards; that water became polluted and, upon information and belief, drained into Dunnett's Cove through sewers, groundwater and/or by overland flow.

**F.    Facts Specific To Defendant Maine Central Railroad Company**

66. Maine Central Railroad was chartered in or about 1856 and began operating in Bangor in or about 1862.

67. The rail yard in Bangor, Maine, (the "Rail Yard"), which occupies more than 30 acres along the banks of Dunnett's Cove, operated for more than a century as a terminal for MEC.

68. The Rail Yard served as a point of departure and as a station for loading and unloading cargo including wood and paper pulp, coal, oil and tar for countless trains over the years.

69. For a number of years, the operators of the Rail Yard used the banks of Dunnett's Cove to store large amounts of coal.

70. Two large tar storage tanks located at the Rail Yard existed at various locations on that property over the years, including locations close to the banks of Dunnett's Cove.

71. During operation of the Rail Yard by MEC, a number of spills of PAH-containing materials occurred there, and contaminants from some or all of those spills reached Dunnett's Cove.

72. A 1984 report on a spill at the Rail Yard described "negligence, apathy and inappropriate testing of equipment," as well as a prevalence of "archaic attitudes" toward environmental pollution.

73. The soil at the Rail Yard was contaminated with tar and other materials containing PAHs. That contaminated soil has recently been covered to prevent human exposure.

74. Significant fires occurred at the Rail Yard on several occasions during its history, including fires at the coal storage near the river; such fires substantially increased the amount of PAHs in the area.

75. At least until the 1960s, sewers in the Rail Yard drained, directly and without treatment, into the Penobscot River.

76. On information and belief, during the more than 100 years that the Rail Yard operated as a terminal for MEC, numerous spills of tar and other PAH-containing materials occurred—either accidentally or through the negligence, apathy and inappropriate testing of

equipment described in the 1984 report—and drained into Dunnett's Cove through sewers, groundwater and/or by overland flow.

**G.     Facts Specific To Defendant Guilford Transportation Industries, Inc.**

77.     Maine Central Railroad was purchased by Guilford Transportation Industries, Inc. in or about 1981.

78.     Guilford has operated MEC in such a manner that it is liable for the activities of MEC, including liabilities related to the operation of the Rail Yard.

**H.     Facts Specific To Defendant United States Army Corps Of Engineers**

79.     On several occasions beginning in or about 1908, the Corps participated in dredging activities on the Brewer side of the Penobscot River.

80.     During these dredgings, tens of thousands of cubic yards of sediment and debris were removed from the bottom of the Penobscot River on the Brewer side of the river.

81.     Some or all of the sediment and debris removed from the bottom of the Penobscot on the Brewer side of the river was subsequently dumped into Dunnett's Cove on the Bangor side of the Penobscot.

82.     On information and belief, the sediment and debris removed from the Brewer side of the Penobscot and dumped on the Bangor side of the Penobscot contained tar and other hazardous substances and hazardous wastes, some of which may have originated at the manufactured gas plant in Brewer.

**I.     Facts Specific To Defendant UGI Utilities, Inc.**

83.     The manufactured gas plant known as the Bangor Gas Works operated as a manufactured gas plant in Bangor, Maine from approximately 1851 until 1978.

84.     From approximately 1851 until 1948, Bangor Gas Light Company was nominally the owner and operator of the Bangor Gas Works.

85. American Gas Company owned and operated the Bangor Gas Works through Bangor Gas Light Company from in or about 1901 until in or about 1928.

86. American Gas Company merged into United Gas Improvement Company in or about 1925.

87. UGI Utilities, Inc., is successor to the liabilities of United Gas Improvement Company and American Gas Company.

88. To the extent any tar was discharged or released from the Bangor Gas Works to Dunnett's Cove through 1928, American Gas Company, and therefore UGI, bears liability for costs and damages related to those discharges or releases.

**J. Facts Specific To Defendant CenterPoint Energy Resources Corp.**

89. American Gas & Power Company owned and operated the Bangor Gas Works through Bangor Gas Light Company (renamed Bangor Gas Company in or about 1941) from in or about 1928 until in or about 1944.

90. American Gas & Power Company, through a series of mergers and name changes, eventually became CenterPoint Energy Minnegasco, a division of CenterPoint Energy Resources Corp.

