# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

FRONTIER COMMUNICATIONS )
COMPANY, )
           )
      Plaintiff, )
           )
v. )           Civil Action No. 07-00113-GZS
           )
BARRETT PAVING MATERIALS, INC., )
et al, )
           )
      Defendants. )

## DEFENDANT CENTERPOINT ENERGY RESOURCES CORP.'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

## MOTION

Defendant, CenterPoint Energy Resources Corp. ("CenterPoint"), by and through its counsel of record, hereby moves this Court for summary judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure regarding the allegations in Plaintiff's Complaint. The reason for this motion, as set forth in the incorporated memorandum of law is that there is no genuine issue of fact in dispute and CenterPoint is entitled to judgment as a matter of law.

## INCORPORATED MEMORANDUM OF LAW

### I.      INTRODUCTION AND SUMMARY OF ARGUMENT

In <u>United States v. Bestfoods</u>, 524 U.S. 51 (1998), the Supreme Court confirmed the "bedrock principle" that a parent corporation will generally not be responsible for any liability of its subsidiaries under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601 <u>et seq</u>. ("CERCLA"). 524 U.S. at 61-62. This decision is consistent with the well-established principle that shareholders have limited liability for corporate debts. The <u>Bestfoods</u> case was followed by a steady stream of decisions concluding that a shareholder is not

responsible for environmental cleanup costs of a company in which it holds shares, even if the company is a wholly owned subsidiary and the shareholder's officers and directors were significantly involved in the operation of the subsidiary company.

The claims by Frontier Communications Company f/k/a Citizens Communications Company ("Frontier" or "Plaintiff") in this case fly in the face of these well-established principles by seeking to hold a former parent corporation and former shareholder of the Bangor Gas Light Company ("Bangor Gas") responsible for environmental cleanup costs attributable to the operations of Bangor Gas without any evidence that the shareholder had day-to-day involvement in any aspect of the operations of the Bangor Gas Works, much less its waste operations.  Because these claims are defective under CERCLA, they must be dismissed.

Two separate Courts of Appeal have looked at facts virtually identical to those alleged to have existed in the relationship between Bangor Gas and CenterPoint's predecessor, American Gas & Power Company ("AG&P") and found that the parent corporation did not have liability under CERCLA.  See Atlanta Gas Co. v. UGI Utilities, Inc., 463 F.3d 1201 (11th Cir. 2006) ("Atlanta Gas"); Consolidated Edison Co. v. UGI Utilities, Inc., 153 Fed. Appx. 749 (2d Cir. 2005) ("Con Ed").  The Atlanta Gas case involved virtually identical claims against both CenterPoint and UGI, and the Con Ed case involved only UGI on substantially the same facts.  In both Atlanta Gas and Con Ed, the district courts decided on summary judgment that the circumstances did not warrant liability under Bestfoods.  These decisions were affirmed on appeal in the Eleventh and Second Circuits respectively.

Similarly, the First Circuit Court of Appeals confirmed that direct operator liability for a parent under Bestfoods requires proof that the parent participated in environmental or waste disposal activities at the subsidiary's facility.  United States v. Kayser-Roth Corp., 272 F.3d 89, 102

(1st Cir. 2001) ("Kayser-Roth"). Following the precedent set by these cases and their progeny, CenterPoint cannot have CERCLA liability, and CenterPoint is entitled to summary judgment.

## A. Background

### 1. Procedural History

Frontier initiated this action against CenterPoint on August 3, 2007, seeking reimbursement and contribution damages from CenterPoint and other third party defendants under CERCLA as well as common law theories of contribution and indemnity (the "Complaint"). Frontier contends that CenterPoint is liable under Sections 107(a) and 113(f) of CERCLA, 42 U.S.C. §§ 9607(a) and 9613(f), to reimburse it for monies it has paid to settle a claim brought against it by the City of Bangor and for additional monies that the City allegedly incurred or will incur in connection with the environmental cleanup in the portion of the Penobscot River known as Dunnett's Cove. (Compl. ¶ 13.) Frontier's claims against CenterPoint are premised on its allegation that AG&P "owned and operated the MGP Site through Bangor Gas Light Company from in or about 1928 until in or about 1944." (Compl. ¶ 89.)

## II. ARGUMENT AND CITATION OF AUTHORITY

### A. Summary Judgment Must Be Granted Where There Is No Evidence to Support Plaintiff's Case.

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate if the pleadings, affidavits, and other evidence "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." Celotex, 477 U.S. at 323-24.

According to the Supreme Court, summary judgment is required:

> against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex, 477 U.S. at 322 (emphasis added).

