# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| FRONTIER COMMUNICATIONS CORPORATION, | )<br>)<br>) Civil Action No. 1:07-cv-00113-GZS |
| Plaintiff, | )<br>) |
| v. | )<br>) |
| BARRETT PAVING MATERIALS, INC., *et al.*, | ) |
| Defendants. | |

## PLAINTIFF FRONTIER COMMUNICATIONS CORPORATION'S OPPOSITION TO DEFENDANT CENTERPOINT ENERGY RESOURCES CORP.'S MOTION FOR SUMMARY JUDGMENT

Pursuant to the Federal Rules of Civil Procedure and the Local Rules of this Court, Plaintiff Frontier Communications Corporation ("Frontier") respectfully submits this opposition to Defendant CenterPoint Energy Resources Corp. ("CenterPoint")'s Motion for Summary Judgment.

## INTRODUCTION

In October of last year, the Magistrate Judge issued a scheduling order that permitted the filing of "early dispositive motions"—*i.e.*, motions that did not "require additional formal discovery to resolve." The Magistrate left CenterPoint and similarly situated Defendant UGI Utilities, Inc. ("UGI") to decide whether they were prepared to file Rule 56 motions at this "early" stage in the present case. Given that discovery against CenterPoint and UGI in the prior, related litigation was stayed before its completion, and that discovery in the present case has not yet begun, it is surprising that CenterPoint alone has concluded this is an appropriate time to move for summary judgment.

The issues on which CenterPoint seeks summary judgment are quintessentially factual. CenterPoint claims that, as a matter of fact, its predecessor did not "operate" the Bangor Gas

1

Works manufactured gas plant. CenterPoint also argues that the facts of the relationship between its predecessor and the Bangor Gas Light Company ("BGLC") do not justify the equitable remedy of veil piercing. CenterPoint admits that it has not "support[ed] its motion with evidence negating Frontier's claim." Instead, CenterPoint's motion attempts to "point[] out . . . an absence of evidence to support [Plaintiff's] case." It challenges Frontier to "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial."

The evidence already available and presented in connection with this opposition brief and statement of material facts meets CenterPoint's challenge head-on. The evidence designated by Frontier shows why the Maine Public Utility Commission, which had regulatory authority over the Bangor Gas Works, concluded that CenterPoint's predecessor "took over the operation of" that facility after buying the stock of BGLC in 1928. The parent company directed the installation of new gas production equipment at Bangor—the same equipment that is alleged to have polluted Dunnett's Cove. More than that, the parent company exercised authority over all the important workings of the Bangor plant and its business, adhering to the philosophy that "central operation is far superior to local operation." This philosophy also caused CenterPoint's predecessor to regularly overstep its bounds and ignore the corporate separateness of its subsidiary, BGLC. Frontier's evidence shows that CenterPoint's predecessor conducted BGLC business on its own stationery, neglected to hold BGLC board meetings or keep adequate records of BGLC business, and required BGLC personnel to seek parent company approval for even the smallest expenditures. This and a great deal of other evidence, taken in the light most favorable to Frontier, precludes entry of summary judgment in CenterPoint's favor.

**BACKGROUND**

After years of litigation, this Court is no doubt familiar with BGLC, the entity incorporated in 1850 to own and operate the manufactured gas plant in Bangor, Maine known as

the Bangor Gas Works. During the early 20th century, BGLC's stock was owned by a series of companies, including the American Gas & Power Company ("AG&P"), a predecessor of Defendant CenterPoint. Opposing Statement of Material Facts ("OSMF") ¶¶ 1, 3. AG&P bought BGLC's stock in 1928, and sold it in 1944.[1] OSMF ¶ 1. In between, as explained in more detail below, AG&P managed and controlled all important details of BGLC's business, including the operation of the Bangor Gas Works.

AG&P's ownership of BGLC coincided with the passage of the Public Utility Holding Company Act of 1935 ("PUHCA" or the "Act"). This law was directly relevant to AG&P, which owned a number of utilities across the country, including BGLC. Indeed, to evade the strictures of the Act, AG&P shifted its management activities into the hands of a new entity, Public Utilities Management Corporation ("PUMC"), whose stock was nominally owned by AG&P's subsidiaries. OSMF ¶¶ 5, 6, 7, 8. Functionally, however, AG&P continued to manage its utilities. OSMF ¶ 10. A U.S. Securities and Exchange Commission ("SEC") investigation eventually uncovered AG&P's efforts to circumvent the PUHCA, and forced AG&P to terminate PUMC's service contracts with AG&P's subsidiary corporations. OSMF ¶ 10, 11.

