UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| FRONTIER COMMUNICATIONS<br>CORPORATION f/k/a CITIZENS<br>COMMUNICATIONS COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>BARRETT PAVING MATERIALS,<br>INC., *et al.,*<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil No. 07-113-B-S |

**RECOMMENDED DECISION ON DEFENDANT
CENTERPOINT ENERGY RESOURCES CORPORATION'S
MOTION FOR SUMMARY JUDGMENT**

Frontier Communications Company commenced this action on August 3, 2007, seeking contribution, indemnity and recovery for costs associated with environmental remediation in Dunnett's Cove, pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601 *et seq.* Defendant CenterPoint Energy Resources Corporation has filed a motion for summary judgment (Doc. No. 113), contending that the evidence is not sufficient to impose liability on it for pollution generated by the Bangor Gas Works between 1928 and 1944, when the facility was owned by a subsidiary of CenterPoint's corporate predecessor. The Court referred the motion to me for report and recommendation in accordance with 28 U.S.C. § 636(b)(1)(B). Although Frontier complains that the motion is premature, it has not interposed a Rule 56(f) motion. Based on my review of the summary judgment record, I recommend that the Court grant the motion.

## FACTS

The following facts are drawn from the parties' competing statements of material facts, filed in accordance with Local Rule 56, and from the record cited in support of those statements. See Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004) (outlining the mandatory procedure for establishing factual predicates needed to support or overcome a summary judgment motion); Toomey v. Unum Life Ins. Co., 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining "the spirit and purpose" of Local Rule 56).

The Bangor Gas Light Company owned and operated the Bangor Gas Works from 1852 until 1948, changing its name to the Bangor Gas Company in 1941.  (Def.'s Statement (DS) ¶ 1, Doc. No. 113-2.)  I refer to this corporate entity as Bangor Gas and the facility as the Gas Works. From 1928 to 1944 the American Gas & Power Company (AG&P) owned all of the shares of Bangor Gas.  (Pl.'s Additional Statement (PAS) ¶ 1, Doc. No. 125.)  AG&P is a corporate predecessor of CenterPoint Energy Resources Corporation, the movant herein.  (Id. ¶ 3.)

Prior to 1935, AG&P's subsidiary corporations, such as Bangor Gas, maintained service contracts with AG&P, pursuant to which AG&P provided "accounting, engineering, purchasing, new business, advertising, inspection, corporation records, treasury, and financial services, for which the holding company [AG&P] was to receive various percentages of the gross income of its subsidiaries."  (Id. ¶ 4;  Findings and Opinion of the SEC dated July 2, 1943, at 44a, Doc. No. 125-5 at 20[1].)  The record contains unexecuted, form agreements developed by AG&P to govern the terms of these relationships.  (AG&P Minutes, Doc. No. 125-12 at 5;  Form "Management Corporation" Agreement, Doc. No. 125-12 at 11-15;  Form "Engineering Corporation"

---

[1]     I have provided a pin cite for the page number of the .pdf document rather than to the Bates stamp number.

Agreement, Doc. No. 125-12 at 6-10.)  Among other provisions, the Management Corporation

Agreement included the following preliminary recitals:

> WHEREAS the Management Corporation [AG&P] is willing to manage the plants and properties of the [subsidiary] Company upon the terms and conditions hereinafter set forth . . . .
>
> The Management Corporation will manage the plants and properties of the Company.  . . . .
>
> In connection with supervising the management and operations of the business of the Company, the services of the following departments of the organization of the Management Corporation will be furnished:  Accounting, purchasing, new business, advertising, technical, inspection, corporation records, treasury and financial service;  the services of those departments being as follows:  . . . .

(PAS ¶¶ 27-29;  Form Mgmt. Corp. Agreement at 12.)[2]

In addition to the form agreement addressing AG&P's provision of services in the role of

"Management Corporation," AG&P utilized another form contract to govern its provision of

services to its subsidiaries in the role of "Engineering Corporation."  That form agreement

included the following recitals:

> The Engineering Corporation shall act as consulting, designing and supervising engineers in all engineering work which may from time to time be authorized by the Company and shall supervise the construction of such work. The Engineering Corporation shall act under the general direction of the officers of the Company.
>
> The scope and character of the work contemplated cover Consulting, Designing and Supervising, and Miscellaneous Engineering Work . . . .

(PAS ¶ 31;  Form Eng'g Corp. Agreement at 7.)  Designing and supervising engineering

included:

---

[2]     CenterPoint notes that Frontier "has produced no evidence showing that Bangor Gas Light Company entered in such a contract with AG&P in 1930."  (Reply Statement ¶ 30.)  I find that it would be fair for the fact finder to draw an inference that the relationship between AG&P and Bangor Gas conformed to AG&P practices at the time.

The design and supervision of the construction of and substantial additions, extensions, or alterations to:

(1)  Gas generating plants, by-product plants, equipment, storage holders, and distribution systems . . . .

The services above described are intended to cover work as listed which can be handled most efficiently and economically by engineers, leaving to local operating forces such work as they are qualified to do . . . .

