**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| FRONTIER COMMUNICATIONS COMPANY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 07-cv-113 |
| ) | |
| BARRETT PAVING MATERIALS, INC., et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

**DEFENDANT UGI UTILITIES INC.'S  MOTION FOR SUMMARY JUDGMENT**
**AND INCORPORATED MEMORANDUM OF LAW**

**MOTION**

Defendant, UGI Utilities, Inc. ("UGI"), by and through its counsel of record, moves for summary judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure.  Since there is no genuine issue of fact in dispute, UGI Utilities, Inc. is entitled to judgment as a matter of law with respect to the claims that Plaintiff Frontier Communications Company ("Frontier") has made against it.[1]

**INCORPORATED MEMORANDUM OF LAW**

**I.      INTRODUCTION AND SUMMARY OF ARGUMENT**

Frontier is the successor to Bangor Gas Light Company ("BGLC"), which changed its name in 1941 to the Bangor Gas Company ("BGC") and with whom Frontier merged in 1948.[2]  BGLC owned and operated a manufactured gas plant in Bangor, Maine ("Bangor MGP") from 1852 until 1941.  (UGI Statement of Material Facts ¶ 1, filed with this Motion.)  In November 2002, the City of Bangor filed a complaint under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA" 42 U.S.C. §§ 9601-9675) alleging that Frontier as the "owner" and "operator" of the Bangor MGP was responsible for tar contamination in the Penobscot River.  After a trial on the merits, Frontier

---

[1] The court has granted a similar motion to co-defendant CenterPoint Energy Resources Corporation on similar grounds. (Ex. A)
[2] Frontier's merger with BGLC. (Ex. B)

was found liable and subsequently settled the City's claim by paying $7.6 million. In 2007, Frontier filed

a complaint for contribution under state law and CERCLA ("Complaint") against UGI and CenterPoint and

others. As to UGI, the Complaint contains a mere six conclusory paragraphs relating to the conduct of

UGI's alleged predecessors, American Gas Company of New Jersey ("AGCNJ") and The United Gas

Improvement Company ("TUGIC"), during the time period 1901 to 1928.[3]

Frontier's claims against UGI are particularly suitable for summary judgment for a number of

reasons. <u>First</u>, there will be no fact witnesses who can testify on the "owner" and "operator" liability

issues that are central to Frontier's CERCLA claim. Instead, all the facts regarding these issues must be

obtained from 80 to 100-year-old documents that have been produced in discovery.[4] For the Court's

reference, UGI has provided under separate cover, a CD containing: (1) the documents that Frontier has

identified as supporting its claims; (2) the documents UGI has produced in this matter; and (3) BGLC

reports filed with the Maine PUC during the relevant time period.[5] Thus, the documentary record at

issue is before the Court and there are no facts in dispute; the only disagreement concerns how each

side chooses to characterize those facts. On the basis of this production, Frontier will be unable to

provide factual support for its CERCLA claims against UGI.

<u>Second</u>, the case law firmly supports an award of summary judgment to UGI. UGI has also won

summary judgment against similar "owner/operator" theories in other federal district courts and those

judgments have been affirmed respectively by the Second and Eleventh Circuits.[6] Earlier this year, UGI

also obtained a favorable judgment on such CERCLA claims by Judge Kravitz in the District of

---

[3] <u>See</u> Compl. ¶¶ 83-88.
[4] In March of 2003, UGI produced (and subsequently supplemented) all documents in its possession referring to BGLC. In October of 2008, Frontier was ordered to disclose to UGI all documents upon which it intended to rely in support its claims and it disclosed those in January 2009.
[5] A copy of the index of the documents contained in the CD and accompanying cover letter is attached hereto as Ex. C.
[6] <u>See</u> <u>Consol Edison v. UGI Utilities, Inc.</u>, 310 F. Supp. 2d 592, 601, 607 (S.D.N.Y. 2004), <u>aff'd in relevant part</u>, 153 Fed. App. 749, 752 (2d Cir. 2005); <u>Atlanta Gas Light Co. v. UGI Utils., Inc.</u>, No. 3:03-cv-614-J, 2005 WL 5660476, 2005 U.S. Dist. LEXIS 43592, at *26-41 (M.D. Fla. Mar. 22, 2005), <u>aff'd</u>, 463 F.3d 1201 (11th Cir. 2006).

Connecticut, after a hybrid summary judgment/bench trial proceeding.[7]

<u>Third</u>, the record in this case simply does not support Frontier's owner and operator claims.[8] The facts are that neither AGCNJ or TUGIC actually owned the Bangor MGP during the relevant time period and Frontier does not contend that they did. Rather, BGLC owned the Bangor MGP throughout the relevant time period and AGCNJ and TUGIC were, at best, respectively direct and indirect shareholders in BGLC. Thus, Frontier's owner liability claim is really predicated on the assertion that the corporate veil of its own predecessor, BGLC, should be pierced because UGI (through either AGCNJ or TUGIC) allegedly exercised too much control over BGLC and thus acted as its "alter ego." This unusual **<u>self</u>**-piercing claim must fail because UGI's conduct does not satisfy the two-prong test for veil piercing under Maine or federal common law: (1) a demonstrated abuse or misuse of the corporate form; and (2) an unjust or inequitable result if the Court regards the corporate entity as separate.[9]

Frontier's claims against UGI for CERCLA "operator" liability are equally deficient and fail for three basic reasons clearly set forth by the United States Supreme Court in its landmark decision in <u>U.S. v. Bestfoods</u>, 524 U.S. 51 (1998). First, Frontier cannot produce any evidence of UGI's alleged predecessors' direct operation of <u>the subject facility</u>, as opposed to operation by BGLC, which owned the facility, as required by <u>Bestfoods</u>. Second, Frontier will not be able to produce evidence that UGI

---

[7] <u>See</u> <u>Yankee Gas Services Company v. UGI Utilities, Inc.</u>, 616 F. Supp 2d 228 (D. Conn 2009). UGI admitted that for a discrete period of time, it had operated one MGP pursuant to a direct lease arrangement of a kind not at issue here and so there are to be further proceedings on liability and damage issues. However, with respect to the other twelve sites at issue, Frontier dismissed all of their claims against three of the sites right before trial, dismissed their owner liability and veil piercing claims against all twelve sites at the close of trial, and had their operator liability claims against the remaining nine sites flatly rejected by the court. In one CERCLA case in the District of South Carolina, UGI had summary judgment denied without an opinion; a bench trial was held in that case but no decision has been rendered.

