UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| FRONTIER COMMUNICATIONS CORPORATION, | )<br>)<br>) Civil Action No. 1:07-cv-00113-GZS |
| Plaintiff, | )<br>) |
| v. | )<br>) |
| BARRETT PAVING MATERIALS, INC., *et al*., | ) |
| Defendants. | |

**PLAINTIFF FRONTIER COMMUNICATIONS CORPORATION'S OPPOSITION TO DEFENDANT UGI UTILITIES, INC.'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to the Federal Rules of Civil Procedure and the Local Rules of this Court, Plaintiff Frontier Communications Corporation ("Frontier") respectfully submits this opposition to Defendant UGI Utilities, Inc. ("UGI")'s Motion for Summary Judgment.

**INTRODUCTION**

Several months ago, the Magistrate recommended that the Court grant an early dispositive motion filed by Defendant CenterPoint Energy Resources Corp. ("CenterPoint"). Now, after the deadline for filing such early dispositive motions has passed and the Magistrate has lifted the years-long stay on discovery, UGI has filed its own motion for summary judgment. UGI's motion points out that the facts here in dispute revolve around the interpretation of historical documents; no fact witnesses are alive or available to testify about UGI's activities during the period it owned the Bangor Gas Light Company ("BGLC"). But this incomplete cache of century-old documents is not the sort of evidence that can serve as the basis for summary judgment. The 2005 trial regarding the potential sources of contamination in Dunnett's Cove demonstrated that, even when there is little or no direct evidence of historic releases,

1

inferences drawn from circumstantial evidence can serve as a basis for imposing environmental liability. Similarly, the evidence of UGI's liability—especially given that discovery remains incomplete—is more than sufficient to survive UGI's summary judgment motion.

**BACKGROUND**

Two distinct pieces of background are important to the resolution of UGI's motion for summary judgment. The first involves the factual questions surrounding the operation of the Bangor Gas Works manufactured gas plant by UGI's predecessor. The second relates to the procedural history of this case and the prior, related litigation, *City of Bangor v. Citizens Communications Company*, No. 02-cv-0183.

**A.     The role of UGI's predecessor in the operation of the Bangor Gas Works**

The available evidence shows that when UGI's predecessor purchased the stock of BGLC in 1901, it began treating BGLC as a department of the parent company.[1] Opposing Statement of Material Facts ("OSMF") ¶ 3. UGI's predecessor took complete control of decisions concerning the Gas Works facility, such as construction of numerous plant improvements (OSMF ¶¶ 5-7), as well as more minor decisions about BGLC's budget (OSMF ¶ 4, 15). In fact, under BGLC's 1910 corporate by-laws, the President of BGLC, who was also a director of UGI's predecessor, had "absolute control" over the "practical management" of BGLC. OSMF ¶ 10.

Through its construction arm, UGI's predecessor made extensive additions and modifications to the Bangor Gas Works plant, including the rebuilding of the coal gas plant and several additions of purification equipment. OSMF ¶ 7-8. These additions and modifications to the gas manufacturing equipment inevitably involved the handling of any tar-laden wastewater

---

[1]     UGI has conceded, for purposes of the present motion, that American Gas Company, the direct owner of BGLC's stock, is a predecessor of UGI. *See* Docket No. 172, UGI's Motion for Summary Judgment and Incorporated Memorandum of Law ("UGI Mot.") at 3 n.8.

2

created during the gas manufacturing process. Indeed, UGI's predecessor in 1912 directed the addition of a "Tar and Ammonia Separator," which was the first piece of tar separation equipment known to have been constructed at the Bangor Gas Works. OSMF ¶ 7e.

Just as UGI's predecessor put a great deal of effort into the operation of the Bangor Gas Works and BGLC, it also took a great deal out of its subsidiary's bottom line. BGLC was chronically undercapitalized, primarily because most of its profits were extracted by its parent company. OSMF ¶ 17. The dual officers of BGLC and UGI's predecessor also directed the transfer of $300,000 in bonds—more than $7 million in today's dollars—from BGLC to UGI's predecessor. OSMF ¶ 18. Although this money was supposed to be spent by UGI's predecessor to make improvements at the Bangor facility, the Maine Public Utilities Commission ("PUC") concluded that only about $50,000 was ever used for that purpose. OSMF ¶ 19. The remainder was never properly accounted for. OSMF ¶ 20.

UGI's predecessor sold BGLC to American Commonwealth Power Corporation in 1928. OSMF ¶¶ 23-24.