91. CenterPoint is successor to the liabilities of American Gas & Power Company.

92. To the extent any tar was discharged or released from the Bangor Gas Works to Dunnett's Cove through 1944, American Gas & Power Company, and therefore CenterPoint, bears liability for costs and damages related to those discharges or releases.

**K. Facts Specific To Defendant North American Utility Construction Company**

93. North American Utility Construction Company contracted to purchase the Bangor Gas Works from Citizens in or about 1963.

11

94. NAUCC owned and/or operated the Bangor Gas Works both through its own actions and through the actions of its subsidiary, Maine Utility Gas Co. ("MUGC"), from in or about 1963 until in or about 1978.

95. NAUCC is liable for the activities of MUGC related to the Bangor Gas Works.

96. MUGC and NAUCC ceased operations at the MGP Site in or about 1978.

97. NAUCC and MUGC sold the Bangor Gas Works and associated operations to the City of Bangor in or about 1978.

98. When NAUCC and MUGC turned the Bangor Gas Works over to the City in or about 1978, an agent of the City found the facilities to be in a severe and dangerous state of disrepair.

99. When NAUCC and MUGC sold the MGP Site to the City, they left pollutants in the soil and in underground vessels that were released to the environment during and after NAUCC's and MUGC's ownership and operation of the Bangor Gas Works.

## COUNT I

### Cost Recovery Under CERCLA § 107(a)

100. Citizens repeats and incorporates by reference the allegations contained in paragraphs 1 through 99 of this Complaint.

101. Under a Settlement Agreement between the City and Citizens, the City has assigned to Citizens all of its claims against the Defendants in this action related to the cleanup of Dunnett's Cove.

102. Citizens and the City spent several years and millions of dollars investigating the contamination in Dunnett's Cove.

103. The money that Citizens and the City expended on its Dunnett's Cove investigation, including qualifying attorney's fees, were necessary costs of response under CERCLA, and were consistent with the National Contingency Plan, 40 C.F.R. Part 300 ("NCP").

104. Dunnett's Cove is a facility within the meaning of CERCLA.

105. Releases and threatened releases of hazardous substances, as those terms are defined in CERCLA, have occurred in Dunnett's Cove.

106. Each of the Defendants is responsible for the contamination in Dunnett's Cove under CERCLA § 107(a).

107. Because each Defendant qualifies as a responsible party under CERCLA § 107(a), each Defendant is liable for its equitable share of Citizens' and the City's response costs.

## COUNT II

## Contribution Under CERCLA § 113(f)

108. Citizens repeats and incorporates by reference the allegations contained in paragraphs 1 through 107 of this Complaint.

109. Citizens, the City of Bangor, DEP and the State of Maine reached a settlement agreement embodied in the Consent Decree that the Court entered as a final judgment in Civil Case No. 02-0183.

110. Pursuant to the terms of the Consent Decree, Citizens has paid $7.625 million towards the cleanup of Dunnett's Cove.

111. Citizens' $7.625 million payment is a necessary cost of response under CERCLA, and is consistent with the NCP.

112. The Consent Decree also obligates the City to effectuate the cleanup of Dunnett's Cove to the satisfaction of DEP, and provides that the City will pay any costs above the amount paid by Citizens.

113. Any money that the City spends on the remedy in excess of the $7.625 million paid by Citizens would be a necessary cost of response under CERCLA, and will be spent consistent with the NCP.

114. Because each Defendant qualifies as a responsible party under CERCLA § 107(a), each Defendant is liable for its equitable share of Citizens' $7.625 million payment.

115. Because each Defendant qualifies as a responsible party under CERCLA § 107(a), each Defendant is liable for its equitable share of any amounts to be spent by the City in excess of Citizens' $7.625 million payment.

## COUNT III

### Declaratory Judgment

116. Citizens repeats and incorporates by reference the allegations contained in paragraphs 1 through 115 of this Complaint.

117. The City is likely to incur future response costs under the Consent Decree in connection with the cleanup of Dunnett's Cove.

118. A justiciable controversy presently exists regarding the allocation of future response costs incurred by the City under the Consent Decree.

119. Pursuant to 28 U.S.C. § 2201(a) and 42 U.S.C. § 9613(g)(2), the Court may enter a judgment declaring rights and liabilities concerning future response costs.

120. To the extent the Court allocates liability for the City's future response costs in connection with the cleanup of Dunnett's Cove, Citizens is entitled to a declaration that each of the Defendants is liable for an equitable share of those future response costs.