Here, because CenterPoint does not bear the burden at trial, it need not support its motion with evidence negating Frontier's claim. See Hinchey v. NYNEX Corp., 144 F.3d 134, 140 (1st Cir. 1998). Rather, CenterPoint may discharge its burden by "showing – that is, pointing out to the district court – that there is an absence of evidence to support [Plaintiff's] case." Celotex, 477 U.S. at 325. Once CenterPoint "avers an absence of evidence to support [Frontier's] case, [Frontier] must adduce specific facts establishing the existence of at least one issue that is both genuine and material." Sheinkopf v. Stone, 927 F.2d 1259, 1261 (1st Cir. 1991) (citations and internal quotations omitted); Maine v. Kerramerican, Inc., 480 F. Supp. 2d 348, 351 (D. Me. 2007); see also United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437-38 (11th Cir. 1991) (en banc). To survive summary judgment, Frontier must "go beyond the pleadings" to "designate specific facts showing that there is a genuine issue for trial." Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 31 (1st Cir. 1990); see also Anderson, 477 U.S. at 250. "The evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial." Mack v. Great Atlantic & Pacific Tea Co., 871 F.2d 179, 181 (1st Cir. 1989).

### B. CenterPoint Is Not Liable for the Ownership or Operation of the Bangor MGP.

Frontier's allegations fail to state even a basic *prima facie* claim under CERCLA against CenterPoint. Frontier's only allegation is that, because AG&P ostensibly owned and operated the Bangor Gas Works through the Bangor Gas Light Company, "[t]o the extent that any tar was

discharged or released from the Bangor Gas Works to Dunnett's Cove through 1944," CenterPoint is liable for those costs. (Compl. ¶ 92.)[1] However, Frontier's claim that AG&P owned and operated the MGP Site from 1928 to 1944 seeks to disguise the fact that Bangor Gas – Frontier's own predecessor – is the company that actually owned and operated the MGP Site during that time. There is no genuine dispute that Bangor Gas was the owner responsible for the operations of the Bangor MGP Site. (Ex. A, City of Bangor v. Citizens Communications Company et al, 437 F. Supp. 2d 180, 185 (D. Me. 2006), Findings of Fact & Conclusions of Law ¶ 31.) AG&P was merely Bangor Gas's shareholder during this time. Because Bangor Gas subsequently merged into Frontier, Frontier is in the curious position of arguing that one of its own constituent corporations was unable to manage its corporate affairs without eccentric shareholder interference.

In order for Frontier to prevail in its claim against CenterPoint, Frontier would have to show that AG&P ignored the corporate formalities of its subsidiary to such an extent that the corporate veil that existed between AG&P and Bangor Gas should be pierced (referred to as "indirect liability") or prove that AG&P directly operated aspects of the Bangor Gas Works specifically related to pollution or environmental compliance instead of or in addition to Bangor Gas (referred to as "direct liability"). See Bestfoods, at 61-66. In such instance the focus is not whether the parent operated the subsidiary but whether the parent operated the subsidiary's facility. Id. at 68. Frontier has provided no evidence that AG&P either "indirectly" or "directly" operated the Bangor Gas Works, as those terms are applied under CERCLA. In fact, all of the corporate records and documents produced by Frontier as relating to Bestfoods liability point to the inescapable

---

[1] Frontier does not specify the nature of its CERCLA claims against CenterPoint and has failed to allege the elements of any of the four categories of CERCLA responsible parties. 42 U.S.C. § 9607(a). Since Frontier does not allege, nor could it, that CenterPoint is the current owner or operator of Dunnett's Cove, a past owner or operator of Dunnett's Cove or a transporter of hazardous substances to Dunnett's Cove, CenterPoint is left to surmise that Frontier intends to claim under Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3), that AG&P "arranged for" the disposal of hazardous substances at Dunnett's Cove.

conclusion that AG&P and Bangor Gas acted wholly within the bounds of a conventional parent/subsidiary relationship. The corporate minutes demonstrate that AG&P's officers and directors acted properly and consistent with their respective corporate roles. While some officers and directors served official roles at both AG&P and Bangor Gas, courts have held that overlapping officers and directors between a parent company and its subsidiary are by no means unusual, and such evidence does not create operator liability under CERCLA for the parent. See Con Ed, 153 Fed. Appx. at 751-52 (citing Bestfoods, 524 U.S. at 69-70). In fact, Bestfoods dictates that there is a presumption that such dual officers when serving the subsidiary are acting on behalf of the subsidiary. See Maine v. Kerramerican, Inc., 480 F. Supp. 2d 348, 353 (citing Bestfoods, 524 U.S. at 69-70).

Frontier's claim is contrary to Bestfoods and its progeny, which establish beyond question that parent corporations acting appropriately within accepted norms of parental oversight cannot be liable for owning and operating the facility of a subsidiary:

> The acts of direct operation that give rise to parental liability must necessarily be distinguished from the interference that stems from the normal relationship between parent and subsidiary. Again norms of corporate behavior (undisturbed by any CERCLA provision) are crucial reference points. Activities that involve the facility but which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability. The critical question is whether, in degree and detail, actions directed to the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility.