The management activities of AG&P and PUMC at the Bangor Gas Works raise numerous issues of material fact that preclude the granting of CenterPoint's summary judgment motion. As discussed below and set forth in Frontier's Opposing Statement of Material Facts, the evidence in this case is sufficient for a reasonable fact-finder to conclude that CenterPoint's predecessor was both an operator of the Bangor Gas Works under CERCLA and subject to veil-piercing liability for the activities of BGLC.

---

[1] Bangor Gas Light Company changed its name to Bangor Gas Company in 1941, during AG&P's ownership. OSMF ¶ 2. Frontier uses the abbreviation "BGLC" to refer to both entities throughout this opposition paper.

ARGUMENT

Under Federal Rule of Civil Procedure 56(c), CenterPoint must demonstrate two things in order to prevail on its motion for summary judgment: (1) that "the pleadings, the discovery and disclosure materials on file and any affidavits show that there is no genuine issue of material fact" and (2) "that the movant is entitled to judgment as a matter of law." Moreover, "it is elementary that at summary judgment a court must view the record in the light most favorable to the nonmoving party and draw reasonable inferences in favor of the same." *Chadwick v. WellPoint, Inc.*, 561 F.3d 38, 41 (1st Cir. 2009). In this light especially, CenterPoint's motion fails to fulfill Rule 56(c)'s requirements.

I. **CenterPoint is directly liable under CERCLA for any contamination caused by releases from the Bangor Gas Works.**

The U.S. Supreme Court's decision in *United States v. Bestfoods*, 524 U.S. 51 (1998), makes clear that two separate and distinct legal routes are available to a plaintiff seeking to hold a parent corporation liable under CERCLA for contamination at a facility owned by the corporation's subsidiary. First, a plaintiff may establish ***direct*** liability by showing that the parent corporation itself was an "operator" of the relevant facility. *See id*. at 64. Second, a plaintiff may establish ***indirect*** or derivative liability by piercing the veil between the parent and its subsidiary. *See id*. at 63-64.

In the present circumstances, CenterPoint is both directly and indirectly liable under CERCLA § 107(a) due to the acts of its acknowledged predecessor, American Gas & Power Company ("AG&P"). Frontier will first address CenterPoint's direct liability as an operator of the manufactured gas plant known as the Bangor Gas Works.

## A. A parent company with decision-making authority that knows and approves of contamination-causing activities is an operator for CERCLA purposes.

### 1. Under Bestfoods, "operation" may include either day-to-day, physical control over a facility or managerial discretion over it.

One of the Supreme Court's basic holdings in *Bestfoods* is simply stated in the opinion's opening paragraph. "[A] corporate parent that actively participated in, and exercised control over, the operations of the facility itself may be held directly liable in its own right as an operator of the facility." *Id*. at 55. After *Bestfoods*, no doubt exists about the possibility of holding a parent company directly liable as a facility operator under CERCLA § 107(a). The more difficult question, and the question on which the Supreme Court gave less guidance, is what sort of active participation in and control over a facility qualifies a parent company as an operator.

One of the difficulties facing the Court in *Bestfoods* stemmed from CERCLA's circular, and therefore unhelpful, definition of the term "operator." The Court accordingly employed the plain meaning of "operator," recognizing that "in the organizational sense more obviously intended by CERCLA, the word ordinarily means 'to conduct the affairs of; manage; *operate a business*.'" *Id*. at 66 (emphasis in original) (brackets omitted). "So," the Court concluded, "under CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility." *Id*.

The Court's emphasis on "operation" encompassing managerial tasks is unmistakable. Operation "obviously mean[s] something more than mere mechanical activation of pumps and valves . . . ." *Id*. at 71. The term "must be read to contemplate 'operation' as including the exercise of discretion over the facility's activities." *Id*. In other words, operation is not control over the day-to-day activity of running the facility's processes, but rather control over the policy-level, discretionary decisions about how to run the facility's processes in the first place.

## 2. Knowledge and approval of, and discretion over, activities at a facility constitute operation of that facility.

CenterPoint ignores this distinction between the day-to-day, physical operation of a plant and the plant's managerial operation. Its motion for summary judgment uses terms like "participated specifically in" and "directly participated in" to describe *Bestfoods* standard for operator liability. Docket No. 113, Defendant CenterPoint Energy Resources Corp.'s Motion for Summary Judgment and Incorporated Memorandum of Law ("Mot.") at 7, 13. These phrases fail to capture the type of managerial operation described by the Court in *Bestfoods*. More significant, CenterPoint's narrow understanding of "operation" ignores the First Circuit's elaboration on *Bestfoods* in *United States v. Kayser-Roth Corp.*, 272 F.3d 89 (1st Cir. 2001).