(PAS ¶ 32;  Form Eng'g Corp. Agreement at 7-8.)

The servicing arrangements in place in the 1930s would have been in violation of the Public Utilities Holding Company Act of 1935 (PUHCA),[3] when that Act became effective. (PAS ¶ 5.)  Consequently, AG&P organized the Public Utilities Management Corporation (PUMC) in 1935 to assume AG&P's service contracts.  (Id. ¶ 6;  DS ¶¶ 3, 5.)  Originally, the stock of PUMC was held by the AG&P subsidiaries rather than by AG&P.  (PAS ¶ 7;  DS ¶ 4.) According to the SEC findings, "all of the officers and employees of American Gas were shifted from the holding company payroll to the payroll of the Management corporation."  (PAS ¶ 8; Findings and Opinion of the SEC at 44a, Doc. No. 125-5 at 20.)  The individuals concerned continued to work from the same premises.  (PAS ¶ 9.)

Due to the manner by which the cost of PUMC's services were allocated among AG&P's subsidiaries, the SEC found that the arrangement failed to conform to the standards of the PUHCA because it did not result in "fair and equitable allocation of costs among the system companies" and resulted in "direct or indirect payment by the operating companies of holding company expenses."  (PAS ¶ 11;  Findings and Opinion of the SEC at 49a, Doc. No. 125-5 at

---

[3]      The PUHCA provided the SEC with regulatory authority over, among other things, accounting and reporting practices used by public utility holding companies.  Am. Power & Light Co. v. SEC, 158 F.2d 771 (1st Cir. 1946).


22.)[4]  In the course of its findings, the SEC indicated its view that "for the most part the activities of the Management corporation are managerial, executive, and policy-forming, as distinguished from services of an operating nature."  (Def.'s Reply Statement (DRS) ¶ 23;  Findings and Opinion at 46a, Doc. No. 125-5 at 21.)  The SEC described one PUMC employee, M.K. Patterson, as being in charge of PUMC's "Operation Department" and found that he performed "some services that relate directly to operations of the subsidiary companies and distinguished from management and control of the companies."  (PAS ¶ 24;  Findings and Opinion at 46a, 48a, Doc. No. 125-5 at 21-22.)  Another AG&P employee, Charles B. Gamble, Jr., was described by the SEC as being in charge of the "Procurement Department" and the SEC found that he "devotes much of his time to operating problems."  (Findings and Opinion at 47a-48a, Doc. No. 125-5 at 21-22.)  Among other findings made by the SEC was the finding that:  "The debt in the superstructure continues to exert considerable pressure on the holding company's management to draw up from its subsidiary companies maximum cash payments."  (PAS ¶ 47;  Findings and Opinion at 28a, Doc. No. 125-5 at 12.)

The record includes a 1938 agreement executed by PUMC and Bangor Gas.  Like the form Management Corporation Agreement used by AG&P prior to 1935, the PUMC agreement described PUMC as "the Management Corporation" and specified that PUMC would "furnish to the Company the following services:  Accounting, engineering, purchasing, new business, advertising, technical, inspection, corporation records, treasury, and financial . . . ."  (PAS ¶¶ 33-

---

[4]        There is a dispute over characterization of the SEC findings.  Frontier asserts that the SEC ordered the termination of all service contracts between PUMC and AG&P's subsidiaries, whereas CenterPoint asserts that PUMC proposed termination of the service contracts.  (PAS ¶ 11;  Def.'s Reply Statement ¶ 11.)  I do not believe this nuanced disagreement is material to the summary judgment determination.  Either way one looks at it, the SEC approved of a new arrangement where PUMC and AG&P would acquire the stock of PUMC and all expenses of PUMC would be paid by AG&P, so that "the service company can no longer be used as a medium for charging the operating companies for the cost of the holding company's exercise of control and supervision."  (Findings and Opinion of the SEC at 50a, Doc. No. 125-5 at 23.)

34;  Agreement Between PUMC and Bangor Gas, Doc. No. 125-13 at 2.)  As to engineering

services, the agreement provided:

> This service in general covers consulting, designing and supervisory engineering
> service under the direction of the officers of the Company on all engineering work
> which may from time to time be authorized by the Company and advice and
> assistance on special technical problems arising in the course of the operations of
> the Company, including specifically:  . . . (5) designing and supervision of the
> construction of substantial additions, extension or alterations to gas generating
> plants, by-product plants, equipment, storage holders and distribution systems
> . . . .

(PAS ¶¶ 35-36;  Agreement Between PUMC and Bangor Gas at 3.)

There is a document in the record labeled "Memorandum to Chairman Southard," the

Chairman of the Maine Public Utilities Commission, regarding a "Proposed Issue of Bonds."