[8] Initially, UGI notes that Frontier's claim that AGCNJ is a predecessor entity is not supportable. Although UGI merged in 1925 with a different American Gas entity, AGCPA, which owned the stock of AGCNJ, AGCNJ continued to own the Bangor Company stock until 1928 when the stock was sold. Thereafter, AGCNJ continued as a separate corporate entity, dissolving in 1936. For the purposes of this Motion, however, UGI will not rely on the defense that it is not AGCNJ's predecessor and will allow the court to assume, *arguendo,* that AGCNJ was a UGI predecessor. Even with this assumption, there are no facts to support a finding that either AGCNJ or UGI was an owner or operator of the Bangor MGP. Hereafter, the reference "UGI" will be used to refer to both UGI and AGCNJ unless otherwise noted.

[9] <u>See</u> Ex. A at 21 ("Frontier cannot overcome CenterPoint's Summary Judgment Motion based upon a veil piercing argument without articulating why it would be unjust to leave liability for Bangor Gas' operations between 1928 and 1944 with the corporate successor of Bangor Gas."). <u>See also</u> Ex. E.

managed, directed or controlled operations of the facility specifically related to the "leakage or disposal of hazardous waste." Id. at 66-68 (emphasis added).  Third, Frontier's "evidence" will likely focus on the service of so-called "dual officers or directors", that is, various BGLC officers/directors that also served as officers/directors of UGI.  The Supreme Court in Bestfoods rejected similar evidence and adopted a presumption that a director or officer of a subsidiary is deemed to be acting for the subsidiary, absent clear evidence to the contrary or evidence that he is acting against the interest of that company.  Id. at 69-70.  As a result, the actions of BGLC officers/directors must be attributable to BGLC, not UGI, even though they may also have been officers/directors of UGI.  There is no evidence to overcome this Bestfoods presumption.

In short, UGI should be granted summary judgment on Frontier's owner and operator liability claims because, based upon the undisputable facts in the record, there is simply insufficient evidence to conclude that veil piercing is appropriate or that UGI "manage[d], direct[ed], or conduct[ed] operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste …".  Bestfoods, 524 U.S. at 66-67.

II.  **FACTUAL BACKGROUND**

A.  **The Parties.**

1.  **Frontier (Citizens Communications Company).**

BGLC was organized in Maine in 1850 as the Bangor Gas Light Company.  (Ex. B).  In 1852, BGLC sought and obtained approval to discharge processing wastes from the plant to the Penobscot River.  (Stat. of Mat. Facts at 3; Ex. F).  BGLC continued to own and operate the Bangor MGP until 1941, when it became the Bangor Gas Company ("BGC").  During this time, in 1901 AGCNJ acquired the capital stock of BGLC. It owned the capital stock until it was sold in 1928 to the predecessor of CenterPoint. In 1948 Frontier acquired the stock of BGC, and merged the company into Frontier. (Ex. B).  Thus, both BGLC and

BGC were merged into Frontier which acquired and assumed the liabilities of BGC. Frontier continued to own and operate the Bangor MGP until 1963.

### 2. UGI Utilities, Inc.

Defendant UGI Utilities, Inc. is the successor to The United Gas Improvement Company ("TUGIC"). By the early 1900s, TUGIC had become one of the country's first holding companies. TUGIC was investing in gas companies and electric utilities, typically by acquiring the corporate stock of these entities. (Stat. of Mat. Facts ¶ 6.) However, TUGIC (i.e. UGI) never directly owned the Bangor MGP, or even the corporate stock of BGLC. Rather, UGI acquired the corporate stock of AGCNJ in 1925, which owned the BGLC stock, by means of a merger with its parent, American Gas Company of Pennsylvania ("AGCPA"). (See id. ¶ 18.)

### 3. AGCNJ and the Acquisition of BGLC.

When AGCNJ acquired the stock of BGLC, it controlled the voting stock of nine other similar companies. (Ex. G). As such, AGCNJ was in some sense a competitor of UGI. In 1901, BGLC had already been manufacturing gas at the Bangor MGP for roughly 50 years. AGCNJ maintained involvement in the business of its subsidiary, BGLC, for the next 26 years.[10] UGI supervised the business of BGLC as a subsidiary of AGCNJ between July 1925 and the sale of BGLC stock by AGCNJ in 1928.

### B. The Corporate Structure and Management of BGLC.

AGCNJ owned the stock of BGLC during the 1901-1928 timeframe. As such, is normal for a parent company, AGCNJ was involved in a wide variety of BGLC's activities, including overseeing and approving budgets and expenditures, offering advice and strategy, recommending personnel changes and performing certain ancillary services such as accounting, purchasing, and capital improvements.

---

[10] See AGCNJ Stockholder Min. UGIII 0159-0231; see also AGCNJ Directors & Executive Committee Min. UGIII 0232-0320; ACCNJ Min. & Budget Summary UGIII 0321-0340.

1.      **The Management And Directors Of BGLC Acted Independently Of AGCNJ**.