### B. The status of discovery in the present case

For years, UGI has successfully resisted discovery concerning the activities of its predecessor. In June 2003, UGI and other third party defendants in the prior incarnation of this case moved to stay Frontier's discovery efforts against them. *See* Case No. 02-cv-0183, Docket No. 114. As a result, the third parties' obligation to respond to Frontier's discovery requests was extremely limited by a subsequent order issued by the Magistrate. *See* Case No. 02-cv-0183, Docket No. 373 at 2. In August 2004, again at the behest of UGI and other third party defendants, the Magistrate formally bifurcated the "primary case" between the City and Frontier, leaving Frontier's case against CenterPoint and the other third parties on indefinite hold. *See* Case No. 02-cv-0183, Docket No. 404. Bifurcation (and the associated stay of discovery) was

3

done over Frontier's objection, with disastrous consequence for efficient trial and resolution of the case. After settlement of the dispute between the City and Frontier, the Court entered a Consent Decree resolving the "primary" claims, and ordered Frontier to file its third party claims as a new action. *See* Case No. 02-cv-0183, Docket No. 771.

Although Frontier promptly filed the present action in compliance with the Court's order, this case then was stayed in its entirety while the First Circuit resolved the appeal in the prior case. *See* Docket No. 70, Order Granting Stay of Action. Once the First Circuit issued its mandate in the appeal of the prior case, the Magistrate ordered that discovery in the present case remain stayed while the parties developed a scheduling order. *See* Docket No. 75, Report of Telephone Conference and Order. In October 2008, at the request of the litigants, the Magistrate entered several orders that continued the stay of discovery until "after the parties . . . have had an opportunity to have 'early' dispositive motions finally resolved." Docket No. 87, Report of Telephone Conference and Order. UGI did not elect to file the instant motion within the Court's deadline for early dispositive motions.

Eventually, the Magistrate lifted the stay of discovery. Docket No. 165, Report and Recommended Decision at 14. Some time after the Magistrate's order, but before UGI received or responded to any discovery, UGI filed the instant summary judgment motion. Frontier has now submitted several discovery requests to UGI, and UGI is obliged to answer them.[2]

---

[2] Frontier has submitted an affidavit together with this motion explaining the current status of its discovery requests to UGI. *See* Affidavit of Martha C. Gaythwaite. Pursuant to Federal Rule of Civil Procedure 56(f), Frontier contends that until UGI fully complies with these pending discovery requests, facts essential to arguments against summary judgment remain unavailable. Frontier accordingly requests that UGI's motion be denied without prejudice to its being renewed when discovery has been completed.

4

## ARGUMENT

Federal Rule of Civil Procedure 56(c) authorizes a court to enter summary judgment in favor of a moving party if "the pleadings, the discovery and disclosure materials on file and any affidavits show that there is no genuine issue of material fact" and "the movant is entitled to judgment as a matter of law." In determining whether a material factual dispute exists, "a court must view the record in the light most favorable to the nonmoving party and draw reasonable inferences in favor of the same." *Chadwick v. WellPoint, Inc.*, 561 F.3d 38, 41 (1st Cir. 2009).

Under the U.S. Supreme Court's decision in *United States v. Bestfoods*, 524 U.S. 51 (1998), two separate and distinct legal routes are available to a plaintiff seeking to hold a parent corporation liable under CERCLA for contamination at a facility owned by the corporation's subsidiary. First, a plaintiff may establish ***direct*** liability by showing that the parent corporation itself was an "operator" of the relevant facility. *See id*. at 64. Second, a plaintiff may establish ***indirect*** or derivative liability by piercing the veil between the parent and its subsidiary. *See id*. at 63-64. Here, UGI is liable both directly and indirectly under CERCLA § 107(a) due to the acts of its acknowledged predecessor.

**I.   UGI is directly liable under CERCLA for any contamination caused by releases from the Bangor Gas Works.**

    **A.   The evidence already available would allow a reasonable fact finder to conclude that UGI's predecessor operated the Bangor Gas Works.**

In *Bestfoods* the Supreme Court employed what it considered to be the plain meaning of the statutory term "operator," recognizing that "in the organizational sense more obviously intended by CERCLA, the word ordinarily means 'to conduct the affairs of; manage; *operate a business*.'" *Id*. at 66 (emphasis in original) (brackets omitted). The Court concluded that, "under CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility." *Id*. Importantly for present purposes, the Court emphasized that

"operation" in the CERCLA sense "obviously mean[s] something more than mere mechanical activation of pumps and valves . . . ." *Id*. at 71. Rather, the term "must be read to contemplate 'operation' as including the exercise of discretion over the facility's activities." *Id*.