## COUNT IV

### Common Law Contribution

121. Citizens repeats and incorporates by reference the allegations contained in paragraphs 1 through 120 of this Complaint.

122. Each of the Defendants is liable in tort for any harm to Dunnett's Cove that occurred in connection with its operations on or near Dunnett's Cove.

123. Citizens has paid the cost of cleaning up hazardous substances and other materials in Dunnett's Cove for which each of the Defendants is responsible.

124. The City has already paid, and may pay in the future, the cost of cleaning up hazardous substances and other materials in Dunnett's Cove for which each of the Defendants is responsible.

125. As a joint tortfeasor, each Defendant is responsible for an equitable share of the overall liability for the costs described in the preceding paragraphs.

## COUNT V

### Common Law Indemnity

126. Citizens repeats and incorporates by reference the allegations contained in paragraphs 1 through 125 of this Complaint.

127. Each Defendant is directly responsible for any harms caused by the release of hazardous substances or other materials into Dunnett's Cove as a result of its operations.

128. Citizens and the City have paid the cost of cleaning up hazardous substances and other materials in Dunnett's Cove for which it was only vicariously liable.

129. Under the Consent Decree, the City may spend money cleaning up hazardous substances and other materials in Dunnett's Cove for which it was only vicariously liable.

130. Because Citizens has paid a settlement that discharges each Defendant's liability to other parties, because the City has signed a Consent Decree obligating it to cleanup the property, and because the City has assigned its claims against the Defendants to Citizens, each Defendant must indemnify Citizens for an amount corresponding to the harms for which it is directly responsible.

## COUNT VI

### Negligence

131. Citizens repeats and incorporates by reference the allegations contained in paragraphs 1 through 130 of this Complaint.

132. Each of the Defendants had a duty to undertake its operations on or near Dunnett's Cove with ordinary care.

133. Each of the Defendants breached its duty of care by causing and/or permitting one or more releases of hazardous substances or other materials into Dunnett's Cove.

134. Citizens has incurred various costs that were a reasonably foreseeable consequence of the releases into Dunnett's Cove that were caused by each of the Defendants.

135. The City has incurred and will incur in the future various costs that were a reasonably foreseeable consequence of the releases into Dunnett's Cove that were caused by each of the Defendants.

136. Releases of hazardous substances or other materials into Dunnett's Cove that were caused by each of the Defendants have injured Citizens by proximately causing it to incur these costs.

137. Releases of hazardous substances or other materials into Dunnett's Cove that were caused by each of the Defendants have injured the City by proximately causing it to incur these costs.

138. The City has assigned its claims against the Defendants to Citizens.

139. Citizens is entitled to damages from each of the Defendants for injuries that were proximately caused by each Defendant's negligence.

## COUNT VII

### Contractual Indemnity Against Defendant Beazer East, Inc.

140. Citizens repeats and incorporates by reference the allegations contained in paragraphs 1 through 139 of this Complaint.

141. Pursuant to a lease agreement dated September 26, 1955, Koppers Company, Inc. agreed to indemnify Citizens for injuries caused by the negligence of Koppers Company, Inc. in its operations on the leased premises.

142. Defendant Beazer East, Inc., as the successor of Koppers Company, Inc., must indemnify Citizens for all damages covered by the indemnity clause of the agreement mentioned in the previous paragraph and for any other damages covered by indemnification agreements between Citizens and Koppers Company, Inc.

## REQUESTED RELIEF

WHEREFORE, Citizens Communications Company respectfully requests that the Court enter legal judgment against each of the Defendants and in favor of Citizens with the following relief:

(a) Legal, Declaratory and Equitable relief as set forth above, and

(b) Attorneys fees, interest, costs and such other and further relief as the Court may deem just and proper.

Dated: August 3, 2007

                                            Respectfully submitted,

                                            _____ */s/* Martha C. Gaythwaite_____
                                            Martha C. Gaythwaite
                                            Attorney for Citizens Communications
                                            Company

FRIEDMAN GAYTHWAITE WOLF & LEAVITT
Six City Center, P.O. Box 4726
Portland, ME 04112-4726
(207) 761-0900

**Of Counsel:**
John S. Hahn
Jay C. Johnson
Mayer, Brown, Rowe & Maw LLP
1909 K Street, N.W.
Washington, D.C. 20006
      (202) 263-3000