BP Amoco Chem. Co. v. Sun Oil Co., 316 F. Supp. 2d 166, 171 (D. Del. 2004) (emphasis in original) (quoting Bestfoods, 524 U.S. at 71-72).[2] The First Circuit Court of Appeals has

<hr />

[2] Numerous other courts have held that considerable parental oversight does not lead to direct liability as long as that oversight is not eccentric under accepted norms. See, e.g., United States v. Friedland, 173 F. Supp. 2d 1077, 1095-97 (D. Colo. 2001) (majority shareholder not liable under CERCLA for subsidiary mine's environmental contamination even though an officer and director of the parent "was involved in decision-making at the site," the

confirmed that <u>Bestfoods</u> requires proof that the parent participated specifically in environmental or waste disposal activities at the subsidiary's facility. <u>Kayser-Roth</u>, 272 F.3d at 102.

Because the claims by Frontier involve corporate activities that occurred prior to 1944, the only available fact evidence is contained in documents. None of the available documents show any eccentric degree of oversight by AG&P agents over the Bangor Gas Works, and none of these documents show that any agents operating solely at the direction of AG&P directed environmental or waste disposal activities at the Bangor Gas Works.

### 1. American Gas & Power Did Not Manage, Direct Or Conduct Bangor Gas's Environmental Or Waste Disposal Operations Or Practices.

In examining the virtually identical facts of AG&P's relationship with Bangor Gas's sister corporation, St. Augustine Gas & Electric Company, the Eleventh Circuit Court of Appeals determined

> Looking at the facts through the prism of corporate norms, as required by <u>Bestfoods</u>, it is clear that [Plaintiff] has not adduced enough evidence of CenterPoint's management of the plant to hold it liable for clean-up costs under CERCLA. As mentioned in the context of UGI, the existence of overlapping officers and directors is not inconsistent with corporate norms. Turning to CenterPoint's two contracts, it is clear that the services they contemplate are not in the nature of operating the plant itself and its polluting capacity.

---

(continued...)

subsidiary paid the parent fees for some engineering services, and employees of the parent "frequently visited . . . the mine"); <u>Schiavone v. Pearce</u>, 77 F. Supp. 2d 284, 286-89, 293 (D. Conn. 1999) (parent not liable under CERCLA for subsidiary's environmental contamination despite the fact that parent and subsidiary shared the same board of directors, several high-ranking officers of the parent were also employed by the subsidiary, and shared board made several decisions relating to acquisition of pollution control equipment); <u>Datron, Inc. v. CRA Holdings, Inc.</u>, 42 F. Supp. 2d 736, 748 (W.D. Mich. 1999) (holding that parental establishment of corporate policies for subsidiary was consistent with parent's investor status); <u>Raytheon Constructors, Inc. v. ASARCO Inc.</u>, 368 F.3d 1214, 1218-20 (10th Cir. 2003) (finding evidence insufficient to establish direct operator liability where president of parent also served as president of subsidiary and liaison between two companies; and on behalf of the subsidiary negotiated ore smelting contract, submitted mineral separation licenses, entered into electric power supply contracts, purchased new transformers, and supervised on-site manager); <u>Bestfoods v. Aerojet-General Corp.</u>, 173 F. Supp. 2d 729, 750-51 (W.D. Mich. 2001) (The district court in <u>Bestfoods</u> after remand from the Supreme Court and the Sixth Circuit found the "record evidence far too thin" to support claim of operator liability where agent of parent corporation actively provided advise to subsidiary on environmental compliance, attended and developed strategy for meetings with state environmental regulators, and advised subsidiary to delay capital expenditures related to environmental matters).

Atlanta Gas, 463 F.3d at 1206-07.

The Court concluded

> It is clear . . . from the totality of the evidence in this record, that
> CenterPoint did not operate the St. Augustine facility itself, and
> certainly did not "manage, direct or conduct operations specifically
> related to pollution, that is, operations having to do with the leakage
> or disposal of hazardous waste." Bestfoods, 524 U.S. at 66-67.

Id. at 1208.

Frontier has not alleged, nor could it, that AG&P "manage[d], direct[ed], or conduct[ed]

operations specifically related to pollution" at the Bangor MGP facility. See Bestfoods, 524 U.S. at

66. Under the Court's order of October 17, 2008, Frontier provided CenterPoint with "all relevant

documents in its possession relating to the so-called Bestfoods corporate structure defense."

Frontier produced several thousand pages of documents. Nothing in these documents provides

evidence to support Frontier's claim that AG&P directly "owned" or "operated" the Bangor MGP.

The documents provided by Frontier are self-explanatory and require no specialized knowledge to

comprehend. They demonstrate that the relationship between AG&P and Bangor Gas was entirely

consistent with corporate norms, which, as the Bestfoods court recognized, does not establish

CERCLA liability. There is no suggestion in the record that AG&P directly operated the Bangor

Gas facility, let alone operated the pollution and environmental compliance related aspects of the

facility. Consequently, Frontier cannot show that CenterPoint is liable under the CERCLA direct

operator theory of recovery.