Applying the *Bestfoods* standard, the First Circuit in *Kayser-Roth* concluded that the defendant parent company's activities placed it "squarely within the Supreme Court's definition of operator liability." 272 F.3d at 102. The key factual findings on which the Court of Appeals based this determination were: (1) that the parent company "***knew***" its subsidiary "employed a scouring system that used TCE [the contaminant at issue]"; (2) that the parent company "***approved*** the installation of that [scouring] system"; (3) that the parent company ordered that its legal department "be notified of any governmental agency or court contact regarding environmental matters"; and (4) that the parent company "***essentially was in charge*** in practically all of [the subsidiary's] operational decisions, including those involving environmental concerns." *Id*. (emphasis added) (quoting *United States v. Kayser-Roth Corp.*, 724 F. Supp. 15, 19, 22-23 (D.R.I. 1989)).[2] The factors cited by the First Circuit, in addition to

---

[2] Notably, the district court in *Kayser-Roth* found that the subsidiary's officers had the "autonomy" that was "necessary to operate the facility on-site from day to day," including authority over "hiring and firing hourly employees and ordering inventory." *Kayser-Roth*, 272 F.3d at 103 (quoting *Kayser-Roth*, 724 F. Supp. at 20). In other words, the parent company was

6

being the governing law in this case, are much more in tune with the Supreme Court's view of "managerial operation" under CERCLA than the more stringent test advocated by CenterPoint. If a parent company knows and approves of the processes that caused the contamination at issue, and has decision-making authority at the facility, it is an operator for CERCLA purposes.

### B. CenterPoint's predecessor was not only aware of, but also directed, key operations at the Bangor Gas Works.

CenterPoint does not deny that its predecessor, AG&P, was the sole shareholder of the Bangor Gas Company for approximately 16 years, from 1928 through 1944. OSMF ¶¶ 1, 3. During that time, AG&P instituted significant changes to the gas manufacturing processes at the Bangor Gas Works plant, and exercised managerial direction over the plant's operations. This is precisely the sort of knowledge and discretionary control that creates operator liability under CERCLA.

*1. CenterPoint's predecessor made extensive operational changes at the Gas Works, including installation of an entirely new gas production system.*

According to the Maine Public Utility Commission ("MPUC"), when AG&P "acquired ownership of the [BGLC] stock" in 1928, it also "***took over the operation*** of the [Bangor Gas Works] property." OSMF ¶ 12 (emphasis added). This contemporaneous description of AG&P as an "operator" at the Bangor facility is not to be taken lightly, especially in light of the Supreme Court's use of that term's "ordinary and natural meaning" (*Bestfoods*, 524 U.S. at 66). The fact that the relevant state regulatory body viewed AG&P as "taking over" the "operation" of the gas plant "property" strongly suggests the existence of a material factual dispute between Frontier and CenterPoint over AG&P's status as an operator under CERCLA. An examination

---

liable because it enjoyed discretionary authority over activities at the facility, even though it was ***not*** making daily operational decisions.

of AG&P's activities at the Bangor Gas Works reveals numerous additional facts that point toward operator liability, and preclude summary judgment.

From the outset of its ownership, AG&P undertook a program to modernize gas production at the Bangor Gas Works. MPUC reports indicate that soon after AG&P "took over" in 1928, "extensive additions and improvements were made at the gas plant, to the extent that the major portion of the MGP was rebuilt." OSMF ¶ 13. M.K. Patterson, Director of Operations for PUMC, testified before the Securities and Exchange Commission ("SEC") that additional changes were made to the Bangor plant under the direction of PUMC, including the installation of a smaller "water gas" set, with auxiliaries, in 1936, installation of a second, larger "water gas" set in 1939, and addition of a "secondhand purifier" in 1942. OSMF ¶¶ 14, 15, 16.[3]

AG&P and PUMC's direct involvement in these extensive changes to the production capabilities of the Bangor Gas Works is strikingly parallel to the role of the parent corporation in *Kayser-Roth*. Indeed, the parent in *Kayser-Roth* was described as merely having "approved" the installation of a TCE-based process (272 F.3d at 102), whereas the evidence recounted above indicates that AG&P and PUMC directed the installation of new manufactured gas equipment that generated tar byproducts consistent with the contaminants now present in Dunnett's Cove.[4]

---

[3] It is impossible to argue that the officers of AG&P and PUMC were acting in their capacities as officers of BGLC when they directed the installation of these new manufactured gas processes. The personnel in question did not even receive salaries from BGLC. OSMF ¶ 39. Their status as officers of that entity accordingly was nominal at best. Moreover, BGLC paid AG&P and PUMC for the services BGLC received. OSMF ¶¶ 26, 30, 33. If the officers were not acting on behalf of the relevant management company, those payments would have been for nothing. These facts are more than sufficient to overcome any presumption that dual officers wear the "hat" of the subsidiary when dealing with the subsidiary's affairs.