This 1940 memorandum was authored by Leslie E. Little, Appraisal Engineer, and includes a

statement to the effect that "the present owners, American Gas and Power Company, acquired

ownership of the stock and took over the operation of the property in 1928."  According to Little:

"From 1928 to 1931, extensive additions and improvements were made at the gas plant, to the

extent that the major portion was rebuilt."  (PAS ¶¶ 12-13;  Doc. No. 125-6 at 11.)  Among the

exhibits attached to Little's report is an October 15, 1940, letter he directed to Bangor Gas noting

that certain Bangor Gas books and records were missing, including the ledger for the second half

of 1928, all books and records for 1929 and 1930, and records supporting the general ledger for

the years 1931 through and including 1934.  (PAS ¶ 43;  Doc. No. 125-7 at 17.)  In the

concluding remarks of his memorandum, Little expressed doubt whether "anything can be

produced to explain the apparent overstatement of Plant Investment account of the Bangor

Company, which so far I have found to be not less than $350,000."  (PAS ¶ 44;  Doc. No. 125-6

at 30.)

Two letters in the record from August 1941 demonstrate that James P. Reilly, a dual officer of PUMC and Bangor Gas, corresponded with Chairman Southard concerning Bangor Gas business using PUMC letterhead.  (PAS ¶ 42;  Reilly Letters, Doc. Nos. 125-14, 125-15.)

In testimony given to the SEC on December 8, 1942, Morton Kingsley Patterson, whom CenterPoint identifies as an officer of Bangor Gas, PUMC, and AG&P, testified that, in 1936, "[t]he first job there [at the Gas Works] with which I was connected was the installation of a small water gas set, five-foot diameter set which was necessary . . . ."  Mr. Patterson also testified that, in 1939, "a second water gas set, this time of six-foot diameter, was installed," and that, in 1942, he saw to the acquisition of a purifier for the Gas Works, installation of which had begun in 1942, as of the date he gave his testimony to the SEC.  (PAS ¶¶ 14-16;  Official Report of Proceedings Before the SEC, Dec. 8, 1942, at 704-706, Doc. No. 125-8 at 38-40.)  Mr. Patterson described his department within PUMC as "operation[s]."  (PAS ¶¶ 21-22;  Official Report, Dec. 8, 1942, at 673, Doc. No. 125-8 at 7.)  He testified that the local operators of the Gas Works could spend up to $50 for non-routine construction expenditures, but expenditures above that amount for non-routine projects required a work order and consultation with him or with the PUMC office.  (PAS ¶ 46;  Doc. No. 125-8 at 10.)

There is also testimony in the record given by F.W. Seymour, President of PUMC since its organization in 1935.  Mr. Seymour testified as follows concerning management of the Gas Works and other facilities held by AG&P subsidiaries:  "The American Gas & Power Company operated the properties or, rather, managed the properties" prior to the organization of PUMC.  (PAS ¶ 17;  Official Report of Proceedings Before the SEC, July 19, 1938, at 7, Doc. No. 125-9 at 9.)  As for the nature of PUMC's service to AG&P, Mr. Seymour testified:

7

> Our function concerns itself with financial, operating, and all of its details;
> manufacturing, distribution, utilization of gas, sale of services and appliances;
> advising with member companies on questions of finance, refunding, sale of
> securities, preparation of indentures, procuring of accounting and legal services,
> and rendering continuous advice and service on detailed questions of accounting
> and planning, and supervision in laying out of construction programs.

(PAS ¶ 18;  Official Report, July 19, 1938, Doc. No. 125-9 at 11-12.)  Mr. Seymour

acknowledged that PUMC continuously initiated ideas and projects for the respective operating

companies and would daily check operations with a view to effecting operating economies.

(PAS ¶ 19; Official Report, July 19, 1938, at 10-11, Doc. No. 125-9 at 12-13.)  He opined that a

"good syndicated operation or central operation is far superior to local operation," in response to

a question concerning PUMC's service to operating companies of the AG&P group.[5]  (PAS ¶ 20;

Official Report, July 19, 1938, at 14-15, Doc. No. 125-10 at 14-15.)

   The documents produced to date do not contain any minutes from meetings of the Bangor

Gas board of directors.  (PAS ¶ 48.)  Annual reports that Bangor Gas submitted to the Maine

Public Utilities Commission and annual reports that AG&P issued to its stockholders reveal that

four of Bangor Gas's five directors for the years 1932 through 1942 were officers and/or

directors of AG&P with New York City work addresses[6] and that, from 1933 through and

including 1938, the president of Bangor Gas was also the president of AG&P.  Additionally, in

these years (1933-1938) most Bangor Gas officers were employees of AG&P, although the

general manager and one vice president of Bangor Gas were Bangor-based employees of Bangor

---

[5]      CenterPoint offers a qualification to suggest that Mr. Seymour was not clearly talking about PUMC but
about another entity.  (Reply Statement ¶ 20.)  This is a fact question.  The testimony could readily support a finding
that his statement was related to PUMC's services to the AG&P group of companies.

[6]      It is harder to classify personnel prior to 1932 because AG&P's relevant personnel were located in New
York and Michigan, though AG&P's dominance over Bangor Gas's management structure was the case in earlier
years as well.  Also, in at least one year there was an additional Bangor-based director.  I have characterized
personnel in this fashion to reword the broad-brush statements offered by Frontier in paragraphs 37 through 40 of its
additional statement and denied in each instance by CenterPoint.