The documentary record in this case demonstrates that from 1901 to 1928, BGLC was a fully functioning company with By-Laws (Ex. D), a Board of Directors (two of whom were normally Maine residents), officers and numerous employees, including a superintendent, gas and electric canvassers, road masters, station engineers, works foremen, utility men, inspectors, gas works laborers, gas distribution laborers, along with others.  (Stat. of Mat. Facts ¶ 11-13; Ex. H; Ex. I).[11]  There is no evidence that any of these employees were employees of UGI.

Although many of the BGLC records have not survived, given that BGLC was a regulated utility from 1915, there is little doubt that such records did in fact exist and were subject to regulatory review. For example, "Ex. D" contains a 1927 statement that this copy of the By-Laws (which was obtained from the Maine PUC files by counsel) was extracted from the "permanent records of Stockholder meetings of BGLC."  (Ex. D at 4).  Finally, in purchasing BGLC in 1948, Frontier's due diligence undoubtedly included a review of the corporate books and records, which would have become the property of Frontier as the purchaser following the closing.  Thus, it is <u>Frontier,</u> the last owner of the BGC,  that is responsible for the failure to preserve the company records.

The documents that did survive from that era show that BGLC's directors were elected annually at a stockholders meeting held each year on the fourth Wednesday of May. (Stat. of Mat. Facts ¶ 11.) Directors met as directed by the President.  (Ex. D).  Some AGCNJ officers/directors did occupy positions at BGLC, but there is no evidence that these dual officers/directors took any action that was against BGLC's interest.  From the available records, it is clear that:

    a.      BGLC conducted an annual stockholders meeting.  (Ex. I).
    b.      BGLC had its own officers/directors.
    c.      BGLC financial accounts were audited by an outside auditor. (Ex. J.)
    d.      BGLC was regulated as an independent corporation by MPUC 1915-1928. (Ex. I.)
    e.      BGLC kept its own corporate records.  (Ex. D).

---

[11] All of the BGLC Annual Reports from 1915 to 1928 are contained on the CD provided to the Court under separate cover.

      f.      BGLC had its own local manager, responsible for the operation of the MGP. (Stat. of Mat. Facts ¶¶ 11 - 13.)

Nevertheless, Frontier alleges that AGCNJ directed the day-to-day operations of the Bangor MGP, including the direction, management and conduct of operations specifically related to waste disposal.[12] But Frontier cannot identify any facts to support this allegation, which is why summary judgment is appropriate. Moreover, Frontier's theories regarding AGCNJ's alleged control over other aspects of the facility's operation simply cannot measure up to the <u>Bestfoods</u> standards.

**III.    <u>ARGUMENT</u>**

    **A.    UGI Should be Granted Summary Judgment Because Frontier Cannot Meet its Burden to Show That UGI Is Liable As An Owner or Operator Under CERCLA For The Activities Conducted At The Bangor MGP During 1901 To 1928.**

        **1.    <u>Summary Judgment Is Appropriate In This Case</u>.**

Summary judgment is properly granted where there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). Once the moving party, has met its burden to show that no genuine, material factual dispute exists, the nonmoving party must "set forth specific facts or show that there is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-49, 255-56 (1986). A party opposing summary judgment must present some "significant probative evidence" tending to support the complaint. <u>Id.</u> at 248-249. While the facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the nonmoving party, a mere "alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." <u>Petitti v. New England Tel & Tel Co.</u>, 909 F.2d 31 (1st Cir. 1990).

---

[12] As a practical matter, there was simply no method of communication in 1901 that would have allowed AGCNJ, located in Philadelphia, PA, to conduct the day-to-day operations of gas making, distribution and customer service at a facility located in Bangor, ME. Moreover, the 1925 Report evaluating operations of the gas plant demonstrates that the nature of a gas plant requires that it be operated by on-site personnel. (Ex. H).

UGI does not bear the burden of proof at trial in this case.  Therefore, UGI need only show that Frontier's proffer is insufficient to carry its burden.  <u>See</u> <u>Hinckly v. NYNEX Corp.</u>, 144 F.3d 134, 140 (1st Cir. 1998).  The documents that Frontier has represented it intends to rely upon do not satisfy the <u>Bestfoods</u> standards for imposing CERCLA operator liability.  Moreover, the Frontier cannot avoid summary judgment by using speculative interpretation of the documents.[13]  Indeed, where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

Because Frontier will not be able to show all the required elements of its veil piercing and operator liability claims, summary judgment should be awarded to UGI.[14]

### 2. UGI Is Not Liable Under CERCLA As An Owner Of The Bangor MGP Because The Undisputed Facts Do Not Support Piercing BGLC's Corporate Veil.

In establishing new standards for determining liability as an "owner" or "operator" under CERCLA, Supreme Court in <u>Bestfoods</u> reinforced the widely held principle of corporate limited liability. The Court sought to balance the remedial environmental interests of CERCLA with the "bedrock principle" of limited corporate liability, and tipped the balance in favor of limited liability.  <u>Bestfoods</u>, 524 U.S. at 62.  In the Court's words, "[i]t is a general principle of corporate law deeply 'ingrained in our economic and legal systems,' that a parent corporation … is not liable for the acts of its subsidiaries," <u>id.</u> at 61, and "nothing in CERCLA purports to reject this bedrock principle."  <u>Id.</u> at 62.

Thus, a parent corporation may be charged with CERCLA owner liability based on its subsidiary's actions, also known as "indirect" or "derivative" liability, "<u>only</u> when the corporate veil may be pierced." <u>Id.</u> at 63-64.  In establishing this standard, the Court noted that it is "horn-book law" that the general exercise of control which normally accompanies stock ownership, including "the election of directors,

---

[13] <u>See</u> <u>Mack v. Great Atlantic Pacific Tea Co.</u>, 871 F.2d 179, 181 (1st Cir. 1989) ("[T]he nonmoving party… cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another").