In addressing CenterPoint's motion for summary judgment, the Magistrate emphasized that Frontier has the burden of producing evidence that "the parent was exercising control over environmental policy, attempting to resolve a distinct pollution problem, or directing a release of hazardous waste." Docket No. 152, Recommended Decision on Defendant CenterPoint's Motion for Summary Judgment ("Rec. Dec.") at 14. This requirement sets the bar too high. There is no evidence in this case that, in the unregulated era of the early 1900s, **BGLC** exercised control over "environmental policy," attempted to resolve a distinct "pollution problem," or directed a release of "hazardous waste." Indeed, it would be anachronistic to expect such evidence—concepts like "environmental policy" and "pollution problems" simply did not exist at the time UGI's predecessor was involved with the Bangor Gas Works.

Moreover, the Court's findings after the trial in the previous incarnation of this case noted the lack of direct evidence that the Bangor Gas Works was even connected to the sewer that drained into the Penobscot River. *See* Case no. 02-cv-0183, Docket No. 658, Findings of Fact and Conclusions of Law ("Findings and Conclusions") ¶ 61.[3] The Court's conclusion that the Gas Works nonetheless discharged contaminated wastewater into the sewer accordingly was therefore necessarily based on "the preponderance of circumstantial evidence." *Id*. ¶ 79. It would be completely inappropriate to demand direct evidence of pollution-related operational

---

[3] The Court's Findings and Conclusions were ultimately superseded by a Consent Decree (*see* Case No. 02-cv-0183, Docket No. 771 at 2), but they provide useful factual context for purposes of the present motion.

decisions by UGI's predecessor, especially in the context of a summary judgment motion, when all of the evidence must be viewed in the light most favorable to the non-moving party.

The circumstantial evidence strongly suggests that UGI's predecessor made operational decisions that would have implicated the disposal of any contaminated wastewater. The prime example of such decisions are the several instances in which UGI's predecessor rebuilt or upgraded the plant's gas manufacturing facilities. OSMF ¶ 7. This sort of change to the basic way in which the plant operated would inevitably have involved changes in wastewater discharge. UGI's predecessor could not have directed the former without also directing the latter. In addition, the evidence that UGI's predecessor exercised a high degree of control over operational minutiae at the Gas Works (OSMF ¶¶ 4, 7, 15), and entered into operational contracts giving UGI's predecessor significant control over activities at the Gas Works (OSMF ¶¶ 12-13) indicates that the predecessor also would have controlled any decision relating to the disposal of wastewater. This evidence, circumstantial though it may be, is more than sufficient to withstand UGI's summary judgment motion.

**B.      Expert testimony is appropriate to interpret the documents at issue in this case.**

Much of UGI's argument for summary judgment hinges on a narrow parsing of the documents regarding its predecessors activities. *See, e.g.*, UGI Mot. at 16. This heavy reliance on the interpretation of the select documents—and it is acknowledged by all sides that many relevant documents have been lost over the years—is problematic as a matter of history. UGI's predecessor owned BGLC from 1901 to 1928. The documents at issue are thus in the range of 81 to 108 years old. Indisputably, a lot about the relationships between parent and subsidiary corporations has changed in the intervening years. Indeed, the specific type of relationship that

UGI's predecessor had with its subsidiaries was outlawed when Congress passed the Public Utilities Holding Company Act in 1935.

In light of these changes, the most sensible way to interpret the available historical materials is with input from experts who can provide context and meaning to the documents at issue. *See Langboard v. United States Dep't of Treasury*, 2009 WL 1312576, at *3-*7 (E.D. Pa. May 7, 2009) (approving the use of experts whose opinions were based on interpretation of "historical documents and reports" from the 1930s). Frontier had designated just such an expert for these purposes in the prior case, and that same expert is available to testify in this action. *See* Affidavit of Martha C. Gaythwaite. That expert's knowledge of corporate governance in the early 20th century is an invaluable and, in this case, essential guide for the finder of fact. UGI undoubtedly will designate its own corporate history expert. At the very least, these specialists should be deposed regarding their reading of the historic record before any decision is made on UGI's summary judgment motion.