### a.    The Contracts

Included in the documents produced by Frontier were some unsigned form contracts

ostensibly entered into by AG&P with its various subsidiary companies, including Bangor Gas.

These contracts are not sufficient to establish that AG&P was the operator of its subsidiaries'

facilities. Although no copies of any agreement between Bangor Gas and AG&P have been located, the unsigned versions of form agreements used by AG&P with its subsidiaries indicate that the agreements, by their very terms, left the full operation of the subsidiary company in the hands of the subsidiary company and placed all decision-making authority with the subsidiary company.[3] (See Ex. B, Management Contract, BG03161-65; Ex. C, Engineering Contract, BG03156-60.)

Even assuming the contracts were actually executed and performed, they merely provided a mechanism whereby AG&P provided advice, assistance and recommendations to its subsidiary companies. They do not demonstrate that AG&P operated the Bangor MGP. For example, the form management contract states that the management service provider's function was simply to provide "advice," "assistance," "suggestions" and "recommendations" at the request of the Company [i.e. Bangor Gas], "at all times subject to the direction of the board of directors of [Bangor Gas]." (See Ex. B, Management Contract, at BG03161-65.) Similarly, the engineering contract provides that AG&P would provide services "which from time to time may be authorized by the Company [Bangor Gas]," that AG&P would act under the "general direction of the officers of the Company [Bangor Gas]," and that the Company [Bangor Gas] could terminate the contract at any time. (Ex. C, Engineering Contract, at BG03156-60.) The engineering contract also provided that AG&P shall "act under the general direction of the officers of [Bangor Gas]" and that all work "[would] be carried out in full co-operation with the operating forces of [Bangor Gas]." (Id. at BG03157 & 03159.) Clearly, even if these contracts were in place, they provided that Bangor Gas operated its own facility.

---

[3] AG&P's Board of Directors were authorized to enter into certain management and engineering contracts with the operating subsidiaries in January 1930. (See Statement of Material Facts ¶ 2.) In 1935, AG&P assigned all of the management and engineering contracts to the newly created Public Utilities Management Company ("PUMC"). Ex. F, AG&P Annual Report (1934-1935), BG00520 – BG00559, at BG00524.) The several operating subsidiaries owned 100% of the shares of PUMC. If AG&P entered into these management and engineering contracts with Bangor Gas, they were in effect for only five of the sixteen years of AG&P's stock ownership.

These are the very contracts examined by the District Court and the Eleventh Circuit in Atlanta Gas. As the Eleventh Circuit observed, these contracts do not establish that AG&P operated the Bangor MGP under CERCLA because the roles set forth in them fall within the accepted contours of parental oversight.

> Turning to CenterPoint's two contracts, it is clear that the services they contemplate are not in the nature of operating the plant itself and its polluting capacity. . . . The details of the CenterPoint contract reveal that it contemplates activities in the nature of advice and consultation.

Atlanta Gas at 1207.

The Con Ed decision is similarly instructive because the court refused to impose liability based on allegations that the defendant exerted direct control over the MGPs owned by its subsidiary. See Con Ed, 153 Fed. Appx. at 752 (citing Consolidated Edison Co. v. UGI Utilities, 310 F. Supp. 2d 592, 606-610 (S.D.N.Y. 2004), aff'd in part and reversed in part, 153 Fed. Appx. 749 (2d Cir.2005)).[4]

### b.     SEC Testimony

The documents produced by Plaintiff include excerpts of certain testimony given before the Securities Exchange Commission ("SEC") in the late 1930's and early 1940's. The SEC was apparently conducting hearings related to utility companies' status under the Public Utilities Holding Company Act enacted in 1935. The individuals who gave this testimony were employees of PUMC at the time of the hearings, and they gave the testimony as representatives of PUMC.

---

[4] In Con Ed, the district court concluded there was no Bestfoods liability while noting plaintiff's allegations, among others, that the parent corporation made corporate decisions for its subsidiaries from its own corporate offices; that its board of directors approved decisions pertaining to the subsidiaries' management, including requests for approval of equipment purchases for the MGPs, formation of contracts, and property extensions; that the parent's general manager served as the general manager for all of its subsidiaries; the superintendent of each MGP reported to parent corporation's general manager and obtained his approval before taking any action; the parent corporation installed its own corporate officers and directors as officers and directors of its subsidiaries; and it approved the purchase and erection of a purifier plant at the MGP and the replacement of the gas manufacturing apparatus. Consolidated Edison Co. v. UGI Utilities, 310 F. Supp. 2d 592 (S.D.N.Y. 2004), aff'd in part and reversed in part, 153 Fed.Appx. 749 (2d Cir.2005).

Taken out of context from an unrelated series of proceedings, to the extent that this testimony has any relevance to the current proceeding, it does not establish that AG&P's relationship with its subsidiary companies exceeded the normal bounds of parental oversight.