[4] The Court's Findings and Conclusions from the prior incarnation of this litigation state that water gas tar is present in Dunnett's Cove. *See* Case No. 02-cv-0183, Docket No. 658, Findings of Fact and Conclusions of Law ("Findings and Conclusions") ¶ 49 (noting that from 1932 through 1949, the Bangor Gas Works used a carbureted water gas process that "generated

Thus—at a bare minimum—CenterPoint's predecessor knew and approved of that equipment's operation. As in *Kayser-Roth*, such knowledge and approval of hazardous substance releases justifies a finding that AG&P was an operator of the Bangor Gas Works.

2. *CenterPoint's predecessor exercised discretion over operation of the Gas Works.*

AG&P's operation of the Bangor Gas Works did not stop with the multiple installations of new equipment that generated tar byproducts. Extensive testimony before the SEC reveals that AG&P enjoyed thoroughgoing discretion over the operation of the Gas Works. For example, PUMC's President explained that before 1935, AG&P had "***operated*** the properties or, rather, ***managed*** the properties" owned by its subsidiaries (including the manufactured gas plant in Bangor). OSMF ¶ 17 (emphasis added).[5] When PUMC became AG&P's surrogate, its involvement in these "properties" continued to embrace management of numerous operating details, such as manufacturing, distribution and utilization of gas. OSMF ¶ 18. PUMC also "initiate[d] ideas and projects" for AG&P's subsidiaries "[c]ontinuously," and its "daily duty" included "check[ing] the operations of the [subsidiary] company with a view to effecting operating economies." OSMF ¶ 19. To that end, PUMC employed a Director of Operations with responsibility for "engineering, construction and similar service to the subsidiary companies," as well as "operation of the properties."

PUMC's President summarized AG&P and PUMC's philosophy in this way: "[A] good syndicated operation or ***central operation is far superior to local operation***." OSMF ¶ 20

---

petroleum tar"); *id.* ¶ 79 (concluding that the Bangor Gas Works "discharged tar-laden wastewater into Dunnett's Cove").

[5] The distinction between "operation" and "management," to the extent AG&P's President was making one, is irrelevant for purposes of direct operator liability under CERCLA. *See Bestfoods*, 524 U.S. at 66 ("[U]nder CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility.")

9

(emphasis added). The SEC, after an in-depth investigation, concluded that PUMC was putting this "central operation" philosophy into practice. The agency's report on PUMC found that the "duties" of PUMC's President and Secretary/Treasurer were "almost exclusively central management activities." OSMF ¶ 23. The officers in charge of PUMC's Operation Department and Procurement Department, who "participat[ed] actively" in the "control functions" performed by the President and Secretary/Treasurer, also "perform[ed] some services that relate directly to the operations of the subsidiary companies . . . ." OSMF ¶ 24. Put differently, the SEC's review of testimony from PUMC's officers led it to the conclusion that PUMC was performing both discretionary management and daily operational functions for AG&P subsidiaries, including BGLC.[6] At the very least, this evidence creates a triable issue of fact on the question of CenterPoint's status as an operator of the Bangor Gas Works.

### 3. AG&P and PUMC operated the Bangor Gas Works through specialized service contracts with BGLC.

As CenterPoint acknowledges, the evidence shows that AG&P entered into Management and Engineering Contracts with its subsidiaries, including the Bangor Gas Company. *See* Mot. at 9 & n.3; OSMF ¶¶ 25, 26, 30. These service contracts were one, but certainly not the only, means by which AG&P (and later PUMC) exercised discretion over the operations of plants owned by its subsidiaries. A brief review of their terms offers additional insight into the extent and nature of AG&P's operation of the Bangor Gas Works.