Gas.  The AG&P-based officers of Bangor Gas were not identified as receiving any salary from

Bangor Gas in its annual reports for this period.  Even the Bangor-based officers were not

identified as receiving any salary from Bangor Gas in 1933 through and including 1936.  (PAS

¶¶ 37-40;  Bangor Gas Annual Reports for 1932-1942, on CD-ROM;  American Gas Annual

Reports for 1932, 1935, 1937, 1941, also on CD-ROM.)

<div align="center">DISCUSSION</div>

Summary judgment "should be rendered if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is

material if its resolution would "affect the outcome of the suit under the governing law," and the

dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  When

reviewing the record for a genuine issue of material fact, the Court must view the summary

judgment facts in the light most favorable to the nonmoving party and credit all favorable

inferences that might reasonably be drawn from the facts without resort to speculation.  P. R.

Elec. Power Auth. v. Action Refund, 515 F.3d 57, 62 (1st Cir. 2008).  If such facts and

inferences could support a favorable verdict for the nonmoving party, then there is a trial-worthy

controversy and summary judgment must be denied.  Azimi v. Jordan's Meats, Inc., 456 F.3d

228, 241 (1st Cir. 2006).

The purpose of the pending summary judgment contest is to determine whether the facts

outlined above are sufficient to demonstrate that CenterPoint is a potentially responsible party by

virtue of being an owner or operator of the Gas Works facility under CERCLA § 107(a)(2), 42

<div align="center">9</div>

U.S.C. § 9607(a)(2),[7] for releases of hazardous substances from the Gas Works for the period during which AG&P (one of CenterPoint's corporate predecessors) owned Bangor Gas.  This is not a foregone conclusion because ownership of the Gas Works was in Bangor Gas, a separately organized corporate subsidiary of AG&P.[8]

In United States v. Bestfoods, the Supreme Court addressed "whether a parent corporation that actively participated in, and exercised control over, the operations of a subsidiary may, without more, be held liable as an operator of a polluting facility owned or operated by the subsidiary."  524 U.S. 51, 52 (1998).  The Court's answer:  "no, unless the corporate veil may be pierced.  But a corporate parent that actively participated in, and exercised control over, the operations of the facility itself may be held directly liable in its own right as an operator of the facility."  Id.  Defendant CenterPoint argues that the evidence in the record is not sufficient to subject it to liability as an operator of the Gas Works facility because the evidence does not demonstrate that AG&P specifically controlled pollution activity at the Gas Works.

---

[7]     CERCLA imposes liability on, among others, "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of[.]"  42 U.S.C. § 9607(a)(2).  The phrase "owner or operator" is defined, unhelpfully, as "any person owning or operating" a facility.  Id. § 9601(20)(A)(ii).

[8]     The Supreme Court explains:

It is a general principle of corporate law deeply "ingrained in our economic and legal systems" that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries.  Thus it is hornbook law that "the exercise of the 'control' which stock ownership gives to the stockholders . . . will not create liability beyond the assets of the subsidiary.  That 'control' includes the election of directors, the making of by-laws . . . and the doing of all other acts incident to the legal status of stockholders.  Nor will a duplication of some or all of the directors or executive officers be fatal."  . . . [N]othing in CERCLA purports to reject this bedrock principle, and against this venerable common-law backdrop, the congressional silence is audible.

Bestfoods, 524 U.S. 61-62 (quoting Douglas & Shanks, Insulation from Liability Through Subsidiary Corporations, 39 Yale L. J. 193, 193 & 196 (1929)) (additional citations omitted).

10

CenterPoint also argues that it cannot be liable as an owner of the facility because the corporate veil that separated AG&P from Bangor Gas should not be pierced on this record.

Before I discuss the CERCLA issues, it has to be noted that there are three state law claims in the complaint (Counts IV, V, and VI) that are not discussed by the parties in their summary judgment memoranda. There is no apparent basis to conclude that these state law claims would call for a different disposition than what I recommend for the CERCLA-related claims (Counts I, II, and III), given the need to pierce the corporate veil for each of them. For that reason, my recommendation concerning piercing the corporate veil extends to the state law claims as well.