[14] (<u>See</u> <u>Celotex Corp.</u>, 477 U.S. at 322.  Fed. R. Civ. P. 56(c) mandates entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case.").

the making of by-laws … and the doing of all other acts incident to the legal status of stockholders" will not support piercing the corporate veil. Id. at 61-62. "Nor will a duplication of some or all of the directors or executive officers be fatal." Id. at 62 (quotations omitted);[15] Rather, it is when "the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud" that the corporate veil may be pierced and the parent held indirectly liable for the acts of its subsidiary. Bestfoods, 524 U.S. at 62 (citing Fletcher Cyc. Corp. § 43 at 285-86).

      a.      **The Relevant Requirements for Veil Piercing.**

While the Supreme Court declined to address whether federal common law or state law should be applied in resolving CERCLA owner liability,[16] and the First Circuit has not addressed this issue, "there does not appear," as this Court recently observed, "to be any critical distinction between state and federal law when it comes to the basic factors that inform the alter ego determination." (Ex. A at 16).

Maine courts apply a two-prong test. Johnson v. Exclusive Props, Unlimited, 720 A.2d 568, 57 (Me. 1998); Snell v. Bob Fisher Enterprises, Inc., 106 F. Supp. 2d 87, 90 (D. Me. 2000). First, the party requesting that the court pierce the corporate veil must show that the accused has dominated, abused, or misused the corporate form, generally based on an analysis of twelve factors. Johnson, 720 A.2d at 571. Second, the party must show that some unjust or inequitable result will occur if the court acknowledges a separate corporate entity. Johnson, 720 A.2d at 571. This two-prong test requires that court to balance the policy of "encouraging business development with the policy of protecting those who deal with the corporation." Snell, 106 F. Supp. 2d at 90 (quoting Johnson, 720 A.2d at 571). Federal common law is to the same effect. See Taylor v. Standard Gas Co., 306 U.S. 307, 322 (1939) (requiring that a party seeking to overcome limited liability demonstrate not only significant domination and control by one entity over the other but also that the abuse of corporate form "would work fraud or

---

[15] see also Maine v. Kerramerican Inc., 480 F. Supp. 2d, 348 353 (D. Me. 2007); Amburgery v. Automatic Ski USA, Inc., No. 2:06-CV-149-GZS, 2007 WL 1464380, at *6 (D. Me. May 17, 2007).
[16] Id. at 64 n.9.

injustice.").[17]  The Bestfoods Court's citation to Fletchers Cylopedia and reference to the need for the corporate form to "be misused to accomplish certain wrongful purposes, most notably fraud," 524 U.S. at 62 (emphasis added), further affirms the fundamental principle that "absent fraud or bad faith, a corporation will not be held liable for the acts of its subsidiaries or other affiliated corporations,"[18] and brings federal common law into alignment with Maine law on this point.

As the Court has found in evaluating CenterPoint's Summary Judgment Motion, the veil piercing theory espoused by Frontier does not satisfy the basic requirement that any claimed exertion of control by UGI (or AGCNJ) "demonstrate[ ] a culpable use of the subsidiary for an illegitimate purpose material to the present day remediation effort."  (Ex. A at 20).  The same conclusion is warranted with UGI.

> **b.** **Frontier can provide no evidence that UGI used its purported control of BGLC to accomplish a fraud, injustice or fundamental unfairness that injured it.**

As with CenterPoint, Frontier will not be able to articulate a coherent theory (much less point to any facts) that would satisfy the requirement to show that UGI's or AGCNJ's control over BGLC accomplished a fraud or fundamental unfairness.  Obviously, any conduct by UGI or BGLC during the 1901-1928 period could not have been designed to unlawfully avoid CERCLA claims.  Consequently, Frontier will, at best, try to argue that that UGI's alleged control itself was wrongful and unjust.  Even if there was some improper purpose, which has not been shown, the precedents clearly require more than some general injustice or fraud.  There must be a nexus between the intent to misuse the

---

[17] Taylor involved a parent corporation, Standard, which grossly undercapitalized its subsidiary Deep Rock and caused it to enter into numerous transactions which were favorable to Standard but which resulted in losses for Deep Rock. Deep Rock repeatedly issued dividends in Standard's favor that it could not pay.  At the same time, Standard charged Deep Rock over a million dollars in fees and interest for advisory services.  In sum, Standard used its "complete control and domination" to accomplish numerous transactions that were "to the benefit of Standard and to the detriment of Deep Rock." Id. at 320-22 (emphasis added), Id. at 322. See also Joslyn Mfg. Co. v. T.L. James & Co., 893 F.2d 80, 83 (5th Cir. 1990).

[18] 1 Fletcher Cyc. Corp. § 43 at 285-86 (Perm. Ed.).  According to Fletcher, veil-piercing involves "a presumption of separateness the plaintiff must overcome ...by showing the parent is employing the subsidiary to perpetrate a fraud or commit wrongdoing and that this was the proximate cause of the plaintiff's injury. Merely showing control, in the absence of an intent to defraud or escape liability is insufficient to overcome that presumption." Id. (citations omitted and emphasis added).

corporate form and fraud or injustice that results in an injury to the Frontier.[19]  See Snell, supra, at 91-92.  General control over the subsidiary's affairs, even if pervasive, is insufficient by itself.

Maine courts that have chosen to disregard the corporate form have not done so based on control alone; rather, such cases hinge on proof that defendant's misuse of the corporate form caused harm to the Frontier.  Here, Frontier seeks to recover for environmental harm with absolutely no evidence that UGI's conduct was fraudulent or unjust as to the injury at issue.