## II. UGI is indirectly liable for contamination caused by its predecessor's *alter ego*.

### A. There is adequate evidence to conclude that UGI's predecessor was the *alter ego* of BGLC.

The basic veil-piercing rule in Maine is relatively simple and easily satisfied. Plaintiffs seeking to impose liability on parent corporations need only show that: "(1) the defendant abused the privilege of a separate corporate identity; and (2) an unjust or inequitable result would occur if the court recognized the separate corporate existence." *Johnson v. Exclusive Properties Unlimited*, 720 F.2d 568, 571 (Me. 1998). Maine courts consider "a variety of factors" to determine when a defendant has abused its separate corporate identity, including, among others, "common ownership," "pervasive control," "nonobservance of corporate formalities," "absence of corporate records," "nonfunctioning of officers and directors" and "use of the corporation for

transactions of the dominant shareholders." *Id*. In short, Maine courts are free to "disregard the theory of separate corporate existence to prevent injustice or inequitable consequences." *Id*.[4]

Just as the Magistrate rightly concluded in the case of CenterPoint (*see* Rec. Dec. at 20, n.11), the evidence in this instance is sufficient to survive summary judgment on the *alter ego* question for UGI. BGLC was completely dominated by its sole shareholder, UGI's predecessor company. Even expenditures as small as $3 were subject to the parent company's oversight. OSMF ¶ 15. And BGLC was used to perform transactions that benefitted only UGI's predecessor, including the transfer of hundreds of thousands of dollars in bond proceeds from the subsidiary to the parent. OSMF ¶¶ 18-20. For all of these reasons, a reasonable finder of fact could conclude that UGI's predecessor was the *alter ego* of BGLC.[5]

### B. It would be inequitable to allow UGI to evade responsibility for the environmental harms that padded its predecessor's profits.

UGI contends that equitable considerations weight against veil-piercing in this case, failing to recognize that a number of courts have allowed piercing that would result in holding a polluter responsible for the damage it has caused to the environment. As one District Court in this circuit explained, "public convenience, fairness, and equity dictate" that controlling parent companies be held liable for contamination caused by their subsidiary because "[a]ny other result would provide too much solace to deliberate polluters, who would use this device as an escape." *Kayser-Roth*, 272 F.3d at 93 (quoting *United States v. Kayser-Roth Corp.*, 724 F. Supp. 15, 24 (D.R.I. 1989)); *see also Town of Oyster Bay v. Occidental Chem. Corp.*, 987 F. Supp. 182, 204 (E.D.N.Y. 1997) (holding that "immunizing [a parent] from liability . . . would encourage

---

[4] Maine's Supreme Judicial Court also has unequivocally held that veil piercing "does not require a finding of fraud or illegality." *Id*. at 572.

[5] Again, the assistance of an expert in corporate governance during the early 20th century could provide additional helpful context to the fact finder. As it was in the prior phase of the case, Frontier is prepared to provide such an expert here.

corporate parents to disregard the separate existence of subsidiaries with questionable environmental track records"). A parent company that profits from the ownership of a subsidiary, including the subsidiary's disposal of hazardous substances, simply cannot equitably disclaim liability for the costs of cleaning up those substances. *See AT&T Global Info. Solutions Co. v. Union Tank Car Co.*, 29 F. Supp. 2d 857, 868 (S.D. Ohio 1998).

UGI's predecessor plainly extracted profits out of BGLC during the years that it owned the company, and those profits were undoubtedly increased due in part to whatever environmental contamination BGLC caused. Now such polluting activities are a partial cause of a multi-million dollar cleanup in Dunnett's Cove. It is perfectly fair—and indeed, it is common in these sorts of environmental contamination cases—to impose liability on a parent company that profited from a subsidiary engaged in pollution-causing activities.

## CONCLUSION

For the reasons stated above, Frontier respectfully requests that the Court deny UGI's motion for summary judgment.

Respectfully submitted,

Dated: December 8, 2009 /s/ Martha C. Gaythwaite

Martha C. Gaythwaite
FRIEDMAN GAYTHWAITE WOLF & LEAVITT
Six City Center
P.O. Box 4726
Portland, ME 04112-4726
(207) 761-0900

Of Counsel:
John S. Hahn
Jay C. Johnson
MAYER BROWN LLP
1909 K Street, NW
Washington, DC 20006-1101
(202) 263-3000

10

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the date shown below, copies of the following document(s):

**PLAINTIFF FRONTIER COMMUNICATIONS CORPORATION'S OPPOSITION TO DEFENDANT UGI UTILITIES, INC.'S MOTION FOR SUMMARY JUDGMENT**

was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to the attorney/parties of record who have registered as CM/ECF participants.

Dated: December 8, 2009

                                                        Respectfully submitted,

                                                        /s/ Martha C. Gaythwaite
                                                        Martha C. Gaythwaite
                                                        FRIEDMAN GAYTHWAITE WOLF & LEAVITT
                                                        Six City Center
                                                        P.O. Box 4726
                                                        Portland, ME 04112-4726
                                                        (207) 761-0900

Of Counsel:

John S. Hahn
Jay C. Johnson
MAYER BROWN LLP
1909 K Street, NW
Washington, DC 20006-1101
(202) 263-3000