The Eleventh Circuit examined similar SEC testimony and determined that it did not demonstrate that AG&P operated the subsidiary MGP, St. Augustine Gas. For example, the Eleventh Circuit reviewed the testimony of Mr. Patterson, who was both an employee of the parent and the subsidiary, about work he did at the subsidiary's facility.[5] Citing <u>Bestfoods</u>, the Eleventh Circuit noted that Mr. Patterson was "presumed to have been working on behalf of [the subsidiary]." <u>Atlanta Gas</u>, at 1206 (citing <u>Bestfoods</u>, at 69-70). Similarly, the Eleventh Circuit examined the testimony of Mr. Traver, at the time an officer of AG&P and one or more of its subsidiaries. <u>Atlanta Gas</u>, at 1207. The Court noted that Mr. Traver's testimony confirmed the "advisory and consultative nature of CenterPoint's services." <u>Atlanta Gas</u>, at 1207-1208 (citing <u>Bestfoods</u>, at 66-67).

Frontier has also produced the July 1938 SEC testimony of F.W. Seymour, which was not specifically reviewed by the Eleventh Circuit in <u>Atlanta Gas</u>. (Ex. D, July 19, 1938, Testimony of F.W. Seymour Before the United States Securities and Exchange Commission, F002649 - F002743.) However, Mr. Seymour's testimony does not lead to any perspectives or conclusions different from those gleaned from the similar testimony reviewed by the Eleventh Circuit in <u>Atlanta Gas</u>. At the time of Mr. Seymour's testimony in 1938, he was testifying in his capacity as President of PUMC about the role of PUMC. In 1929, 1932, and from 1934 until his death in 1941, Mr. Seymour was also a director of both Bangor Gas and AG&P. (<u>Compare, e.g.</u>, Ex. E, AG&P Annual Report (1932), BG00583 – BG00599 (containing list of AG&P directors and officers only);

---

[5] The Eleventh Circuit's discussion of Mr. Patterson's testimony relates to a time period when he was employed by UGI and the St. Augustine subsidiary.

Ex. F, AG&P Annual Report (1934-35), BG00520 – BG00559 (containing list of AG&P directors and officers only); and Ex. G, AG&P Annual Report (1940) BG00241 – BG00300 (containing list of both AG&P and Bangor Gas directors and officers) with Ex. H, Annual Report to the Maine Public Utilities Commission (1932), BGRG0007426 – BGRG0007463 (containing list of Bangor Gas directors and officers only); and Ex. I, Annual Report to the Maine Public Utilities Commission (1935), BGRG0007539 – BGRG0007576 (containing list of Bangor Gas directors and officers only); see also Statement of Material Facts ¶ 7-8.)[6] Nothing contained in Mr. Seymour's testimony shows that AG&P's relationship with Bangor Gas eccentrically exceeded the norms of parental oversight. See Bestfoods, 524 U.S. at 69-70. There is also nothing in Mr. Seymour's testimony to overcome the Bestfoods presumption that he acted on behalf of Bangor Gas when serving as an officer of Bangor Gas. Id. Moreover, and most significantly, there is nothing in Mr. Seymour's testimony remotely suggesting that AG&P had any involvement with the pollution or environmental compliance at the Bangor Gas facility. See Bestfoods, at 66-67 (to be an operator under CERCLA, operation must be "specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations").

### c.    Kayser-Roth

The First Circuit in Kayser-Roth has followed the Bestfoods standard and confirmed that direct parent liability under Bestfoods requires proof that the parent participated in environmental or waste disposal activities at the subsidiary's facility. Kayser-Roth, 272 F.3d at 102. In finding the parent liable in Kayser-Roth, the First Circuit noted the District Court's findings that Kayser-Roth, the parent corporation, had exercised "pervasive control" over its subsidiary's environmental affairs. Id. at 102. The presence of a Kayser-Roth representative who was "neither an officer nor a director of" the subsidiary and who "directly exerted operational control over environmental matters

---

[6] Mr. Seymour was also an officer of both Bangor Gas and AG&P for each of these years except 1932. Id.

at the [subsidiary's] facility" was a compelling piece of evidence for the Court. Id. at 103. Noting

the Bestfoods holding that it is entirely appropriate for joint officers or directors to wear two hats,

the First Circuit was careful to note that if the District Court had premised its findings on the actions

of joint officers or directors, a finding of parental liability "might be questionable." Id.[7]

Unlike Kayser-Roth, there is nothing in this record to indicate that any agent of only AG&P

was on the grounds making operational decisions at the Bangor Gas facility. Although there were

several AG&P officers who also served as officers or directors of Bangor Gas, this "wearing of two

hats" was expressly sanctioned by the Bestfoods and Kayser-Roth Courts as an arrangement that

does not create CERCLA liability. There is no evidence that any sole agent of AG&P directly

participated in any of Bangor Gas's operations, let alone operations specifically related to pollution.

In fact, the General Managers of the Bangor Gas facility during AG&P's ownership of Bangor Gas

were solely employed by Bangor Gas and had no role at AG&P. (Compare, e.g., Exs. E, F, and G

with Exs. H and I; see also Statement of Material Facts ¶ 7-8.)