To begin with, AG&P's Management Contract provided that AG&P would "***manage the plants and properties*** of the [subsidiary] Company." OSMF ¶ 27 (emphasis added). On its own,

---

[6] As noted above, the SEC also determined that PUMC was performing the functions of AG&P in an effort to evade the restrictions created under the PUHCA, and that AG&P's payments to PUMC were essentially payments to AG&P. *See supra* at 2-3 & OSMF ¶¶ 6, 10. In other words, PUMC and AG&P were, for practical purposes, the same entity. CenterPoint's suggestion that PUMC's formation exonerates AG&P from responsibility as an operator (*see* Mot. at 9, n.3) cannot be reconciled with the SEC's conclusion.

10

this language is strong evidence that AG&P was directly involved in the operation of the facilities owned by its subsidiaries. The Management Contract's details point in the same direction, describing the extensive "services" that AG&P's departments would provide to its subsidiaries, including "[a]ccounting, purchasing, new business, advertising, technical, inspection, corporation records, treasury and financial service." OSMF ¶¶ 28, 29. AG&P's Engineering Contract separately provided that AG&P would also "act as consulting, designing and supervising engineers in all engineering work" at its subsidiaries' plants, and that AG&P would "supervise the construction of such work." OSMF ¶ 31. These design and supervision services were specifically defined to embrace "[t]he design and supervision of the construction and substantial additions, extensions or alterations to," among other things, "[g]as generating plants, by-product plants, equipment, storage holders, and distribution systems." OSMF ¶ 32. PUMC's Service Contract, which BGLC signed in 1938, included descriptions of services virtually identical to those in the AG&P Management and Engineering Contracts. OSMF ¶¶ 33, 34, 35, 36.

Pursuant to these service contracts, AG&P—and later PUMC—were involved in every aspect of the operation of the Bangor Gas Works, from accounting to engineering. Taken in the light most favorable to Frontier, these facts suffice to demonstrate that AG&P "direct[ed] the workings of, manage[d], or conduct[ed] the affairs of" (*Bestfoods*, 524 U.S. at 66) the Bangor Gas Works facility.[7]

---

[7] CenterPoint contends that because the service contracts contain language indicating that the activities of AG&P were subject to the authorization of BGLC's Board of Directors, the contracts cannot be indicative of AG&P's operation of the Gas Works. *See* Mot. at 9. This claim is wrong on three fronts. First, although CenterPoint pulls a few phrases from the Management Contract and uses them out of context (Mot. at 9), the agreement is not merely for the provision of "advice" or "suggestions." It plainly states that "[i]n connection with supervising the management and operations of the business of [BGLC], the services of the

**C. The decisions of courts regarding CenterPoint's *Bestfoods* liability at other locations are irrelevant here.**

CenterPoint's argument relies heavily on its contention that "[t]wo Courts of Appeal have looked at facts virtually identical to those alleged to have existed in the relationship between [BGLC] and CenterPoint's predecessor . . . ." Mot. at 2 (referencing *Atlanta Gas Co. v. UGI Utilities, Inc.*, 463 F.3d 1201 (11th Cir. 2006) and *Consolidated Edison Co. v. UGI Utilities, Inc.*, 153 Fed. Appx. 749 (2d Cir. 2005)).[8] The effort to short-circuit this Court's review of the evidence in the present case is wrong on multiple levels.

First, the question of whether a parent corporation is directly or indirectly liable under CERCLA is by definition a location-specific inquiry. The fact that a court concluded AG&P was not operating a plant in Florida does not say anything about AG&P's activities in Bangor, Maine. Each case is different. The plaintiff in *Atlanta Gas*, for instance, did not even allege that the veil between AG&P and its subsidiary should be pierced. 463 F.3d at 1204. Here, as discussed below, the evidence for veil piercing is voluminous. With respect to operator liability, the plaintiffs in *Atlanta Gas* appear to have relied on "the existence of overlapping officers and directors" and AG&P's service contracts with its predecessors. *Id*. at 1207. The evidence in the present case offers a number of additional data points, including statements of the relevant state

---

following departments of [AG&P] ***will be furnished***." OSMF ¶ 28 (emphasis added). The contract then lists more than two single-spaced pages worth of services. OSMF ¶ 29. Second, "operation" under CERCLA includes managerial operation, but it is not limited to operation through management. AG&P's participation in operating activities at the Gas Works through a service contract is accordingly sufficient to demonstrate operation. Third, CenterPoint ignores the fact that AG&P officers and directors made up a majority of the officers and directors of the Bangor Gas Company. As explained below, AG&P's relationship to its subsidiaries, understood in historical context, breached the norms of corporate behavior.