**A.      Direct Operation of the Facility**

In <u>Bestfoods</u>, the Supreme Court vacated a Sixth Circuit opinion to the effect that CERCLA liability could only be imposed on a parent in relation to a facility owned by a subsidiary if the circumstances warranted piercing of the corporate veil or a finding that the parent and the subsidiary were engaged in a joint venture. <u>Bestfoods</u>, 524 U.S. at 59-60, 64-67; <u>see</u> <u>also</u> <u>United States v. Kayser-Roth Corp.</u>, 272 F.3d 89, 97-100 (1st Cir. 2001) (discussing <u>Bestfoods</u>, including trial court and circuit court dispositions). The Supreme Court held that the Sixth Circuit was in error because "nothing in the statute's terms bars a parent corporation from direct liability for its own actions in operating a facility owned by its subsidiary," <u>Bestfood</u>, 524 U.S. at 64-66 (citing, *inter alia*, <u>United States v. Kayser-Roth Corp.</u>, 910 F.2d 24, 26 (1st Cir. 1990) ("a person who is an operator of a facility is not protected from liability by the legal structure of ownership")). For example, an intruder or saboteur could be held liable as an operator of a facility, if he caused the release of a hazardous substance. <u>Id.</u> at 65. So, too, could a parent, if an employee acting in agency to the parent caused a release to occur. <u>Id.</u> However,

11

for operator liability to be imposed on a corporate parent apart from a veil-piercing or joint

venture analysis, the parent corporation must be directly linked to a release of pollutants,

meaning that the record must disclose that the parent "manage[d], direct[ed], or conduct[ed]

operations specifically related to pollution, that is, operations having to do with the leakage or

disposal of hazardous waste, or decisions about compliance with environmental regulations." Id.

at 66-67.  See also Kayser-Roth, 272 F.3d at 102.  Evidence that is salient to this analysis is

evidence that depicts the relationship between the parent and the facility itself, rather than the

parent-subsidiary relationship.  Bestfoods, 524 U.S. at 68.  In this respect, the Court must be

cautious not to assume, however, "that the actions of the joint officers and directors are

necessarily attributable to" the parent.  Id.  Thus, the fact that Bangor Gas's management was

controlled by AG&P employees through most of the 1930s (having in mind here Bangor Gas's

president and board), is not determinative.  The district court decision under review in Bestfoods

was held erroneous precisely for its reliance on the parent's control over the subsidiary's

management.  Id. at 68-69.  Control over a subsidiary's management is but an ordinary privilege

of ownership, so the fact that senior employees of the parent dominate the subsidiary's

management structure is not enough to find that every act of operation by the subsidiary is an act

of operation by the parent.  Id. at 69.  The ordinary presumption is that the dual officers and

directors in question "change hats" when they perform management tasks for the subsidiary and

are no longer to be considered employees of the parent.  Id. at 69-70.  In this respect, a plaintiff

may be able to show that a dual agent wore the parent's hat by demonstrating conduct contrary to

the interest of the subsidiary yet advantageous to the parent, id. at 70 & n.13, or a plaintiff might

show that an agent of the parent having no position within the subsidiary managed or directed

pollution-related activities at the facility, id. at 71.  Ultimately, where the wearing of corporate hats is concerned, "norms of corporate behavior . . . are crucial reference points."  Id. at 71.

Frontier argues that operator liability is made out in this case because AG&P knew of, approved, and supervised installations that would produce the pollution byproduct;  required local operators to obtain approval from AG&P or PUMC for expenditure in excess of $50.00;  structured the relationship between AG&P and Bangor Gas so that the dual agents were compensated by the parent and the parent was compensated, in turn, by the subsidiary;  and created a contractual relationship whereby management functions for the facility were assigned to the parent, so that the dual agents were wearing their parent hats when they managed the facility.  (Pl.'s Opposition Mem. at 2, 5-11.)  Frontier also focuses on the use of the term "operation," both by individuals within AG&P's management structure and by individual serving regulatory entities, to describe AG&P's involvement with Bangor Gas or the Gas Works facility.  (Id. at 2, 7, 9-10.)  Frontier says that these facts are analogous to the facts at issue in Kayser-Roth, particularly with respect to Mr. Patterson's direct involvement with "extensive changes to the production capabilities of the Bangor Gas Works."  (Id. at 8.)

With respect to the Bestfoods operator standard, this case is not on the same footing with Kayser-Roth.  There, the First Circuit affirmed a finding of operator liability for a parent corporation, but it was able to light upon evidence that an agent of the parent, who did not also work for the subsidiary, exerted direct control over environmental matters at the facility, such as directing cost studies and electing the course of action to be taken specifically with respect to an identified pollution problem.  272 F.3d at 103.  Similar facts are not present here.  Although it is true that Mr. Patterson managed or directed the installation of new production equipment and was an agent of AG&P (and, later, PUMC), there is no evidence that this work involved any

13

aspect of corporate, environmental policy-making as in <u>Kayser-Roth</u>.  Nor is there evidence that Patterson's participation in facility operations included any operations specifically related to the leakage or disposal of hazardous waste.  Thus, whatever hat Mr. Patterson was wearing[9] when he directed these installations, there is nothing in the record that suggests that the parent was exercising control over environmental policy, attempting to resolve a distinct pollution problem, or directing a release of hazardous waste.

Apart from Mr. Patterson's efforts, the record contains evidence of the contractual documents that demonstrate the parent and the subsidiary's understanding of how management and engineering services would be provided by AG&P to Bangor Gas.  The record also contains evidence of more than the provision of advice and consultative services.  In particular, there is the evidence that Bangor Gas personnel were required to obtain AG&P approval of expenditures over $50 in relation to any non-routine projects.  Nevertheless, because none of this evidence is directly connected with an identified operation specifically related to pollution, I conclude that it is necessary to evaluate this evidence in connection with indirect/ownership liability rather than direct/operator liability.