Indeed, Frontier asks the Court to pierce its own (or its predecessor BGLC's) corporate veil, which flies in the face of the principle that piercing is only used to protect third parties, not the corporation which willingly accepted the benefits of the corporate form.[20]  Although in ruling on the CenterPoint motion this Court would not conclude that self piercing claims like Frontier's are automatically invalid, it nonetheless found that the nature of the self piercing claim "help[ed] to undermine Frontier's ability to meet" the fraud/injustice prong of the veil piercing test.  (Ex. A at 19).  This reasoning applies with equal force here.  Frontier cannot satisfy the requirement to show fraud or unjust action by UGI, or to show injury to itself, much less nexus between the two.

Notably, the Con Ed court also rejected this precise claim in granting summary judgment on a

---

[19] See Fletcher Cyc. Corp., supra, § 43 at 292 ("Although wrongdoing by the parent need not amount to plain fraud or illegality, the injured party must show some connection between its injury and the parent's improper manner of doing business, without that connection, even when the parent exercises domination and control over the subsidiary, corporate separateness will be recognized") (citations omitted).

[20] See In re RCS Engineered Prods. Co., 102 F.3d 223, 226 (6th Cir. 1996) (applying Michigan law and holding: that "a subsidiary does not have standing to raise an alter ego claim against its parent is further supported by basic principles of corporations law. The general rule is that the corporate veil is pierced only for the benefit of third parties, and never for the benefit of the corporation or its stockholders."); see also Harris v. Stony Clove Lake Acres Inc., 608 N.Y.S.2d 584, 586 (N.Y. App. Div. 1994) (stating in a "reverse piercing" case that "[a] corporation, even when wholly owned by a single individual has a separate legal existence from its shareholders, and courts are loathe to disregard the corporate form for the benefit of those who have chosen that form to conduct business"); Colin v. Altman, 333 N.Y.S.2d 432, 433 (N.Y. App. Div. 1972) ("[T]he corporate veil is never pierced for the benefit of the corporation or its stockholders. The procedure is only permissible against a purported stockholder who is using the corporate veil to defraud."); 18 Am. Jur. 2d Corporations § 46 (1985) (stating that "[g]enerally, the corporate veil is never pierced for the benefit of the corporation or its stockholders"); Pemco, Inc. v. Kan. Dep't of Revenue, 907 P.2d 863, 867 (Kan. 1995) (applying Kansas law and refusing to allow a parent to pierce the subsidiaries' veil because there was no injured third party involved that would satisfy the required injustice element.); In re Rehab. of Centaur Ins. Co., 179 Ill. Dec. 459, 464, 606 N.E.2d 291, 295-96 ("[A] subsidiary corporation cannot pierce its own corporate veil to reach a parent corporation" since parental liability arises from fraud or injustice perpetrated not on the corporation but on third persons dealing with the corporation); McCarthy v. Azure, 22 F3d 351, 362-63 (1st Cir. 1994) (citing In re Rehab of Centaur, 179 Ill. Dec. at 464, 606 N.E.2d 291, 296).

veil piercing/owner liability claim against UGI, saying in words that apply perfectly here:

> There are cases that say the harm has to be to a third party, and here, because it is the company itself arguing that its former shareholder is liable under a piercing veil, I reject the claim. Second, even assuming that is wrong, an independent basis exists with respect to the second prong of the two-prong test. I think this is the stronger argument. The only harm alleged is the general environmental harm. That cannot be enough, otherwise it completely obviates the second prong. The point of a piercing the corporate veil claim is that the misuse of the corporate form causes harm to someone. It's the misuse of the corporate forum [sic] that is the key. Con Ed concedes that there was no fraud and the only harm that is argued is the environmental harm … permitting the general environmental harm to be sufficient to meet the second prong would eliminate the second prong, in CERCLA cases … CERCLA does not rewrite the longstanding law on corporations and piercing the veil … it is clear to me that the second prong has to require some fraud or harm that flows from the misuse of the corporate forum [sic].[21]

Here, as in Con Ed and with CenterPoint, there can be no showing that any exertion of control by the parent company resulted in a fraud or injustice that injured Frontier in a legally cognizable fashion. Thus, summary judgment for UGI should be awarded on Frontier's piercing claim.

### c. Frontier cannot prove that UGI exercised improper control or disregarded corporate formalities.

In addition to its ability to show fraud or injustice, which in itself is dispositive of Frontier's piercing claim, Frontier lacks sufficient evidence to satisfy the other prong of the piercing test, that UGI exercised sufficient improper control over BGLC. This inquiry generally calls for a multi-factor analysis of the relationship in determining whether the corporate form has been abused.[22]

The documents disclosed by Frontier do not contain evidence that would allow piercing under the multifactor analysis. While some common officers/directors existed between BGLC and AGCNJ, there is no evidence that they did not independently function in the best interests of BGLC. The Maine PUC regulated BGLC as an independent utility, requiring it to be virtually transparent in its corporate

---

[21] Ex. L at 49. The Con Ed court further found that there was no evidence of domination.
[22] Maine courts have considered twelve factors: (1) common ownership; (2) pervasive control; (3) confused intermingling of business activity, assets, or management; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporate assets by the dominant shareholders; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud. Johnson, 720 A.2d at 571 (relying on the factors used by Massachusetts courts); Snell, 106 F. Supp. 2d at 92.

finance structure. Although Frontier may point to UGI's close monitoring of BGLC about varied corporate matters, this does not establish improper domination by a parent over its subsidiary. Frontier underestimates the scope of the control in normal parent-subsidiary relationship, not only as set out in Bestfoods but also in courts around the country. In fact, parents "are almost always 'active participants' in the affairs of an owned corporation … in the usual case, the exercise of such control over a subsidiary's actions is entirely permissible."[23] A parent may appropriately "monitor[s] the subsidiary's performance, supervis[e] the subsidiary's finance and capital budget decisions, and articulat[e] general policies and procedures.'" Bestfoods, 524 U.S. at 72. Thus, even "widespread involvement" in financial and management decisions is not sufficient to meet a Frontier's burden. Craig v. Lake Asbestos of Quebec, Ltd., 843 F.2d 145, 151 (3d Cir. 1988). To prove liability under the alter ego rule, Frontier must show that the parent's control amounted to "**total domination** of the subservient corporation, to the extent that the subservient corporation manifest[ed] no separate interests of its own and function[ed] *solely* to achieve the purposes of the dominant corporation."[24] The fact that BGLC was an independent corporation regulated by the MPUC belies such an argument.