>    **2.      American Gas & Power Did Not "Indirectly Operate" the Bangor Gas
>              Facility Because Frontier Has Failed to Allege Facts Sufficient to Pierce
>              its Own Corporate Veil.**

The documents produced by Frontier also are not sufficient to establish that CenterPoint has

indirect operator liability through a corporate veil-piercing theory. Frontier cannot seek to pierce its

own corporate veil. Even if it could, the facts dictate a decision not to pierce the corporate veil.

>        **a.      Frontier Cannot Pierce Its Own Corporate Veil**

---

[7] Similarly, the facts were appreciably different in this Court's denial of a motion for summary judgment to dismiss a CERCLA direct liability claim in Maine v. Kerramerican, Inc., 480 F. Supp. 2d 348, 351 (D. Me. 2007). In Kerramerican, there were several employees of the parent company heavily involved in the operations at the subsidiary's facility despite having no formal relationship with the subsidiary. Id. at 354-56. Also, the record contained testimony from employees of the parent that they directed operations at the subsidiary's facility solely as employees of the parent. Id. There is no such testimony here, and no available evidence that employees wearing only AG&P "hats" directly managed operations at the Bangor Gas Works.

By seeking to pierce Bangor Gas's corporate veil, Frontier effectively argues that its own corporate form should be disregarded. Frontier admits that it merged with Bangor Gas in 1948 and that Frontier is Bangor Gas's surviving entity. (See Citizens Communications Company Answer and Counter Claim, Civ. Action No. 02-183-B-S, ¶12.) Frontier and Bangor Gas are therefore legally the same corporate entity.

As the present-day equivalent of Bangor Gas, Frontier is equitably estopped from seeking to disregard Bangor Gas's corporate form and hold CenterPoint indirectly liable for Bangor Gas's actions. Because veil-piercing doctrine is equitable in nature, it is only available to third parties, and it may not be used by a subsidiary to pierce its own veil in an attempt to attach liability to the parent corporation. McCarthy v. Azure, 22 F.3d 351, 362-63 (1st Cir. 1994) (citing In re Rehabilitation of Centaur Ins. Co., 238 Ill. App. 3d 292, 300-301 (Ill. App. Ct. 1992) (barring a subsidiary from piercing its own corporate veil in order to reach its parent because "the equitable remedy lies with third parties")); see also Intergen N.V. v. Grina, 344 F.3d 134, 149-50 (1st Cir. 2003). "[A] corporation may not pierce its own veil, because to do so would have the effect of denying the corporation its own corporate existence." Flocco v. State Farm Mut. Aut. Ins. Co., 752 A.2d 147, 155 (D.C. 2000) (quotations omitted).

The rule against allowing a corporation to disregard its own corporate form holds true whether Maine or federal veil-piercing law is applied.[8] Schenley Distillers Corp. v. U.S., 326 U.S. 432, 437 (1946) ("[C]orporate entities . . . will not be disregarded where those in control have deliberately adopted the corporate form in order to secure its advantages."); Alford v. Frontier

---

[8] The Supreme Court in deciding Bestfoods declined to decide whether state or federal corporate veil-piercing law should be applied in a CERCLA action, 524 U.S. at 63 n.9, and recognized the U.S. District Court of Massachusetts' observation that "the choice between state and federal law may in many cases present questions of academic interest, but little practical significance." Id. (citing In re Acushnet River and New Bedford Harbor Proceedings, 675 F. Supp. 22, 33 (D. Mass. 1987)). Under either application, piercing Bangor Gas' corporate veil is not justified in this case.

Enterprises, Inc., 599 F.2d 483, 484 (1st Cir. 1979) (applying federal veil-piercing law and holding that a litigant may not "use the corporate form both as shield and sword at his will"); In re Crowe Rope Indus., LLC, 307 B.R. 1 (Bankr. D. Me. 2004); Sturtevant v. Town of Winthrop, 732 A.2d 264, 270 (Me. 1999) (an entity that "has voluntarily adopted the corporate form to engage in business is precluded from asking courts to disregard that form merely because the [entity] is disadvantaged by its use"); Bonnar-Vawter, Inc. v. Johnson, 173 A.2d 141 (Me. 1961); 18 Am. Jur. 2d Corporations § 46 (1985) ("Generally, the corporate veil is never pierced for the benefit of the corporation or its stockholders."). Therefore, Frontier is legally estopped from asserting that its own corporate form should be disregarded and that the corporate veil between Bangor Gas and its former shareholders should be pierced.