[8] Only one of these cases, *Atlanta Gas*, involved CenterPoint's predecessor AG&P. As their titles reveal, both cases involved the predecessor of another Defendant, UGI Utilities, Inc. But UGI has not joined CenterPoint in moving for summary judgment against Frontier's claims in this case.

regulatory body, MPUC, the contemporary sworn testimony of AG&P and PUMC officers, and independent investigations of operations and finances at the Bangor Gas Works.

Moreover, it seems clear that the law in the Eleventh Circuit regarding operator liability is substantially more parent-friendly than the rule in the First Circuit under *Kayser-Roth*. For example, the Court of Appeals in *Atlanta Gas* observed that AG&P's Engineering Contract provides for "general engineering advice and assistance on proposed additions, extensions and alterations," as well as "design, supervision and construction" on those plant changes. 463 F.3d at 1207. Yet the panel concluded that these activities did not constitute "operation" of the facility. *Id*. In *Kayser-Roth*, by contrast, the First Circuit found a parent company liable as an operator based in part on the fact that the parent "knew" and "approved" the installation of a process that led to the release of hazardous substances. 272 F.3d at 102.

Finally, both CenterPoint and the Eleventh Circuit in *Atlanta Gas* focus heavily on "whether or not corporate norms [were] observed" by the parent corporation. 463 F.3d at 1204; *see* Mot. at 6-10. That inquiry, while in some ways tangentially relevant to the question of operator liability, is primarily a means of determining whether it is appropriate to pierce the corporate veil. *See Bestfoods*, 524 U.S. at 62 (noting that "the corporate veil may be pierced . . . when, *inter alia*, the corporate form would otherwise be misused to accomplish certain wrongful purposes"). The key issue in terms of operator liability is whether the parent's ***activities at the facility*** itself constitute "operation" under CERCLA, not whether those activities hewed to "corporate norms." *See id*. at 65 ("CERCLA's 'operator' provision is concerned primarily with direct liability for one's own actions."). The evidence discussed in detail above is more than sufficient to demonstrate that under the legal standards applicable in the First Circuit, CenterPoint's predecessor was operating the Bangor Gas Works.

## II. CenterPoint's predecessor was the *alter ego* of the Maine corporation that owned the Bangor Gas Works.

As already noted, direct, operator liability under CERCLA § 107(a) is not the only method of holding a parent company liable for activities at a facility owned by its subsidiary. The Supreme Court's opinion in *Bestfoods* also identified an entirely separate possibility: derivative CERCLA liability imposed under the traditional veil-piercing principles of corporate law. *See* 524 U.S. at 62.[9] The evidence in this case, taken in the light most favorable to Frontier, also justifies the imposition of this "indirect" CERCLA liability on CenterPoint.

### A. In circumstances like those in the present case, veil piercing is an appropriate equitable remedy.

CenterPoint's frames its primary argument against indirect liability as an equitable one. According to CenterPoint, "Frontier is equitably estopped" from piercing Bangor Gas Company's veil. Mot. at 14. Ironically, this equitable argument hinges on the highly formalistic proposition that Frontier is "legally the same corporate entity" and "the present-day equivalent" of BGLC. *Id.* Frontier merged with BGLC about 40 years ago. It makes no sense as a matter of logic or equity, however, to describe Frontier as the "same corporate entity" as the company that was founded in 1850 to operate the Bangor Gas Works.

CenterPoint rightly observes that the "veil-piercing doctrine is equitable in nature." *Id.* But it fails to lay out accurately the equities in the present case. Unlike the plaintiff in *McCarthy v. Azure*, 22 F.3d 351, 362 (1st Cir. 1994), Frontier is not a shareholder seeking to pierce the veil of his own subsidiary. Rather, when Frontier merged with BGLC, the latter entity had no

---

[9] The Court declined to answer the related question of whether state or federal veil-piercing law should govern this inquiry. *See id.* at 63 n.9. CenterPoint indicates that the difference between state and federal law is in this instance irrelevant, and proceeds to cite cases employing Maine law. *See* Mot. at 14-19 & n.8. Frontier will accordingly focus its arguments on Maine law.

corporate parent.  Moreover, the events relevant to Frontier's claim against CenterPoint took place in the 1930s and 40s, two decades before Frontier and BGLC merged.