Frontier's opposition memorandum does not include a reference to the joint venture theory of operator liability.  Even under that approach, agreements of the very kind at issue in this case have been regarded as insufficient to demonstrate a joint venture, as opposed to the

---

[9]      Unlike the officer whose conduct was considered dispositive in <u>Kayser-Roth</u>, Mr. Patterson was an officer of both the parent and the subsidiary.  Patterson was designated an assistant secretary, and assistant treasurer, and, eventually, a vice president of Bangor Gas between 1936 and 1942 when he worked on the new installations at the Gas Works site.  If Patterson is viewed as a dual agent, there is nothing in the record to suggest that his efforts were contrary to the interest of the subsidiary yet advantageous to the parent.  I hesitate to state definitively that his installation-related work at the facility cannot be viewed as work performed exclusively in agency to the parent because the management and engineering agreements in the record tend to support a finding that actions taken in performance of services identified in those agreements were to be performed by AG&P personnel under contract to Bangor Gas.

provision of consultative and supervisory services by contract.  Atlanta Gas Light Co. v. UGI

Utilities, Inc., 463 F.3d 1201, 1205 n.6 & 1206-1207 (11th Cir. 2006).  I find that the language of

the agreements supports this conclusion.  The agreements called for supervisory and consultative

managerial and engineering services, as well as book-keeping and accounting services, all of

which reasonably supported Bangor Gas's operation of the facility, but did not amount to control

or management of the facility itself in connection with its ongoing, day-to-day operations.  As

for testimony in the record, it fairly reflects that Mr. Patterson was connected with installations

in 1939 and 1942 and was available as an operations consultant, but there is no mention of him

being present to run the facility's day-to-day operations.  Even Mr. Patterson's testimony

concerning the $50 limit on local, non-routine expenditures recognizes the distinction between

local, day-to-day operations and the sort of special projects for which PUMC consultation would

be required.  While this evidence demonstrates tight budgetary control in connection with any

non-routine projects, it also reflects that routine expenditures were left to the local operators.  As

an example of "common and necessary," routine expenditures, Patterson refers in his testimony

to the extension of gas mains and the installation of meter boxes for new customers.  (Doc. No.

125-8 at 9-10.)  It is, of course, conceivable that there could have been an exercise of managerial

control by PUMC or AG&P over a Gas Works construction project related to tar discharges or

sewer use or maintenance, but there is nothing in the record that would enable the fact finder to

determine whether such a project would have been a routine matter or a special matter, let alone

to determine that such a project or operation occurred.  I also find that there is nothing in the

SEC or MPUC transcripts and records that would otherwise link any act of managerial oversight

to specific pollution activity.  In my view, in order to attribute the Gas Works' known discharges

or releases to CenterPoint, the Court would have to conclude that the record justifies piercing

Bangor Gas's corporate veil.

**B.      Indirect Owner or Operator Liability through Veil-Piercing**

If the corporate veil separating AG&P and Bangor Gas can be pierced, then AG&P,

and—by extension—CenterPoint, may be deemed the true owner (or operator) of the Gas Works

facility.  Bestfoods, 524 U.S. at 64 n.10.  With regard to the standard that applies, there is an

initial question whether this Court should incorporate state law to fashion the rule of decision.

Id. at 63 n.9.  The parties both cite Maine law in support of their respective positions on the

indirect liability question.  (Mot. for Summary J. at 16;  Opposition Mem. at 15.)  There does not

appear to be any critical distinction between state and federal law when it comes to the basic

factors that inform the alter ego determination.  The Law Court condones consideration of

several factors, without necessarily demanding the presence of any one in particular:

> (1) common ownership;  (2) pervasive control;  (3) confused intermingling of
> business activity, assets, or management;  (4) thin capitalization;  (5)
> nonobservance of corporate formalities;  (6) absence of corporate records;  (7) no
> payment of dividends;  (8) insolvency at the time of the litigated transaction;  (9)
> siphoning away of corporate assets by the dominant shareholders;  (10)
> nonfunctioning of officers and directors;  (11) use of the corporation for
> transactions of the dominant shareholders;  and (12) use of the corporation in
> promoting fraud [(though fraud is not required)].

Johnson v. Exclusive Props. Unlimited, 1998 ME 244, ¶¶ 7-8, 720 A.2d 568, 571 (quoting The

George Hyman Constr. Co. v. Gateman, 16 F. Supp. 2d 129, 149-50 (D. Mass. 1998)).  Courts

fashioning a federal rule for piercing the corporate veil have emphasized the following factors,

all consistent with the Law Court's formulation:

> (1) inadequate capitalization in light of the purposes for which the corporation
> was organized, (2) extensive or pervasive control by the shareholder or
> shareholders, (3) intermingling of the corporation's properties or accounts with
> those of its owner, (4) failure to observe corporate formalities and separateness,

(5) siphoning of funds from the corporation, (6) absence of corporate records, and (7) nonfunctioning officers or directors.