It should be noted that BGLC was sold in 1928 by AGCNJ. CenterPoint, as a sophisticated purchaser, undoubtedly conducted due diligence to evaluate the corporate and financial records. CenterPoint obviously concluded that BGLC did have interests of its own that were worth purchasing. Summary judgment should be granted to UGI on Frontier's owner and veil piercing claims, and this judgment dooms Frontier's other common law theories.

---

[23] Esmark, Inc. v. NLRB, 887 F.2d 739, 759 (7th Cir. 1989); see also IDS Life Ins. Co. v. SunAmerica Life Ins. Co., 136 F.3d 537, 540 (7th Cir. 1998) (is expected that shared board members would be involved in decisions affecting the subsidiary).
[24] Osborn, 278 F. Supp. 2d at 727 (citing Krivo Indus. Supply Co. v. Nat'l Distillers & Chem. Corp., 483 F.2d 1098, 1106 (5th Cir. 1973) (emphasis in original)).

**3. UGI Is Not Liable As An Operator Under CERCLA Because There Is No Evidence That UGI Managed, Directed, Or Conducted Operations At The Bangor MGP Specifically Related To Pollution Or Waste.**

The issue of CERCLA "operator" liability focuses on whether a parent has "direct liability for its own actions in operating a facility owned by its subsidiary." <u>Bestfoods</u>, 524 U.S. at 64. In contrast to Frontier's owner liability claim, where UGI's liability would have been "indirect" or "derivative" (<u>i.e.</u>, imputed based on the conduct of BGLC), the issue of CERCLA "operator" liability focuses on whether a parent has "direct liability for its own actions in operating a facility owned by its subsidiary." <u>Bestfoods</u>, 524 U.S. at 64. Prior to <u>Bestfoods</u>, courts did not appreciate the significant difference between owner and operator liability claims.[25] In <u>Bestfoods,</u> the Supreme Court, in an effort to resolve these differing standards, took a step back and looked at the bigger picture. In overturning the expansive interpretations previously given to CERCLA's operator standard, the <u>Bestfoods</u> court shifted the focus of the operator inquiry from the relationship between the parent and its subsidiary to the relationship between the parent and the physical facility itself. <u>See id.</u> at 67. But even parental management of facility operations was considered to further "sharpen" the definition, the Court stated that "<u>an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste</u>, or decisions about compliance with environmental regulations." <u>Id.</u> at 66-67 (emphasis added).

The <u>Bestfoods</u> Court also took clear steps to ensure that the operator liability standard would not be inconsistent with regular corporate behavior. Thus, "it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts." <u>Id.</u> at 69. Indeed, the Court announced a presumption that the actions of dual officers/directors were taken properly on behalf of the subsidiary

---

[25] For example, prior to <u>Bestfoods,</u> many courts applied an "actual control" test when assessing a parent's direct operator liability. <u>See, e.g.</u>, <u>U.S. v. Kayser-Roth Corp.</u>, 910 F.2d 24, 27 (1st Cir. 1990).

and, absent clear conflicts of interest or other compelling evidence, were not attributable to the parent. Id. at 70 and n.13.[26]

Finally, the Bestfoods Court envisioned three avenues through which a parent corporation could have operator liability. First, a parent might be held directly liable if it operated the facility "in the stead of its subsidiary or alongside the subsidiary in some sort of a joint venture." Id. at 71. Second, direct liability could also occur if a dual officer or director departed "so far from the norms of parental influence exercised through dual office holding as to serve the parent, even when ostensibly acting on behalf of the subsidiary in operating the facility." Id. Third, a parent could be directly liable if "an agent of the parent with no hat to wear but the parent's hat … manage[d] or direct[ed] activities at the facility." Id. In each instance, the actions at the facility must have related to pollution or waste disposal. Id. at 66-67.

Frontier will not be able to adduce evidence that will be sufficient under any of the three Bestfoods avenues to make UGI liable as an operator during the relevant 1901 to 1928 time period.

### a. There is no evidence that UGI managed or directed waste disposal operations at the Bangor MGP in the stead of or alongside BGLC during the relevant time period.

This first avenue appears to be the primary one that Frontier will seek to apply. Frontier alleges (but has little evidence to show) that UGI managed, conducted or directed operations at the Bangor MGP or Penobscot River but has no evidence showing that UGI was involved with the leakage or disposal of hazardous waste. Moreover, any showing Frontier makes regarding UGI's involvement with operations must not consist of "the interference that stems from the normal relationship between parent and subsidiary." Id. at 71. To survive summary judgment, Frontier must point to evidence of

---

[26] The Court noted that "the presumption that an act is taken on behalf of the corporation for whom the officer claims to act is strongest when the act is perfectly consistent with the norms of corporate behavior, but wanes as the distance from those accepted norms approaches the point of action by a dual officer plainly contrary to the interests of the subsidiary yet nonetheless advantageous to the parent." Id. at 70 n.13.

"eccentric" (as opposed to "normal") parental activity and such activity must specifically relate to the leakage or disposal of hazardous waste.  See id. at 66-67.

Utterly lacking such evidence,[27] Frontier likely will argue that any involvement UGI had at Bangor and shows control, but without regard for whether such involvement relates to the subsidiary, the facility, or pollution and without regard for whether the activity was really "directing" or "managing" as opposed to merely rendering advice or engaging in other normal parental activities.