### b. Frontier Has Admitted That Bangor Gas Was a Legitimate Corporation

Frontier is also estopped from arguing that Bangor Gas was AG&P's alter ego because Frontier admitted Bangor Gas's legitimacy by contracting and merging with Bangor Gas in 1948. A party who contracts with a corporation admits its corporate existence and is estopped from arguing that the same corporate entity does not exist. Close v. Glenwood Cemetery, 107 U.S. 466, 477 (1883) ("One who deals with a corporation as existing in fact is estopped to deny as against the corporation that it has been legally organized."); Puma Indus. Consulting, Inc. v. Daal Assocs., Inc., 808 F.2d 982, 986 (2d Cir. 1987) ("One who contracts with or otherwise deals with a body of persons as a corporation thereby admits that they are a corporation . . . ."); Lichtenstein v. Consol. Servs. Group, Inc., 978 F. Supp. 1 (D. Me. 1997); Seven Star Grange No. 73, Patrons of Husbandry v. Ferguson, 56 A. 648, 649 (Me. 1903); 8 Fletcher Cyclopedia of Private Corp. § 3910 (2001). Because its merger with Bangor Gas constitutes an admission that Bangor Gas was a legitimate and

separate corporate entity, Frontier may not conversely argue here that Bangor Gas was a sham corporation.

### c. Maine's Two-Prong Test for Piercing the Corporate Veil

In order to pierce the corporate veil, Maine courts apply a two-prong test. Johnson v. Exclusive Props. Unlimited, 720 A.2d 568, 571 (Me. 1998); Snell v. Bob Fisher Enterprises, Inc., 106 F. Supp. 2d 87, 90 (D. Me. 2000). First, the party requesting that the court pierce must show that the accused has dominated, abused, or misused the corporate form. Johnson, 720 A.2d at 571; Ex. J, Alternative Nursing Care, Inc. v. C.H. Wright, Inc., No. Civ.A. CV-01-168, 2003 WL 21911056, at *3 (Me. Super. June 2, 2003) (where the accused party "abused the privilege of a separate corporate identity").[9] Second, the party must show that some unjust or inequitable result is likely if the court acknowledges a separate corporate entity. Johnson, 720 A.2d at 571. This two-prong test requires the court to balance the policy of "'encouraging business development with the policy of protecting those who deal with the corporation.'" Snell, 106 F. Supp. 2d at 90 (quoting Johnson, 720 A.2d at 571).

Even if Frontier were not estopped from making veil-piercing arguments, there is no evidence establishing that equity warrants veil-piercing in this case. Piercing the veil of a subsidiary corporation to hold a parent liable for the subsidiary's actions is generally impermissible, unless "the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud, on the shareholder's behalf." Bestfoods, 524 U.S. at 62. Maine courts are generally reluctant to disregard the legal entity and will do so only when necessary to promote justice. Johnson, 720 A.2d at 572. The record produced by Frontier does not contain any facts that would warrant the piercing of Bangor Gas's corporate veil under the Maine two-prong test.

### (1) Prong One: Abuse of the Corporate Form.

---

[9] All unpublished opinions referenced in this memorandum are attached as Exhibit J.

In determining whether the corporate form has been abused, Maine courts have considered twelve factors: (1) common ownership; (2) pervasive control; (3) confused intermingling of business activity, assets, or management; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporate assets by the dominant shareholders; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud. Johnson, 720 A.2d at 571 (relying on the factors used by Massachusetts courts); Snell, 106 F. Supp. 2d at 90. All factors should be considered, but common ownership alone is not enough to establish a *prima facie* showing that piercing the corporate veil is proper. Snell, 106 F. Supp. 2d at 92.

There is no evidence in the several thousand pages of documents Frontier produced under the Court's order of October 17, 2008 to support a finding of any of these twelve factors. These documents speak for themselves and are not the type of documents that are subject to interpretation or opinion, and any attempt to infer a meaning other than that conveyed by their plain words would be speculative. See Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995). The absence of information supporting a veil-piercing claim is resounding.

For example, as evidenced by its annual filings with the Maine Public Utilities Commission, the documents show that Bangor Gas was separately capitalized, reported profits and paid dividends. These annual reports contain detailed financial and accounting information regarding the operations of Bangor Gas. (See, e.g., Ex. K, Annual Report to the Maine Public Utilities Commission (1920), BGRG0006986 – BGRG0007019; Ex. H, Annual Report to the Maine Public Utilities Commission (1932), BGRG0007426 – BGRG0007463; Ex. I, Annual Report to the Maine Public Utilities Commission (1935), BGRG0007539 – BGRG0007576; Ex. L, Annual Report to the

Maine Public Utilities Commission (1938), BGRG0007651 - BGRG0007690; Ex. M, Annual Report to the Maine Public Utilities Commission (1941), BGRG0007779 – BGRG0007819; see also Statement of Material Facts ¶ 6.) The assets of each subsidiary and AG&P were not commingled, but instead were treated as separate accounts. The financial statements contained in the audited Annual Reports of AG&P also showed separate accounting treatment for each subsidiary. (See, e.g., Exs. E, F, and G; see also Statement of Material Facts ¶ 7.) There was also never complete overlap of officers and directors. (Compare, e.g., Exs. E, F, and G with Exs. H and I; see also Statement of Material Facts ¶ 8.) During its corporate relationship with AG&P, Bangor Gas had its own local general manager who was not an employee, officer or director of AG&P. (Id.; see also Statement of Material Facts ¶ 9.)