Under these circumstances, Frontier is—as a matter of equity—akin to "an innocent third party disadvantaged by *someone else's* blurring of the line between a corporation and the person [or company] who controls it . . . ." *Id*. at 363 (emphasis added).  Certainly, it is not Frontier, or even BGLC, that "is claimed to have obscured the line" between a subsidiary and its parent (*id*.). As discussed below, CenterPoint's predecessor AG&P was the one who was abusing the corporate form of its subsidiaries. CenterPoint's effort to block any investigation into the relationship between AG&P and its subsidiaries flips the vital equitable principles on their head. Instead of inquiring into the facts surrounding AG&P's activities, CenterPoint wants to invoke corporate formalities—the merger of BGLC into Frontier in 1948—to avoid its own potential liability.  The cases CenterPoint cites do not support such an inequitable outcome.

    **B.**    **Substantial evidence demonstrates that the Bangor Gas Company was a mere puppet of CenterPoint's predecessor.**

The basic veil piercing rule in Maine is relatively simple and easily satisfied.  Plaintiffs seeking to impose liability on parent corporations need only show that: "(1) the defendant abused the privilege of a separate corporate identity; and (2) an unjust or inequitable result would occur if the court recognized the separate corporate existence." *Johnson v. Exclusive Properties Unlimited*, 720 F.2d 568, 571 (Me. 1998).  Maine courts consider "a variety of factors" to determine when a defendant has abused its separate corporate identity, including, among others, "common ownership," "pervasive control," "nonobservance of corporate formalities," "absence of corporate records," "nonfunctioning of officers and directors" and "use of the corporation for

15

transactions of the dominant shareholders." *Id*. In short, Maine courts are free to "disregard the theory of separate corporate existence to prevent injustice or inequitable consequences." *Id*.[10]

### 1. CenterPoint's predecessor abused the privileges of BGLC's separate corporate identity.

Surprisingly, CenterPoint asserts that "[t]here is no evidence in the several thousand pages of documents Frontier produced . . . to support a finding of any of" the factors Maine courts consider in determining whether a parent company has abused its subsidiary's corporate form. This is far from the truth.[11] The first and most fundamental veil-piercing factor, "common ownership," plainly exists here, because AG&P owned all the stock in Bangor Gas Company (as well as numerous other local gas companies). OSMF ¶ 1. But it is how AG&P used its ownership power that tells the story.

To begin with, AG&P gave its own officers and directors control over Bangor Gas Company by appointing them as a majority of the officers and directors of the subsidiary company. OSMF ¶¶ 37, 38. AG&P's officers were paid by AG&P, even when they ostensibly were working for Bangor Gas Company. OSMF ¶ 39. Most of these AG&P officers (who would later become officers of PUMC) were based in New York, where AG&P was headquartered, and not Bangor. OSMF ¶ 40.

While running BGLC remotely, AG&P's officers and directors regularly ignored the "corporate formalities" that keep a parent separate from its subsidiary. For example, they wrote letters conducting BGLC business on PUMC letterhead, and signed in their capacity as officers

---

[10] Maine's Supreme Judicial Court also has unequivocally held that veil piercing "does not require a finding of fraud or illegality." *Id*. at 572.

[11] Discovery was stayed against CenterPoint in the earlier incarnation of this case before it could be completed. Frontier has subsequently uncovered hundreds of pages of relevant SEC testimony that was not produced by CenterPoint, and believes that CenterPoint may possess other relevant documents. Until discovery is complete, summary judgment is not appropriate.

of PUMC. OSMF ¶ 42. They apparently failed to conduct or failed to record meetings of the "BGLC" board of directors, because the documents produced to date do not include the minutes of any such meetings. OSMF ¶ 48. This inability to maintain basic corporate records for BGLC was noted by the MPUC as well, which could not locate BGLC financial records from the early part of AG&P's ownership. OSMF ¶ 43.

In addition to discarding BGLC's corporate formalities, substantial evidence indicates that AG&P exercised "pervasive control" over BGLC. Some of this evidence is discussed above in the context of AG&P and PUMC's operation of the Bangor Gas Works—a task that should have been handled by a properly-functioning BGLC. *See supra* at 7-13 & OSMF ¶¶ 13-36. In SEC testimony, PUMC's Director of Operations made it clear that PUMC handled "*[e]verything* of an accounting nature, outside the day-to-day routine operations of the local company" for AG&P's subsidiaries. OSMF ¶ 45 (emphasis added). This included, for BGLC, an expenditure limit of $50. OSMF ¶ 46. If someone at BGLC wanted to spend more than that amount, they were required to "consult" with PUMC. OSMF ¶ 46. There is no better evidence of pervasive control over a subsidiary than a mandate that every significant expense be vetted by the representatives of the parent company.