United States v. Kayser-Roth Corp., 724 F. Supp. 15, 20 (D. R.I. 1989) (quoting In Re Acushnet River & New Bedford Harbor Proceedings, 675 F. Supp. 22, 33 (D. Mass. 1987)).  For purposes of federal law, public convenience, fairness, and equity are all legitimate grounds for disregarding corporate form.  Alman v. Danin, 801 F.2d 1, 3 (1st Cir. 1986).  The Maine law requirement that there be a showing of some "inequity," Johnson, 1998 ME 244, ¶ 9, 720 A.2d at 572, is consistent with this approach.  If a corporate parent's misuse of a subsidiary demonstrated culpability in connection with acts undertaken by the subsidiary that were contrary to public policy, the Law Court would likely regard such circumstances as demonstrative of inequity.  Even if Maine law were otherwise, this Court would be justified in applying a uniform federal rule that elevates important national objectives[10] over a local law that extends limited liability to shareholders.  Alman, 801 F.2d at 3;  Mobay Corp. v. Allied-Signal, Inc., 761 F. Supp. 345, 350-51 (D. N.J. 1991) (collecting cases).

Before discussing the veil-piercing factors, CenterPoint contends that Frontier should not be allowed to ask the Court to disregard the corporate separateness of Bangor Gas because Frontier effectively is Bangor Gas.  According to CenterPoint:

> As the present-day equivalent of Bangor Gas, Frontier is equitably estopped from seeking to disregard Bangor Gas's corporate form and hold CenterPoint indirectly liable for Bangor Gas's actions.  Because veil-piercing doctrine is equitable in

---

[10]     There are two objectives that inform the CERCLA remedial scheme:

First, Congress intended that the federal government be immediately given the tools necessary for a prompt and effective response to the problems of national magnitude resulting from hazardous waste disposal.  Second, Congress intended that those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created.

Dedham Water Co. v. Cumberland Farms Dairy, Inc., 805 F.2d 1074, 1081 (1st Cir. 1986) (quoting United States v. Reilly Tar & Chemical Corp., 546 F. Supp. 1100 (D. Minn. 1982)).

> nature, it is only available to third parties, and it may not be used by a subsidiary
> to pierce its own veil in an attempt to attach liability to the parent corporation.

(Id. at 14.)  Frontier objects to the characterization that it is the equivalent of Bangor Gas because it merged with Bangor Gas in 1948.  In its view, it exalts form over substance to say that Frontier is "the 'same corporate entity' as the company that was founded in 1850 to operate the Bangor Gas Works."  (Opposition Mem. at 14.)  Frontier explains that Bangor Gas had no corporate parent in 1948 when the merger took place and that the instant dispute concerns events happening in the 1930s, two decades before the merger.  (Id. at 14-15.)

The lead case cited by CenterPoint does not cleanly support the proposition it extols.  In McCarthy v. Azure, 22 F.3d 351 (1st Cir. 1994), the First Circuit rejected an individual corporate shareholder's request that the distinction between himself and his company be disregarded so that he might take advantage of an arbitration clause in a contract executed by the company.  Id. at 362-63.  Because the shareholder was the alleged wrongdoer who himself "obscured the line" dividing himself from the corporation, rather than an innocent third party, he could not assert the alter ego theory.  Id. at 363.  Unlike the scenario in McCarthy, in this case Frontier (Bangor Gas) was not the party who allegedly abused the corporate form, but the corporation that, allegedly, was misused by its shareholder.  However, CenterPoint cites some additional authority involving the parent-subsidiary relationship.  Two of these cases reflect a rule that the right to pierce the corporate veil belongs to creditors of the subsidiary and may not be asserted by the subsidiary itself to reach assets of the parent.  The stated rationale, in part, is that the subsidiary should not be permitted to "deny its own existence."  (Opposition Mem. at 14, quoting Flocco v. State Farm Mut. Auto. Ins. Co., 752 A.2d 147, 155 (D.C. Ct. App. 2000), citing In re. Rehabilitation of Centaur Ins. Co., 606 N.E.2d 291, 297 (Ill. Ct. App. 1992).)  This formulation, "deny its own

existence," is an outgrowth of an "alter ego" or "corporate disregard" theory of liability.  More precisely, veil-piercing is a means of reaching assets held by shareholders, not because the corporation does not legally exist (it is often a co-defendant), but because equity demands that the shareholder who has misused the corporation to achieve the shareholder's own ends should not receive the limited liability that corporations law would otherwise provide.  It is a question of ensuring equity when the observation of legal rules would result in an injustice.  This is reflected by the authorities cited in the <u>Centaur</u> case.  606 N.E.2d at 297 (quoting 1 W. Fletcher, Cyclopedia of Corporation § 41 (1990)).  It is naturally more difficult to justify an equitable disregard of corporate form when the proponent of veil-piercing is the corporation itself, rather than a third party, but it does not necessarily follow that a situation could not exist where it would be appropriate to permit a corporation to attempt to pierce its own veil to assert claims against a current or former shareholder.  For example, such a claim might be warranted where the corporation is pursuing a derivative claim that would potentially expose the parent or shareholder to liability if pursued by another party.  <u>Morley v. Ontos, Inc.</u>, 478 F.3d 427, 433 (1st Cir. 2007).