For example, Frontier may argue that the "Agreement for Supervision of Operations", which BGLC and UGI entered into on January 1, 1927, somehow supports an inference that UGI was "operating" the MGP. (Ex. L).  This argument should be rejected for several reasons, including those noted by the court in rejecting Frontier's similar argument against CenterPoint.  First, the agreement has nothing to do with the relationship which AGCNJ had with its subsidiary BGLC prior to 1927.  Second, the agreement states that UGI is being retained as an "advisor" under and subject to the direction and control of the Board of Directors of BGLC.  See id. at UGIII0344.  Third, on the face of the agreement, UGI did not make decisions as an "operator" but rather provided recommendations as a consultant in order to improve the subsidiary's business.  E.g., id. at UGIII0347.[28]  Finally, the agreement called for UGI to provide consultation regarding financial, legal, engineering, human resources, public relations and related business matters.  There is no evidence, that this consultation would involve or did involve the leakage or disposal of hazardous waste.  The Eleventh Circuit concluded that an almost identical agreement was incapable of supporting an operator liability claim, see Atlanta Gas, supra, 463 F.3d at 105 n.6 and 1206-07, and the same conclusion is warranted here.

_____

[27] For example, all the UGI Board and Committee minutes that relate to Bangor are in the record (UGIII 0089 to 0152) and they show nothing about UGI's involvement with waste disposal practices.
[28] Indeed, the agreement is replete with references to UGI's obligation to "study" and "submit recommendations" (id. at Article II and III) to "review" the annual budget (id. at Article II); to provide "advice and assistance" (id.); to furnish if desired certain services (id.); to provide BGLC with the benefits of its research (id. at Article IV); to "advise and assist" in reference to engineering problems; to "study and report" on certain new developments (id. at Article IV), and so on.

**b.** **Whatever control UGI may have had over its BGLC subsidiary does not make it an operator of the MGP or the Penobscot River.**

Frontier is also likely to argue that UGI controlled BGLC and/or its management: that UGI selected the BGLC's managers; that UGI reviewed or approved various budgets, capital expenditures, property improvements, extensions, betterments, and contracts for supplies or was a centralized source for BGLC's purchasing needs. Even if Frontier could prove this type of conduct, it would be insufficient to establish operator liability under Bestfoods for several reasons.

First, it is clearly inconsistent with the Bestfoods operator liability standard to argue that this type of conduct should lead to liability because it is conduct directed toward its subsidiary, BGLC, rather than toward the facility. Indeed, Frontier's Complaint does not attempt to distinguish between control over BGLC and control over the facility, the Bangor MGP. (See, e.g., Compl. ¶¶ 85, 89.) Yet Bestfoods established that this distinction was critical (524 U.S. at 67-68 and 70) and thus explicitly rejected the "actual control" test under which simple control over the subsidiary's business, as opposed to control over the pollution-causing activities at the facility, was enough to create operator liability. Id. at 67-68. Second, these type of examples do not constitute involvement in the operations related to disposal or leakage of hazardous waste. The documentary record presents literally no evidence that UGI was involved in the myriad of day-to-day decisions involved in running a gas plant, i.e., how much gas to make, how many shifts to run, how to adjust the gas making process on a daily basis, what to do about leaks or spills, when and whether to empty holders or other equipment. Numerous BGLC employees, were involved in the day-to-day operations of the MGP. (Stat. of Mat. Facts ¶13; Ex. H.) While Frontier may have no choice but to assert that UGI directed the Manager and his staff with respect to Plant matters or to argue that the BGLC executives who did have oversight of the Manager or charge of general operations were really UGI personnel, there is simply no evidence to support these type of assertions. And, of course, there is no evidence of UGI's involvement in waste disposal decisions or practices.

Finally, even assuming, *arguendo*, that some of UGI's conduct related to facility operations, Frontier would need to distinguish UGI's conduct from normal parental oversight.  As the <u>Bestfoods</u> Court explained "the acts of direct operation that give rise to parental liability must necessarily be distinguished from the <u>interference</u> that stems from the normal relationship between parent and subsidiary." 524 U.S. at 71.  The Court emphasized that "norms of corporate behavior" remain "crucial reference points," noting that "activities that involve the facility, but which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures should not give rise to direct [i.e., operator] liability."  <u>Id.</u> at 71-72.  UGI's conduct was well within accepted norms for parental involvement with its subsidiary.  Specifically, approving or recommending subsidiary capital expenditures is an appropriate parental role,[29] as is articulating general policies and procedures.[30]  Likewise, case law holds that the decision-making authority inherent in UGI's role as a "purchasing agent" for BGLC is consistent with a parental role in a subsidiary corporation and does not demonstrate actual control of the Bangor MGP or its pollution-causing sources.

Other courts have not let overall control of the subsidiary or involvement in its business, substitute for <u>Bestfoods'</u> demanding level of proof.  For example, in the <u>Con Ed</u> case, the Frontier contended that UGI's claimed predecessor, American Gas, approved the purchase and installation of a purifier plant and a new water gas plant and that by these acts "assumed control" of operations at the MGP, which made it an operator.  <u>Con Ed</u>, 310 F. Supp.2d at 607.  <u>Id</u>.  Nevertheless, the district court, in a decision affirmed by the Second Circuit, found such evidence was insufficient, noting that "the record

---

[29] <u>See</u> <u>Con Ed</u> at 608-09 ("UGI's approval of [subsidiary] expenditures falls within the parameters of the parent-subsidiary relationship"); (evidence of UGI's appointment as purchasing agent insufficient as matter of law to establish UGI's control as operator); <u>Schiavone v. Pearce</u>, 77 F. Supp. 2d 284, 290 (D. Conn. 1999) (approval of capital expenditures, including those for pollution control equipment, was consistent with typical relationship between parent and subsidiary).