Finally, the management and engineering contracts that supposedly existed between Bangor Gas and AG&P tend to seriously undermine an "indirect operator" claim because they show that Bangor Gas and AG&P recognized and respected corporate separateness. (See Exs. B and C; see also Statement of Material Facts ¶ 2.) If AG&P saw Bangor Gas as a mere puppet upon which to exert pervasive control, it would have no use for service contracts. It could simply force its will on Bangor Gas without resort to legal formalities such as contractual relationships between two legal entities. To the contrary, these documents and the other available documentary evidence show that AG&P recognized and respected the corporate separateness of Bangor Gas.

In Snell, the United States District Court for the District of Maine refused to pierce the corporate veil when the plaintiff claimed that a company and subsidiary were commonly owned; that their assets were commingled because checks were written between the two; and that one of the corporations was thinly capitalized. Snell, 106 F. Supp. 2d at 91-92. In Amburgey v. Automatic Ski USA, Inc., the court chose not to pierce, despite plaintiff's "unsupported and vague allegations

of control," because the mere fact that the parent corporation placed certain individuals on the boards of its subsidiaries did not constitute "clear and convincing evidence required to pierce the corporate veil." Ex. J, No. 2:06-CV-149-GZS, 2007 WL 1464380 at *6 (D. Me. May 17, 2007).

In the present case, Frontier can point to no evidence that AG&P abused the corporate form. In fact, all available evidence supports the opposite conclusion – that AG&P respected the corporate formalities and that Bangor Gas operated as a separate legal entity from 1928 to 1944.

### (2) Prong Two: An Unjust Result Must Be Likely if the Court Acknowledges a Separate Corporate Entity.

The second prong of the Maine veil-piercing test requires the court to determine whether an unjust or inequitable result will occur if the corporation is viewed as a separate entity. Johnson, 720 A.2d at 571. The court must "balance the equities" to determine if justice demands that the veil be pierced. Snell, 106 F. Supp. 2d at 92. The interests of fairness may require courts to apply more stringent standards for veil-piercing in a contractual relationship, as the party seeking relief presumably entered the agreement with the corporate entity knowingly and voluntarily. Theberge v. Darbro, Inc., 684 A.2d 1298, 1301 (Me. 1996). As a result, that party is expected absorb the consequences of dealing with a limited liability business form. Id.

There can be no suggestion AG&P participated in a fraud or that an unjust result will occur. Bangor Gas owned and operated the Bangor MGP facility for over one hundred years. Although AG&P was the sole shareholder of Bangor Gas for nearly twenty years, there is no evidence suggesting that AG&P abused Bangor Gas's corporate form, or that AG&P ever used Bangor's separate legal identity as a sword to commit fraud or as a shield to avoid its own liabilities. Holding CenterPoint liable for the actions of Bangor Gas is not necessary to avoid an unjust result. In fact, it would be much more unjust to allow a corporation to shirk the consequences of its own employees' actions by placing the blame for environmental contamination on a legitimate former shareholder

who has had no relationship with the former subsidiary for over sixty years. Since Frontier cannot point to any evidence sufficient to satisfy either prong of Maine's two-part test for piercing the corporate veil, it fails as a matter of law to prove that AG&P was an "indirect operator" of the Bangor Gas Works for CERCLA purposes.

## III.  CONCLUSION

For the reasons stated herein, Defendant CenterPoint Energy Resources Corp. respectfully requests that its Motion for Summary Judgment be granted and that Plaintiff's Complaint be dismissed with prejudice.

Dated: April 27, 2009                     Respectfully submitted,

*/s/ John H. Grady*
John H. Grady
Jones Day
1420 Peachtree Street, N.E.
Atlanta, Georgia  30309-3053
Ph.:  (404) 521-3939
Fax:  (404) 581-8330
jhgrady@jonesday.com

Charles T. Wehland, Esq.
Jones Day
77 West Wacker Drive, Suite 3500
Chicago, IL 60601-1692
Ph.:  (312) 269-4388
Fax:  (312) 782-8585
ctwehland@jonesday.com

David S. Sherman, Jr.
Drummond Woodsum & MacMahon
245 Commercial Street
P.O. Box 9781
Portland, Maine 04104-5081
Ph:  (207) 772-1941
dshermancf@dwmlaw.com

Attorneys for Defendant
CenterPoint Energy Resources Corp.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 27, 2009 a copy of the DEFENDANT CENTERPOINT ENERGY RESOURCES CORP.'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to the registered participants as identified on the Notice of Electronic Filing (NEF).

<div style="margin-left: 50%;">

/s/ John H. Grady
John H. Grady
Jones Day
1420 Peachtree Street, N.E.
Atlanta, Georgia  30309-3053
Ph.  (404) 581-3939
Fax:  (404) 581-8330
jhgrady@jonesday.com

</div>

ATI-2360884v13