Finally, there is significant evidence in the record that AG&P was using its subsidiaries, including BGLC, to perform "transactions" for its own benefit—a fact confirmed by independent government investigations. For example, the SEC concluded in 1943 that "[t]he debt in the superstructure" of AG&P was "exert[ing] considerable pressure on the holding company's management to draw up from its subsidiary companies maximum cash payments." OSMF ¶ 47. In other words, because AG&P owed too much money, it was forcing its subsidiaries to making higher interest and dividend payments than was healthy for those companies. It is also

noteworthy that an investigation conducted by the MPUC in the early 1940s concluded that BGLC's books overstated the value of the Gas Works by at least $350,000, and that no good explanation existed for this over-valuation. OSMF ¶ 44. These are precisely the sort of "transactions" that can justify veil piercing under Maine law.

Taken together, and in the light most favorable to Frontier, this evidence strongly points toward a finding that CenterPoint's predecessor was abusing the privileges of BGLC's separate corporate identity. Summary judgment on CenterPoint's indirect liability under CERCLA is therefore inappropriate.

> 2. *Expert testimony will be helpful in understanding the operation of public utility holding companies like AG&P during the 1920s, 30s and 40s.*

In addition to the evidence that on its face creates a material issue of fact regarding AG&P's abuse of BGLC's corporate form, the need for expert factual testimony on the veil-piercing issue also should preclude entry of summary judgment in CenterPoint's favor. As already discussed, AG&P's ownership of BGLC spanned the period during which the U.S. Congress passed the PUHCA, a law that was essentially designed to prevent the type of control AG&P was exercising over the Bangor Gas Company. It is a mistake, both historically and legally, to interpret AG&P's relationship to BGLC as if it were a modern parent-subsidiary connection. Frontier plans to call an expert witness, Dr. George Baker of the Harvard Business School, to help put AG&P's control over Bangor Gas Company in historical context.

The testimony of AG&P's witnesses before the SEC begins to paint this vital picture. When Congress enacted the PUHCA, it made illegal AG&P's practice of operating utilities through service contracts that profited the parent company. OSMF ¶ 5. AG&P decided to circumvent the law by forming a shell corporation to handle service contracts with AG&P's subsidiaries. OSMF ¶ 6. The SEC investigated and ultimately invalidated this arrangement,

forcing AG&P to terminate the service agreements between its subsidiary corporations and PUMC. OSMF ¶ 11. The reasons behind the SEC's actions, as well as Congress's original motivations in passing the PUHCA, are all relevant to understanding how holding companies like AG&P dealt with their subsidiaries—and for present purposes, must be viewed in the light most favorable to Frontier (*see Chadwick*, 561 F.3d at 41). Expert testimony on these subjects will give context to the documents produced by CenterPoint that cannot be gained through a dry reading of them. Because no experts have yet been designated, much less deposed, in this matter, summary judgment is unwarranted.[12]

## CONCLUSION

For all the reasons stated above, CenterPoint's motion for summary judgment should be denied.

Respectfully submitted,

Dated: May 18, 2009 /s/ Martha C. Gaythwaite

Martha C. Gaythwaite
FRIEDMAN GAYTHWAITE WOLF & LEAVITT
Six City Center
P.O. Box 4726
Portland, ME 04112-4726
(207) 761-0900

Of Counsel:

John S. Hahn
Jay C. Johnson
MAYER BROWN LLP
1909 K Street, NW
Washington, DC 20006-1101
(202) 263-3000

---

[12] In the prior, related litigation, Frontier had designated Harvard Business School Professor George P. Baker, Ph.D. as its expert witness on the issues raised in CenterPoint's motion for summary judgment. Dr. Baker's designation from that case is attached to Frontier's Statement of Material Facts as Exhibit 12.

### III. CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the date shown below, copies of the following document(s):

**PLAINTIFF FRONTIER COMMUNICATIONS CORPORATION'S OPPOSITION TO DEFENDANT CENTERPOINT ENERGY RESOURCES CORP.'S MOTION FOR SUMMARY JUDGMENT**

was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to the attorney/parties of record who have registered as CM/ECF participants.

Dated: May 18, 2009

Respectfully submitted,

/s/ Martha C. Gaythwaite
Martha C. Gaythwaite
FRIEDMAN GAYTHWAITE WOLF & LEAVITT
Six City Center
P.O. Box 4726
Portland, ME 04112-4726
(207) 761-0900

Of Counsel:

John S. Hahn
Jay C. Johnson
MAYER BROWN LLP
1909 K Street, NW
Washington, DC 20006-1101
(202) 263-3000