Given the nature of the claims that Frontier is pursuing here, I am not persuaded that the <u>Flocco</u> and <u>Centaur</u> cases raise a complete "roadblock" to consideration of a veil-piercing claim. <u>Morley</u>, 478 F.3d at 432.  Nevertheless, I do believe that these considerations help to undermine Frontier's ability to meet the second prong of the veil-piercing standard.  Assuming that a genuine issue exists on the first prong, the alter ego issue,[11] the remaining issue is whether public

---

[11]     There may well be a genuine issue of fact of the first prong, the alter ego test.  Frontier focuses on the following factors:  common ownership, common management by remote AG&P officers and directors, non-observation of corporate formalities and separateness, absence of records, pervasive control, and siphoning funds. (Opposition Mem. at 16-18.)  CenterPoint, on the other hand, argues that the record reflects AG&P's obeisance to corporate formalities, emphasizing the fact that the reports demonstrate separate capitalization and accounting, and

convenience, fairness, and equity warrant disregard of corporate separateness to hold Frontier, as successor to a past shareholder, responsible for Bangor Gas's pollution. Frontier's summary judgment opposition memorandum is silent on this issue. CenterPoint has already identified one way in which the common law is in tension with the kind of veil-piercing operation that Frontier is attempting, although I have not considered that issue to be decisive. Another tension relates to Frontier's voluntary decision to merge with Bangor Gas in 1948, after the Gas Works had been in operation for almost 100 years. By absorbing Bangor Gas and becoming the owner of the facility, Frontier succeeded to the liabilities of Bangor Gas, including liabilities associated with its releases of hazardous substances. CenterPoint argues that Frontier should be expected to absorb the consequences of voluntarily acquiring a limited liability business association. (Mot. for Summary J. at 19, citing Theberge v. Darbro, Inc., 684 A.2d 1298, 1301 (Me. 1996) (raising the bar for veil piercing "in the context of a contractual dispute").)

Both of the obstacles raised by CenterPoint are significant. In addition to those considerations, the record does not depict how AG&P's alleged domination of Bangor Gas from 1928 to 1944 demonstrates a culpable use of the subsidiary for an illegitimate purpose material to the present-day remediation effort. See Bestfoods, 524 U.S. at 63 ("[T]he corporate veil may be pierced and the shareholder held liable for the corporation's conduct when, *inter alia*, the corporate form would otherwise be misused to accomplish certain wrongful purposes."). I

---

the fact that Bangor Gas had its own, local general manager who was not an employee, officer, or director of AG&P. CenterPoint also points to the management and engineering agreements as further evidence that AG&P acknowledged and respected corporate formalities in its dealings with subsidiaries. (Mot. for Summary J. at 17-18.) The record in this case demonstrates AG&P's near total domination of Bangor Gas's finances and management, an absence of corporate records to demonstrate that the Bangor Gas board of directors ever held any meetings, many missing financial records, the siphoning of funds through service contracts (as found by the SEC), and a failure to observe formal distinctions between the parent and the subsidiary in connection with two third-party communications. Although there is some question as to who bears primary responsibility for the absence of certain corporate records, viewed in the light most favorable to Frontier, the summary judgment record supplies an appreciable amount of grist for the mill. I would recommend denying summary judgment if this were the only issue.

conclude that a corporate plaintiff seeking to allocate a portion of its own liability to a present or former shareholder through veil-piercing must demonstrate that an inequity will be imposed on the corporation if the shareholder is permitted to enjoy limited liability.[12]  What a sufficient showing would look like is difficult to anticipate, but there has been no showing (or argument) here.  Frontier cannot overcome CenterPoint's summary judgment motion based on a veil-piercing argument without articulating why it would be unjust to leave liability for Bangor Gas's operations between 1928 and 1944 with the corporate successor of Bangor Gas.  Frontier, as the successor to Bangor Gas, fails to articulate any sufficient reason to pierce the corporate veil so as to hold CenterPoint liable for Bangor Gas's own pollution-related activities.

### CONCLUSION

For the reasons set forth above, I RECOMMEND that the Court GRANT Defendant CenterPoint Energy Resources Corporation's Motion for Summary Judgment (Doc. No. 113).

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

August 14, 2009                          /s/ Margaret J. Kravchuk
                                         U.S. Magistrate Judge

---

[12]      I am aware that Frontier is pursuing this litigation, in part, as a successor to the rights of the City of Bangor, pursuant to a settlement agreement.  (Complaint ¶ 101.)  However, CenterPoint's liability would necessarily be a subset of Frontier's liability, based on the existing record, because its liability would arise from Bangor Gas's operation.

21