[30] <u>Bestfoods,</u> 524 U.S. at 72; <u>see also</u> <u>Datron, Inc. v. CRA Holdings, Inc.</u>, 42 F. Supp. 2d 736, 748 (W.D. Mich. 1999) (parent's establishment of corporate policy regarding engineering at subsidiaries' facility was part of legitimate parental oversight).

[wa]s devoid of any evidence" that American Gas had control over operations having to do with the leakage or disposal of hazardous waste.  Id.  Likewise, the Con Ed, Plaintiff claimed that operator liability arose because UGI served as the plant's purchasing agent and consulting engineer.  The court rejected that claim as well, stating that "any evidence that might support Con Ed's assertion would still be insufficient as a matter of law" since the establishment of engineering and purchasing functions would fall within the contours of permitted parental oversight.[31]

        c.        **When acting on behalf of BGLC, there is no evidence that dual officers or directors departed so far from the norms of parental influence so as to serve UGI and not BGLC's interests.**

Frontier may also resurrect the erroneous argument that the conduct of BGLC officers/directors who also were officers/directors of UGI shows that UGI operated the Bangor MGP alongside or in lieu of BGLC.  Unfortunately for Frontier, such claims flatly contravene Bestfoods' dual officer presumption by ascribing BGLC employee, officer and director conduct to UGI with no evidence of the "clear conflicts of interest or other compelling evidence" required by Bestfoods to overcome the presumption that actions of BGLC personnel were taken on behalf of BGLC.  See Bestfoods, 524 U.S. at 70 n. 13.  Indeed, many courts have rejected evidence of this kind as being capable of supporting an operator liability claim.[32] In short, Frontier cannot show operator liability by virtue of this argument.

        d.        **There is no evidence of any agent of UGI managing or directing activities relating to waste disposal at the Bangor MGP.**

In its opposition to CenterPoint's motion for summary judgment, Frontier tried to analogize to the First Circuit's decision in U.S. v. Kayser-Roth, 272 F.3d 89, 103 (1st Cir. 2001), which held that a

---

[31] Con Ed at 607-609.

[32] See, e.g., Atlanta Gas, 436 F.3d at 1206 (where a UGI employee was temporarily appointed "acting superintendent" of the subsidiary MGP; the superintendent was presumed to have been working on behalf of the MGP because there was nothing in the record that would support a finding that UGI operated the plant, let alone operated the pollution-causing sources); Raytheon Constructors, Inc. v. Asarco, Inc., 368 F.3d 1214, 1219 (10th Cir. 2003) (district court wrongly attributed conduct of subsidiary president to parent because of subsidiary president's strong affiliations with parent but without any evidence to rebut the presumption that his conduct was undertaken on behalf of the subsidiary); Datron, 42 F. Supp. 2d at 748 (dual officer's multiple roles was not evidence that the parent was liable as an operator; under Bestfoods, it was not enough to establish that a dual officer or director supervised activities at the facility).

parent representative who occupied no position as "an officer or director of the subsidiary" and who "directly exerted operational control over environmental matters" at the subsidiary's facility was probative of defendant's liability as an operator. This Court rejected the analogy vis-à-vis CenterPoint and should do so here because there is simply no evidence that any agent of UGI with "no hat to wear" but UGI's managed or directed activities at the facility relating to the leakage or disposal of hazardous waste at the Bangor MGP. Bestfoods, 524 U.S. at 71.

The record contains no specific evidence of UGI personnel directing or conducting emissions of tar or other by-products into the environment at the Bangor MGP between 1901 and 1928. The record also presents no example of any specific waste handling policies or procedures at the Bangor MGP, nor evidence demonstrating UGI's involvement with such practices. By contrast, cases finding a defendant liable as an operator diverge sharply from this case, focusing on the defendant's regular, active involvement with environmental policy or hazardous waste disposal.[33]

IV.  **CONCLUSION**

This is an unusual case in that there are no fact witnesses to testify on matters which bear on liability. The documentary record before the court cannot support that any alleged control that UGI might be deemed to have exercised over BGLC was improper or constituted a fraud or injustice, much less one that caused the injury to Frontier of which it complains. Likewise the same documentary record does not support the claim that UGI managed, directed or conducted operations at the Penobscot River or the Bangor MGP that specifically related to the leakage or disposal of hazardous waste. Accordingly, summary judgment should be granted to UGI.

---

[33] See, e.g., U.S. v. Jones, 267 F. Supp. 2d 1349, 1355-56 (M.D. Ga. 2003) (finding that the defendant "made all of the important decisions involving the facility," was "the primary decision-maker over the facility's compliance with environmental regulations," and was "directly involved in the hiring of environmental consultants, with whom he regularly communicated about the facility's environmental compliance").

Dated:  November 5, 2009

Respectfully submitted,

**UGI Utilities, Inc.**

By Its Attorneys,

_____
*s/ E. Tupper Kinder, Esquire*

E. Tupper Kinder, Esquire
Christopher D. Hawkins, Esquire
(#004047)
NELSON, KINDER, MOSSEAU & SATURLEY, PC
99 Middle Street
Manchester, New Hampshire 03101
(603) 647-1800

s/ Jay N. Varon, Esq.
Foley & Lardner LLP
3000 K Street, N.W., Suite 500
Washington, D.C. 20007
(202) 672-5300
jvaron@foley.com

**CERTIFICATE OF SERVICE**

I hereby certify that on November 5, 2009 a true copy of the foregoing **UGI Utilities Inc.'s Motion for Summary Judgment and Incorporated Memorandum of Law** was sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

_____
s/ E. Tupper Kinder

E. Tupper Kinder, Esquire