UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

FRONTIER COMMUNICATIONS          )
CORPORATION,                     )
                                 )
          Plaintiff,             )
                                 )
     v.                          )          No. 07-cv-113-B-GZS
                                 )
BARRETT PAVING MATERIALS, INC.,  )
*et al.*,                        )
                                 )
          Defendants             )


## RECOMMENDED DECISION ON MOTION TO DISMISS
## RAILROAD DEFENDANTS' THIRD-PARTY COMPLAINT

Defendants Maine Central Railroad Company and Guilford Transportation Industries,

Inc. ("the Railroad")[1] have filed an eight-count third-party complaint in this action, alleging that

the City of Bangor must indemnify them for any liability they may have in the main action

brought by Frontier Communications Corporation under the Comprehensive Environmental

Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601 *et seq.*, and also

seeking a declaration setting aside the Consent Decree entered in the prior litigation between the

City and Frontier.  The Railroad also alleges claims against Norman Heitmann, city attorney, and

Edward Barrett, former city manager.  (Am. Third-Party Compl., Doc. No. 206.)  The third-party

defendants have filed a motion to dismiss the third-party complaint.  (Third-Party Defs.' Mot. to

Dismiss ("Mot."), Doc. No. 213.)  The Court referred the matter for report and recommendation

pursuant to 28 U.S.C. § 636(b).  Based on my review of the complaint, the motion papers, and

the applicable law, I recommend that the Court grant the motion and dismiss all claims except

---

[1]     Guilford Transportation Industries is now Pan Am Railways, Inc.  (See Aug. 8, 2009 Order granting Mot. to Substitute Party, Doc. No. 151.)

the Count VIII contract indemnification claim and the Count VII declaratory judgment claim that corresponds with the claim in Count VIII.

## THE DISMISSAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides that a complaint can be dismissed for "failure to state a claim upon which relief can be granted."  To properly allege a claim in federal court, it is not enough merely to allege that a defendant acted unlawfully;  a plaintiff must affirmatively plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, ___ U.S. ___, ___, 129 S. Ct. 1937, 1949 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007)). Stated otherwise, the complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face."  Id. (quoting Twombly, 550 U.S.  at 570.

To decide a motion to dismiss, the court accepts as true the factual allegations contained in the complaint, draws all fair and reasonable inferences for the plaintiff that are supported by the factual allegations, and determines whether the complaint, so read, sets forth a plausible basis for recovery.  Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 320 (1st Cir. 2008). Evaluating "plausibility" is a highly contextual enterprise.  "[T]he court's assessment of the pleadings is context-specific, requiring the reviewing court to draw on its judicial experience and common sense."  Maldonado v. Fontanes, 568 F.3d 263, 268 (1st Cir. 2009) (internal quotation marks omitted).  With regard to the record for decision, the court is not always restricted to reviewing just the plaintiff's allegations.  Where, as here, the complaint incorporates, relies upon, or attaches exhibits that inform the factual allegations, the court is free to consider the exhibits for purposes of addressing a motion to dismiss.   Trans-Spec Truck Serv., 524 F.3d at 321.

## PROCEDURAL BACKGROUND

The Railroad's third-party action has a history already well-known to the Court, which I merely sketch out here for the sake of coherency. The instant litigation by Frontier is based upon a prior litigation brought against Frontier (then Citizens Communications Company) by the City of Bangor to obtain environmental remediation for a portion of the Penobscot River known as Dunnett's Cove. In the prior litigation, Frontier was the defendant and the Railroad and numerous other entities were third-party defendants to Frontier's third-party action. Frontier and the City settled the prior litigation and assumed certain obligations in a Consent Decree executed by the State of Maine, the Maine Department of Environmental Protection, the City, and Frontier/Citizens. (See Am. Consent Decree in City of Bangor v. Citizens Communications Co., Case No. 02-cv-183-B-S, Doc. No. 755.) Frontier paid $7.625 million to the City to fund the environmental remediation effort. (Compl. ¶ 110.) The City assumed responsibility for overseeing the remediation work and, in exchange for Frontier's payment, assumed Frontier's liability related to the Site. (Am. Consent Decree ¶ 10.) Both the City and Frontier obtained "contribution protection" against Site-related claims and retained the right to seek contribution from other potentially responsible parties (PRPs). (Id. ¶ 9.) Pursuant to the Settlement Agreement between the City and Frontier, the City assigned to Frontier all of its claims against other PRPs. (Compl. ¶ 101.) Following the settlement and entry of the Consent Decree on the docket, the Court dismissed Frontier's third-party claims without prejudice and terminated the litigation between the City and Frontier. Thereafter, Frontier commenced the instant litigation, naming as first-party defendants those entities that previously had been third-party defendants, with the exception of certain PRPs who settled in the interim.

In both this litigation and the preceding litigation Frontier alleged that the Railroad caused or contributed to deposits of hazardous substances located in Dunnett's Cove. That contributory liability is alleged to have arisen through the operation of a rail yard along the banks of the Cove. (Compl. ¶¶ 66-78.)

## THE AMENDED THIRD-PARTY COMPLAINT

The Railroad contends in its third-party complaint that the City of Bangor and/or the City's attorney and former manager are liable to it "for all liability incurred in defending itself against the claims of Plaintiff, Frontier." (Id. ¶ 14.) The bases for this contention and other requested relief are spread across eight counts, as follows.

### Count I

With Count I, the Railroad alleges that the City entered into a binding contract, in January 2004, to indemnify the Railroad against all claims for environmental harm associated with the Dunnett's Cove Site. (Id. ¶ 16.) The allegations that inform this "contractual indemnity" claim are as follows:

17. The City itself and through City Attorney Norman Heitmann, City Manager Edward Barrett, and its retained legal counsel agreed to indemnify the Railroad against any judgment or settlement resulting from Frontier's claims against the Railroad or any other third-party claims.

18. On or about December 30, 2003 retained legal counsel for the City of Bangor, State of Maine, executed on behalf of the City of Bangor an indemnity agreement reached between the City of Bangor, Maine, and Guilford Transportation, Inc. and Maine Central Railroad Company.

19. On or about December 30, 2003, counsel for the Railroad received a document from legal counsel for the City memorializing the indemnity agreement between the City of Bangor, Maine, and the Railroad, a true copy of which Indemnification Agreement is attached as Exhibit B.

20. In addition to indemnity, the Indemnification Agreement between the Railroad and the City of Bangor, Maine included payment of the Railroad's legal

fees by the City and the Railroad's duty to cooperate with the City in its pursuit of claims against Citizens including but not limited to the sharing of non-privileged information and coordination of discovery and pretrial strategies.

21. At the time of the December 30th Indemnification Agreement attached as Exhibit B, William Devoe and Andrew Hamilton and the firm of Eaton Peabody were the attorneys of record and representing the City of Bangor, Maine in its lawsuit against Frontier (at that time Citizens).

22. On January 5, 2004, Frederick J. Badger executed the Indemnification agreement (Exhibit B) as counsel for Guilford Transportation, Inc. and Maine Central Railroad Company.

23. The form of the Indemnification Agreement (i.e., a letter) was requested by counsel for the City of Bangor, Andrew Hamilton.

24. The City of Bangor performed some of the obligations under the Indemnification Agreement by the payment of attorney's fees and costs incurred by Guilford Transportation, Inc. and Maine Central Railroad Company in its defense of Frontier's claims.

25. During the course of the litigation, the Railroad relied on the Indemnification Agreement. Reliance included cooperating with the City in discovery, sharing pretrial strategies, refraining from filing directly against the City, and refraining from objecting to portions of the settlement and Consent Decree entered into between the City and Citizens.

26. Norman Heitmann, individually and/or as City Attorney, Edward Barrett, individually and/or as City Manager, Andrew Hamilton as attorney for the City, and William Devoe as attorney for the City, all represented that the City would be bound by the Indemnification Agreement.

27. The City of Bangor, Maine through its counsel made multiple representations that the City would honor the Indemnification Agreement during the course of the litigation between the City and Frontier over the alleged contamination in Dunnett's Cove.

28. The representations that the City would honor the Indemnification Agreement occurred even after the City had entered into a settlement and Consent Decree with Frontier.

29. On or about April 2009 the City through its counsel refused to honor the terms of the Indemnification Agreement.

30. The refusal by the City to honor the Indemnification Agreement constitutes a

breach of the duty to indemnify and possible grounds for setting aside, reconsideration of, or relief from, in whole or in part, the settlement and Consent Decree entered into between the City and Citizens.

Exhibit B is a letter authored by the City's outside counsel and directed to the Railroad's outside counsel. The letter is signed by outside counsel for both parties. The body of the letter reads as follows:

> This letter is intended to memorialize the agreement between the City of Bangor, Maine ["the City"] and Guilford Transportation, Inc. and Maine Central Railraod [sic] Company [collectively, "the Railroad"] regarding indemnification and cost-sharing in the context of the above-referenced litigation.

> The City has agreed to indemnify the Railroad for any recovery, by way of settlement or judgment, made by Citizens Communications Co. in the context of its third party complaint against the Railroad in this proceeding, or by any other third party defendant to this proceeding to the extent they recover, by way of settlement or judgment, pursuant to a claim for contribution against the Railroad in this proceeding. The City has agreed to reimburse 75 percent of the Railroad's legal fees from the onset of this matter, which we define as the filing of the third party complaint and the Railroad's retention of you as counsel, through submission and any oral argument on a motion for summary judgment, with a cap on the City's contribution at $75,000.00. The latter figure represents 75% of your projected total fees, which we understand to be approximately $100,000.00. In addition, the City has agreed to reimburse the Railroad its out-of-pocket costs for document management (limited to $7,000.00), and 75% of all other out-of-pocket costs including the costs for expert witnesses, with a cap on the City's contribution toward the Railroad's expert witness fees, through the submission and argument of a summary judgment motion, of $9,000.00. The latter figure represents 75% of your projected total expert witness fees, for this period, of $12,000.00.

> In exchange for the indemnification and cost-sharing agreement, the Railroad will make every reasonable effort to cooperate with the City in pursuit of its claim against Citizens, including but not limited to the sharing of non-privileged information and coordination of discovery and pre-trial strategies in this matter. The City, because it will serve to reduce the fees incurred by the Railroad, will provide the Railroad and its counsel with appropriate support, including but not limited to support in the research and drafting of dispositive motions in this case.

> Both parties anticipate that the Railroad will endeavor to secure a summary judgment in its favor at the earliest opportunity. Should that effort prove unsuccessful, the parties will revisit the cost-sharing arrangement set forth above

with respect to projected fees and costs through the conclusion of trial, subject to the present good faith understanding that a continuing arrangement will likely approximate the arrangement set forth above.

If I have misstated any aspect of the agreement between the City and the Railroad in this matter, please let me know. Otherwise, I would appreciate your signing the "seen and agreed to" line below and returning an original copy of the signed 1etter to me for my file.

(Compl. Ex. B, Doc. No. 206-2.) The letter was signed by counsel for both sides as of January 5, 2004, during the pendency of the underlying litigation. (Id.) I refer to this letter as the 2004 Letter Indemnification Agreement.

*Count II*

In Count II, the Railroad claims "breach of contract," and attaches Exhibit C, a 1996 Real Estate Purchase Option Agreement. This document is associated with the City's purchase from the Railroad of real estate situated along the banks of Dunnett's Cove. Exhibit C contains the following material language:

17. HAZARDOUS WASTE. The Buyer hereby acknowledges that the Buyer is purchasing the Premises "as is", "with all faults" and subject to the possible existence of hazardous materials, petroleum products and/or other pollutants regulated by law. Notwithstanding the foregoing, the Buyer, for itself, its successors, assigns and grantees hereby irrevocably waives, gives up and renounces any and all claims or causes of action against the Seller in respect of any claims, suits, and/or enforcement actions, including any administrative or judicial proceedings and any remedial, removal, or response actions ever asserted, threatened, instituted, or requested by any person (including any government agency) on account of: (a) any release of oil or hazardous materials (as those terms are defined in the Comprehensive Environmental Response Compensation, and Liability Act of 1980 (42 U.S.C. § 9601, et seq.) or any applicable state law) on, upon, or into the Premises; and (b) any and all damage to real or personal property, natural resources, and/or harm to persons alleged to have resulted from such release of such oil hazardous materials [sic] upon the Premises. This provision shall survive the delivery of the Deed.

(Compl. Ex. C, ¶ 17, Doc. No. 206-3.) Based on the foregoing recital, the Railroad asserts that the City has waived any and all claims or causes of action against it. (Compl. ¶ 33.)

The Railroad also alleges that the City agreed "to indemnify the [Railroad] for all loss, damage or expense including attorney's fees arising [or] in any way resulting from the presence or activities upon the premises by the buyer".  (Id. ¶ 34.)  This allegation is followed by another to the effect that the City "caused or allowed the presence and/or release of oil and/or hazardous substances and/or materials on the premises in violation of the terms of Exhibit C".  (Id. ¶ 35.) With respect to the provision of an indemnity in connection with the purchase, the Agreement provides as follows:

> 5.  DEED PLAN.  The Seller's obligations under this Agreement are conditioned upon the Buyer furnishing the following items to the Seller no later than ten (10) days prior to the Closing Date:
>
>> (a)  A satisfactory linen or mylar deed plan of the Premises ("the Plan") which:  (i) is prepared by a registered land surveyor . . .
>>
>> (b)  A description of the Premises by metes and bounds . . . .
>
> The Seller agrees to reasonably cooperate with the Buyer or the Buyer's agents to furnish  the information necessary for the Buyer to complete the Plan.
>
> The Buyer agrees to indemnify the Seller for all loss, cost, damage and expense (including reasonable attorneys' fees and expenses) arising in any way out of and resulting from the presence or activities upon the Premises by the Buyer, said registered land surveyor or the Buyer's agents, servants, employees or contractors or any of them, whether such loss, cost, damage or expense is incurred by the Seller, the Buyer, said registered land surveyor or the buyer's agents, servants, employees or contractors of the same, or by others, but not including any liabilities arising out of the presence, investigation, or remediation of any hazardous wastes or hazardous substances located on the premises, except as provided in paragraph 17 below [referring to the hazardous waste provision set out above in this Recommended Decision].

(Compl. Ex. C, ¶ 5.)  Notably, paragraph 5 of the Real Estate Purchase Option Agreement is entitled "Deed Plan."  That paragraph called for the City, as buyer, to provide a deed plan prepared by a registered land surveyor.  (Id.)  There is no language suggesting the indemnity would extend beyond the limited obligation to prepare and furnish a deed plan.

The breach of contract theory espoused in Count II is set out in the following two allegations:

36. The purported assignment of the City's claims against the Railroad to Frontier is invalid and constitutes a breach of contract.

37. The suit commenced by Frontier as assignee of the City of Bangor's claims against the Railroad relating to Dunnett's Cove constitutes a breach of contract under the terms of Exhibit C and possible grounds for setting aside, reconsideration of, or relief from, in whole or in part, the settlement and Consent Decree entered into between the City and Citizens.

According to the Complaint, the Railroad is entitled to recover from the City on a breach of contract claim because the City assigned all of its claims to Frontier upon settlement of the preceding litigation, despite having promised the Railroad in 1996 that it (the City) waived and renounced all claims against the Railroad and would indemnify the Railroad against claims.

*Count III*

Count III recites another breach of contract claim, this time premised on Exhibit D, the Release Deed associated with the same conveyance of real estate in 1996. A review of Exhibit D reflects that it contains, in paragraph 6, a wavier provision that is in all material respects the same as the paragraph 17 hazardous waste provision found in Exhibit C. Notably, the Release Deed does not contain any indemnification provision such as the one found in Exhibit C, further evincing that the Exhibit C indemnification extended only to harms arising in relation to preparation of the deed plan. (Compl. Ex. D, Doc. No. 206-4.) The Release Deed contains the following additional language:

By the acceptance of this deed and as part consideration therefor, the Grantee hereby assumes any and all agreements, covenants, obligations and liabilities of the Grantor in respect to any underground facilities, drainage culverts, walls, crossings and/or other structures of any nature and description located in whole or in part within the Premises.

(Id. ¶ 5.)  The Railroad alleges that the City has assumed all of the Railroad's liabilities and that the City's "purported assignment of . . . claims against the Railroad to Frontier is invalid and is a breach of the terms of the Release Deed."  (Compl. ¶ 42.)

*Count IV*

In Count IV the Railroad alleges that the City entered into an agreement with the Railroad in 2002 that contained a covenant not to sue.  The attached exhibit, Exhibit E, is a letter authored by the City's prospective outside counsel and sent to the Railroad, with whom the firm enjoyed "a longstanding attorney/client relationship," requesting the Railroad's consent to the firm's representation of the City in the City's CERCLA claim against Citizens.  The November 5, 2002 letter includes the following statement:

> The City of Bangor has asked this firm to represent its interests in the context of claims that have been and will be asserted against Citizens Communications Company, a Stamford, Connecticut based business, for damages resulting from contamination of the Penobscot River bed immediate1y adjacent to property owned by the City of Bangor.  A portion of the subject real estate was acquired by the City from the Railroad.  A surviving clause of the purchase and sale agreement is a waiver of any claims the City might assert against the Railroad for contamination of the subject property.  Accordingly, the City will not, and as a practical matter cannot, assert any claims against the Railroad in the context of its recovery effort against Citizens.

(Compl. Ex. E, Doc. No. 206-5.)  The balance of the letter expresses an intention by the City to collaborate with counsel for the Railroad in the event that a third-party action should be commenced by Citizens (now Frontier) against the Railroad.  (Id.)  The Railroad alleges in Count IV that this letter reflects a covenant not to sue and that the assignment of any claim by the City against the Railroad constitutes a breach of contract.  (Compl. ¶ 47.)

*Count V*

Count V, like Count I, draws on Exhibit B, the 2004 Letter Indemnification Agreement, but the claim is cast as intentional misrepresentation and adds allegations that the promise of indemnification was designed "to induce action or forbearance by the Railroad" and that the Railroad "justifiably relied to its detriment."  (Id. ¶¶ 50, 53.)

*Count VI*

Count VI is like Count V, except it alleged negligent rather than intentional misrepresentation.  (Id. ¶¶ 56-58.)

*Count VII*

Count VII asserts a claim for declaratory relief, asking the Court to "determine the relative rights and responsibilities of the parties" pursuant to Exhibits B through E.  (Id. ¶ 61.) With this claim the Railroad also requests a declaration regarding "[t]he validity of, in whole or in part of [sic], the settlement and Consent Decree entered into between the City and Citizens as it may relate to the Railroad."  (Id. ¶ 61(G).)[2]  Count VII also includes a reference to Exhibit F, a document not mentioned in any of the preceding claims.  (Id. ¶ 60.)  Exhibit F is a 1941 Land and Building Lease between the City and the Railroad.  It indicates that the parties agreed that the City would lease "land 50x50 feet for oil tanks and pump house" from the Railroad.  (Compl. Ex. F, Doc. No. 206-6.)  It is not apparent from the amended third-party complaint or from the scanned Exhibit F where this parcel is situated in relation to Dunnett's Cove or the related remediation effort.  The Railroad's request for declaratory relief includes a request that the Court determine the relative rights and responsibilities of the parties pursuant to the 1941 lease.  (Id. ¶¶ 60, 61(F).)

---

[2]  The Railroad seeks the same relief in regard to all of its other claims except Counts IV and VIII, arguing that the alleged transgressions by the City are "possible grounds for setting aside, reconsideration of, or relief from, in whole or in part, the settlement and Consent Decree entered into between the City and Citizens."  (Id. ¶¶ 30, 37, 43, 53, 58.)  The Railroad never explains what this theory of relief is or what legal basis there is for it.

*Count VIII*

In Count VIII the Railroad alleges "contractual indemnity" based on the Exhibit F lease. The Railroad alleges that the tanks in question were used as "oil tar tanks" and that the City agreed to indemnify the Railroad against any claim in connection with the City's use and occupancy of the premises in question. (Compl. ¶¶ 64-66; see also Ex. F, ¶ 4.)

### DISCUSSION

The City Defendants' motion to dismiss can be summed up in two arguments that relate to all eight counts of the amended complaint: (1) that, as a matter of law, there is no indemnification agreement between the City and the Railroad and (2) that, to the extent the law might conceivably prevent Frontier from asserting claims against the Railroad that were ostensibly assigned to Frontier by the City, the issue should be raised in an affirmative defense to Frontier's claims, not in third-party claims against the City Defendants. With the exception of the limited indemnification claim set forth in Count VIII, and incorporated as part of Count VII, I concur in the City's assessment of the Railroad's third-party action and conclude that the Court should dismiss it with prejudice for failure to state a claim.

**A.    Rule 14(a)(1) authorizes the filing of a third-party claim under the circumstances.**

In something of a false-start, the City argues that the Railroad's third-party complaint can be dismissed as premature because, assuming an indemnification agreement exists, it has not yet been breached. In the City's view, no justiciable controversy exists until such time as Frontier obtains judgment against the Railroad, thereby "triggering" the indemnification agreement. (Mot. at 4-5, citing Safeco Ins. Co. v. Barcom, 773 P.2d 56, 60 (Wash. 1990) ("No justiciable controversy exists under a contract until a breach actually occurs."), as cited in Palmero v. Aetna Cas. & Ins. Co., 606 A.2d 797, 798 (Me. 1992) (addressing, as a matter of first impression, when

a breach of contract claim accrues under a contract of insurance).)  This argument is off the mark and the cases are not on point.  The simple answer to this issue is that Rule 14(a)(1) expressly authorizes a defending party to "serve a summons and complaint on a nonparty who is *or may be* liable to it for all or part of the claim against it."  Fed. R. Civ. P. 14(a)(1) (emphasis added).  The defendant has an option and may either wait to bring a second action or else implead the indemnitor in a third-party action even though the contract indemnification claim has not "accrued" as of the filing.  Cf. St. Paul Ins. Co. v Hayes, 676 A.2d 510, 511-12 (Me. 1996) (discussing this situation in terms of the Maine Rules rather than the Federal Rules).  The Railroad's claims fall within Rule 14(a)(1).

**B.**     **Count I—The 2004 Letter Indemnity Agreement**

The Railroad's first count is based on an alleged indemnification agreement memorialized in a letter agreement signed by outside counsel for the parties.  The authority of the City's counsel to offer the agreement and/or execute it on the City's behalf is challenged by the City's motion.  The City argues that the Railroad has failed to state a claim because the Railroad fails to allege that the Bangor City Council voted to enter into the 2004 Letter Indemnification Agreement during a public session.  (Mot. at 5-6.)  In its opposition memorandum the Railroad acknowledges that it has not alleged as much, but it says that dismissal is inappropriate because the allegations do not reflect that a vote did not occur.  (Opp'n Mem. at 8 & 12, Doc. No. 224.)

The Maine Freedom of Access Act prohibits public proceedings that take place without proper notice and ample opportunity for attendance by the public when such proceedings would defeat the purposes of the Act.  1 M.R.S. § 401.  The purposes of the Act are to ensure that the people's business is conducted and deliberated openly and that records of public proceedings are available for public inspection.  Id.  Public proceedings include "the transactions of any functions

affecting any . . . citizens of the State by" among other bodies, "[a]ny board, commission, agency or authority of any . . . municipality." Id. § 402(2). "Pursuant to section 403 of the Act, all public proceedings must be open to the public, except as provided by statute or by section 405." Underwood v. City of Presque Isle, 1998 ME 166, ¶ 12, 715 A.2d 148, 152. In keeping with the requirement of public notice and attendance, the Act permits executive (non-public) sessions in only limited circumstances to address only limited matters. 1 M.R.S. § 405(6). "Final approval" of certain items of public business during an executive session is flatly prohibited. Specifically: "An ordinance, order, rule, resolution, regulation, contract, appointment or other official action may not be finally approved at an executive session." Id. § 405(2). It is illegal to violate this provision. Officials who are responsible for violating the Act are subject to civil penalties. Id. § 409(2). Moreover, if it is found that an identified item of public business was transacted illegally in executive session, a court may declare the action null and void. Id.

Among other matters not relevant to the pending motion, the Act authorizes public officials to engage in executive sessions for purposes of the following:

> Consultations between a body or agency and its attorney concerning the legal rights and duties of the body or agency, pending or contemplated litigation, settlement offers and matters where the duties of the public body's or agency's counsel to the attorney's client pursuant to the code of professional responsibility clearly conflict with this subchapter or where premature general public knowledge would clearly place the State, municipality or other public agency or person at a substantial disadvantage[.]

Id. § 405(6)(E). In line with this provision, the City of Bangor was free to *consult* in executive session with its outside counsel concerning the City's litigation against Frontier and what, if any, impact its prior agreements with the Railroad had in terms of imposing legal obligations or restraints on the City in the context of that civil action. However, the Act does not authorize a public entity to vote to enter into an indemnification agreement in executive session. See, e.g.,

<u>Underwood</u>, 1998 ME 166, ¶¶ 15-16, 715 A.2d at 153 ("[A]ny statutory exceptions to the requirement of public deliberations must be narrowly construed. The mere presence of an attorney cannot be used to circumvent the FAA's open meeting requirement.").[3] By law, execution of a contract is an official action that requires final approval in public session. 1 M.R.S. § 405(2). The City of Bangor could not assume a contractual obligation that would bind the property owners of Bangor to indemnify the Railroad for all environmental contamination the Railroad may have contributed to Dunnett's Cove absent public notice and a vote carried out in public session.

Maine common law has long held that "a person dealing with officers or agents of a municipality does so at his peril, and that it is his duty to determine whether the parties with whom he is contracting were authorized to make the contract." <u>State v. Town of Franklin</u>, 489 A.2d 525, 528 (1985) (quoting <u>Sch. Admin. Dist. 3 v. Me. Sch. Dist. Comm'n</u>, 185 A.2d 744, 747 (1962)). The Law Court has once before declined to allow for an exception to this rule based on the threat of litigation, even where a board of selectmen publicly voted on the matter in question, albeit pursuant to an insufficient warrant. <u>Id.</u> at 528-29. In <u>Town of Franklin</u>, the State of Maine and the Town of Franklin entered into a consent agreement designed to achieve a non-judicial resolution of a dispute over a town landfill, including an agreement by the Town to pay civil penalties for non-compliance with an administrative order. <u>Id.</u> at 527. The Town's "first selectman" executed the agreement "after being authorized to do so by his fellow board members." <u>Id.</u> Following an alleged violation of the agreement, the State commenced an action for enforcement. The Superior Court declared the agreement null and void because the public

_____

[3]       In <u>Underwood</u>, the Law Court recognized that a violation could exist where a zoning board returned from an executive session consultation with counsel and immediately voted on a matter without any deliberation open to the public. 1998 ME 166, ¶¶ 7, 14-15, 23.

vote that ostensibly authorized execution of the agreement proceeded from an insufficient

warrant.  Id.  at 526, 527.  The Law Court affirmed, holding that, although the warrant was

sufficient to provide public notice of the selectmen's plan to discuss the general issue, it was

insufficient to authorize a vote to enter into the contract in question.  Id. at 528.  The Law Court

expressly rejected the idea that the board's decision should bind the Town simply because the

board had inherent authority to control litigation and enter into municipal contracts.  It explained:

> If we were to assume that the Board of Selectmen has inherent authority to
> conduct legal affairs or to enter into contracts for the Town, such authority would
> not include a settlement agreement that requires the Town to accept a substantial
> civil penalty in order to prevent threatened litigation.  In the absence of
> authorization or ratification by the Town, the action of the Board of Selectmen is
> not binding on the Town.

Id. at 529.

Unlike the Town of Franklin, the City of Bangor operates pursuant to a city charter.

Nevertheless, the Town of Franklin scenario is analogous to the one at hand.  The Charter of the

City of Bangor calls for all powers to be exercised through the City Council.  Pursuant to the

Bangor Code:  "The meetings of the City Council shall be open to the public.  The City Council

shall act only by ordinance, order or resolve."  (Charter of the City of Bangor, Art. II § 8, Doc.

No. 118-3.)  The Freedom of Access Act clearly restricts the authority of a municipal corporation

to approve an ordinance, order, or resolution—or to enter into a contract—in executive session.

1 M.R.S. § 405(2).  However much leeway the City of Bangor may have had to choose litigation

tactics based on its consultation with counsel outside of the public sphere, Maine law prohibited

the City from finally assuming a contractual obligation to indemnify the Railroad absent compliance with the Freedom of Access Act's open meeting dictates.[4]

Where municipal contracts are concerned, persons dealing with agents of a municipality do so at their peril and are obliged to ascertain the authority of the agent purporting to bind the municipality. Town of Franklin, 489 A.2d at 528. It is the Railroad's burden, as plaintiff, to prove that it dealt with someone having authority to bind the City of Bangor. Sirois v. Town of Frenchville, 441 A.2d 291, 294 (Me. 1982). A review of the Railroad's amended third-party complaint reflects that the Railroad has failed to allege that the City entered into the 2004 Letter Indemnification Agreement pursuant to a vote taken in open session. This omission makes Count I implausible for purposes of Rule 12(b)(6) unless the allegations appearing on the face of the complaint invite an inference that City Council voted in open session to enter into the contract. A reading of the third-party complaint does not support an inference that the City Council ever voted in open session to indemnify the Railroad against all claims for environmental response costs associated with the Railroad's long-term operation in the vicinity of Dunnett's Cove. To the contrary, it is implicit from the Railroad's allegations that no such vote transpired. The Railroad is clearly alleging everything it can think of to potentially fill in the void arising from the City Council's failure to vote in public session on a matter of such keen interest to the Railroad.

In my September 23, 2009,Recommended Decision on Frontier's motion to dismiss the Railroad's counterclaim, I recommended that the Court deny Frontier's motion because Frontier

---

[4]     The City's outside counsel may have possessed the authority to negotiate terms and memorialize them by way of letter agreement, but that process cannot have resulted in formal acceptance by the municipality absent a vote in open session.

had not adequately briefed the impact of the Freedom of Access Act. (Doc. No. 165.) I had also located precedent from another jurisdiction, applying a different public access law, suggesting that counsel might bind a municipality to settlement terms negotiated pursuant to authority granted in executive session. I am persuaded at this juncture that the law in question there, the Iowa Open Meetings Act that was in effect in 1985, is sufficiently dissimilar to the Maine Freedom of Access Act so that the rationale of <u>Dillon v. City of Davenport</u>, 366 N.W.2d 918 (Iowa 1985), should not apply here. On this issue, I am in full agreement with the argument presented by the City. (See Mot. at 7-8.) Although the dividing line between an attorney's authority to compromise litigation through settlement and the authority required for any municipal agent to bind a municipality to a contractual undertaking may not be crystal clear in all cases, I am satisfied that the contractual negotiations underlying the 2004 Letter Indemnification Agreement could not have given rise to a contract binding the citizens of Bangor to indemnify the Railroad for any and all environmental liabilities associated with Dunnett's Cove.[5] The Legislature has indicated in plain language that only *consultations* may transpire between a municipality and its counsel during executive session, including with respect to settlement offers, and that the power to enter into contract must be formally exercised in open session. 1 M.R.S. §

---

[5]     In the prior Recommended Decision on Frontier's motion to dismiss the Railroad's counterclaim, I expressed reluctance about rushing a ruling with respect to whether or not an attorney/litigation exception should be recognized under the Freedom of Access Act. That reluctance stemmed from a concern that any erosion of Maine's Freedom of Access Act would undermine the democratic process in Maine at the municipal level. Having revisited the issue I am persuaded by the City that there was no legal basis for the City's counsel to bind the City to the 2004 letter agreement based on any direction counsel may have received from the City Council in executive session consultations. To rule otherwise would be directly contrary to the Freedom of Access Act. My impression from the record is that the 2004 letter agreement was meant to negotiate how the City would fulfill any obligation it might owe to the Railroad pursuant to preexisting contracts, assuming that an obligation existed in connection with environmental remediation in Dunnett's Cove. Presumably, in 2004 the City's litigation counsel advised the City Council that some obligation to the Railroad existed. Whether that was so is addressed in the discussion of Counts II through IV and VIII.

405(6)(E). Paraphrasing the Sirois opinion, an attorney "cannot bind a town to a contract unless his authority to act alone is proved or his actions subsequently ratified." Sirois, 441 A.2d at 294. Count I fails to state a claim because it lacks an allegation that there was an open session vote authorizing the City's outside counsel to bind the City to the purported indemnification agreement or an open session vote to ratify the letter agreement after the fact.[6] 1 M.R.S. § 405(2).

## C.    Count II—The 1996 Purchase Option Agreement

Count II presents another breach of contract claim, albeit one based on the 1996 Real Estate Purchase Option Agreement, Exhibit C.  In its amended third-party complaint, the Railroad asserts that the City has waived any and all claims or causes of action against it associated with hazardous waste.  (Compl. ¶ 33.)  The Railroad also alleges that the City agreed "to indemnify the [Railroad] for all loss, damage or expense including attorney's fees arising [or] in any way resulting from the presence or activities upon the premises by the buyer."  (Id. ¶ 34.) The City's waiver in the hazardous waste paragraph of the Purchase Option Agreement does not give rise to an obligation to indemnify the Railroad against third-party claims related to waste that migrated beyond the premises.  The hazardous waste provision simply does not contain that

---

[6]    The Railroad states that the 2004 letter indemnity agreement "was an acknowledgement by the City of an obligation the City had already undertaken in the earlier agreements," referencing an obligation allegedly undertaken in connection with the City's acquisition of land from the Railroad in 1996.  (Opp'n Mem. at 5, Doc. No. 224.)  The Railroad contends that the 2003 agreement "required no further action by the City Council" because the "obligation" was already approved in 1996.  (Id.)  The Railroad varyingly refers to the letter agreement as interpreting, managing, implementing, confirming, stipulating, ratifying and/or clarifying a preexisting obligation.  (Id. at 5-7, 13.)  If that is so, then perhaps the Railroad has a stated a valid claim in Count II or III.  It has not stated one in Count I.

The Railroad also argues that the City ratified the 2004 Letter Indemnification Agreement because, during the course of the preceding litigation, the City paid out money to the Railroad's counsel based on a warrant issued by the City finance director.  Therefore, says the Railroad, "the City must have certified that the claims were legally due and payable."  (Opp'n Mem. at 10.)  The City may well have honored the terms of the agreement initially, but that does not mean the agreement was legitimate.  Nor did the payment of a limited claim amount to an open session vote approving the broad indemnification described in the 2004 Letter Indemnification Agreement.  The Railroad fails to offer any authority in support of this proposition.

language. It only waives the City's rights against the Railroad for harms associated with hazardous waste located in or on the premises. Moreover, the plain language of the contract reflects that the indemnification language is restricted to potential liabilities arising from preparation of the deed plan associated with the real estate transaction. The Railroad fails to articulate any viable breach of contract with respect to these provisions.

In its opposition memorandum, the Railroad flags a non-assignment provision in the Agreement and argues that the City's assignment of claims to Frontier breached this provision. (Opp'n Mem. at 18.) The identified language, paragraph 24, provides that the buyer may not assign the Purchase Option Agreement or any interest in it, without prior written consent from the seller. It is fair to say that this provision is now moot. The City has already purchased the parcel. The purchase option has been exercised at this point. This non-assignment provision has absolutely nothing to do with the instant litigation.

The Railroad fails to articulate a plausible theory of recovery against the City based on the language of the 1996 Real Estate Purchase Option Agreement. A review of that document, attached and incorporated into the third-party pleading, does not reveal any plausible claim for breach of contract. The Court should dismiss Count II.

### D.    Count III—The 1996 Release Deed

Count III alleges breach of the 1996 Release Deed associated with the same conveyance of real estate in 1996. The Release Deed contains, in paragraph 6, a waiver provision that is in all material respects the same as the paragraph 17 hazardous waste provision found in Exhibit C. The Release Deed does not contain any provision prohibiting assignment of claims. However, the Release Deed contains the following additional language in paragraph 5:

By the acceptance of this deed and as part consideration therefor, the Grantee hereby assumes any and all agreements, covenants, obligations and liabilities of the Grantor in respect to any underground facilities, drainage culverts, walls, crossings and/or other structures of any nature and description located in whole or in part within the Premises.

(Doc. No. 206, Ex. D ¶ 5.)  The Railroad alleges in the amended third-party complaint that the City has assumed all of the Railroad's liabilities and that the City's "purported assignment of . . . claims against the Railroad to Frontier is invalid and is a breach of the terms of the Release Deed."  (Compl. ¶ 42.)  The Railroad also asserts that the City is obligated to indemnify it to the extent of any Railroad liability to Frontier.  (Id. ¶ 43, wherefore clause B.)

There is no deed provision prohibiting assignment of claims, so a "breach-by-assignment" claim is not plausible even if such a claim is theoretically cognizable.  The real issue is whether paragraph 5 of the Release Deed gives rise to a claim for indemnification in relation to the adjacent Dunnett's Cove Site.  Oddly, the Railroad does not address paragraph 5 in its memorandum of law in opposition to the motion.[7]  Instead, it talks about how the City has conceded or stipulated to the notion that the 1996 documents associated with Counts II and III require the City to indemnify the Railroad against liability associated with Dunnett's Cove.[8]  In fact, the Railroad goes as far as to state:  "Frontier's allegation that the City misread the 1996 Purchase Option Agreement and Deed is irrelevant."  (Opp'n Mem. at 6.)  This statement is made in the context of discussing Count I, but the Railroad never really supports the separate claims alleged in Counts II and III.  Counts II and III must be able to stand on their own if they are in

---

[7]    The City does not address the provision, either.

[8]    The Railroad's position, in effect, is that the 2004 Letter Indemnification Agreement amounts to a stipulation or concession that entitles the Railroad to judgment on its indemnification claims.  The City's outside counsel could not stipulate to entry of judgment, even if they intended to.  There were no claims pending between the City and the Railroad.  This effort to end-run the Freedom of Access Act based on "clandestine" negotiations should be declared null and void at this point, the participation of lawyers notwithstanding.  1 M.R.S. § 401.

fact separate counts.  The Railroad devotes about 300 words to these counts at pages 18 and 19 of its opposition memorandum, though a third of those are, once again, addressed to the 2004 (or 2003) Letter Indemnification Agreement.  As for the 1996 documents, the Railroad discusses, exclusively, the non-assignment provision in the Purchase Option Agreement.  (Id. at 18.)  For reasons just explained in the preceding section of this discussion, that non-assignment provision is utterly immaterial to this dispute.

The Court should put to rest the notion that the 1996 agreements justify the distraction of this third-party action.  "Construction of the language in a deed is a question of law."  Jordan v. Shea, 2002 ME 36, ¶ 14, 791 A.2d 116, 121.  Paragraph 5 of the Release Deed unambiguously restricts the City's liability to "structures of any nature and description located in whole or in part within the Premises."  The Dunnett's Cove Site does not rest in whole or in part within the premises.  Nor is it a structure.  Paragraph 5 of the Release Deed does not obligate the City to indemnify the Railroad against environmental remediation contribution claims associated with whatever hazardous substances the Railroad may have released to Dunnett's Cove during the Railroad's ownership of the premises in question.  If such a broad indemnity were intended, it would have been recited in the hazardous waste provision, which contains no such language. The hazardous waste provision waives the City's claims against the Railroad concerning the premises, but it does not promise an indemnity against all hazardous waste claims pursued by other parties for environmental harm to adjacent real estate.  Count III should be dismissed because the Release Deed does not justify the sort of remedies the Railroad is requesting in this third-party action.[9]

_____

[9]    The parties do not discuss paragraph 5 of the Release Deed.  The Court may prefer to address the scope of the language at summary judgment, though the Railroad has failed to oppose the City's motion based on any assertion that paragraph 5 gives rise to an indemnity respecting Dunnett's Cove.  The Railroad's opposition

### E. Count IV—The 2002 Conflict of Interest / Consent Letter

In Count IV the Railroad alleges that the City entered into an agreement with the Railroad in 2002 that contained a covenant not to sue. This claim is based on a letter from the City's then prospective outside counsel to the Railroad, with whom the firm enjoyed "a longstanding attorney/client relationship," requesting the Railroad's consent to the firm's representation of the City in the City's CERCLA claim against Citizens. The November 5, 2002, letter includes a representation that "the City will not, and as a practical matter cannot, assert any claims against the Railroad in the context of its recovery effort against Citizens." (Compl. Ex. E, Doc. No. 206-5.) The balance of the letter expresses an intention by the City and the Railroad to collaborate in the event that a third-party action should be commenced by Citizens (now Frontier) against the Railroad. (Id.) The Railroad alleges in Count IV that this letter reflects a covenant not to sue and that the assignment of any claim by the City against the Railroad constitutes a breach of contract. (Compl. ¶¶ 46-47.)

The City objects to the notion that it could be liable for breach of any contractual obligation to the Railroad based on its general assignment to Frontier of any and all claims it may have against third parties. (Mot. at 9-10.) The amended third-party complaint does not include an allegation describing the language of the assignment. The City's observation is that, if it waived any and all claims against the Railroad, then Frontier could not have acquired any claim from the City to pursue against the Railroad, negating the possibility that such an assignment would amount to a breach. (Id. at 10.) In its opposition memorandum, the Railroad states: "It defies logic to argue that a party obligated not to file suit could assign its right to

---

memorandum reads as though the Railroad is depending entirely on the 2004 Letter Indemnification Agreement when it comes to the issue of indemnification. To the extent the Railroad relies on the earlier documents, it does so in support of the 2004 Letter Indemnification Agreement or in support of this idea that the City breached a non-assignment provision. (See, e.g., Opp'n Mem. at 18.)

another party for the specific purpose of filing suit, without it being considered a breach."

(Opp'n Mem. at 18.)  This seems to reflect an agreement between these parties that the City

could not have assigned a claim it had previously waived.  The Railroad fails to articulate a

plausible breach of contract claim against the City in Count IV, much less one that can be

specifically performed or that could give rise to an indemnity and attorneys' fees, the only

remedies described in Count IV of the amended third-party complaint.  The Railroad cannot

transform potential affirmative defenses into third-party claims against the City.[10]

## F.    Counts V and VI—Misrepresentation Tort Claims

With Counts V and VI the Railroad raises misrepresentation tort claims, seemingly

against not only the City, but also City Attorney Norman Heitmann and former City Manager

Edward Barrett.[11]  The City, Mr. Heitmann, and Mr. Barrett seek dismissal based on the Maine

Tort Claims Act.  (Mot. at 10-13.)  They also argue that justifiable reliance is missing from this

case as a matter of law.  (Id. at 14-15.)  The Railroad responds that it is inappropriate to address

the immunity provisions of the Maine Tort Claims Act in a motion to dismiss under Rule

12(b)(6), as opposed to a motion for summary judgment, because it is an affirmative defense.

(Opp'n Mem. at 14-18.)  The Railroad also argues that its alleged reliance was reasonable and

that "[t]he City cannot legitimately claim that the City's attorneys . . . should not have been

trusted."  (Id. at 20.)

As to timeliness of the immunity issue, the available precedent favors the Railroad.  See,

e.g., Gomes v. Univ. of Me. Sys., 304 F. Supp. 2d 117, 131 (D. Me. 2004);  Bussell v. City of

---

[10]    The only fee-shifting language appears in the 2004 Letter Indemnification Agreement.  That agreement is void for reasons already explained.

[11]    Count V for intentional misrepresentation requests relief exclusively against the City and the individual defendants are not mentioned until Count VI.  Neither count explains the nature of the relief sought from Mr. Heitmann or Mr. Barrett.

Portland, 1999 ME 103, ¶ 2, 731 A.2d 862, 863.  The reliance argument, on the other hand, favors the City.  Claims of negligent misrepresentation and intentional misrepresentation require proof of, among other things, justifiable reliance.  To state a viable claim, it is not sufficient that one party has been misled as to a material factual matter by another party.  The first party must also be justified in relying on the second party's representation as a true statement.  Me. Eye Care Assocs., P.A. v. Gorman, 2008 ME 36, ¶¶ 12-15, 942 A.2d 707, 711-12 (intentional misrepresentation);  Rand v. Bath Iron Works Corp., 2003 ME 122, ¶ 13, 832 A.2d 771, 774 (negligent misrepresentation).

The Railroad alleges that it relied on representations by the City, by Mr. Heitmann, and by Mr. Barrett that (1) the City agreed to the terms of the 2004 Letter Indemnification Agreement and (2) the City would be bound by the agreement.  (Compl. ¶¶ 26, 53, 55.)  The theory behind the Railroad's misrepresentation claims is rather difficult to translate.  Repeatedly in the opposition memorandum the Railroad suggests that the 2004 Letter Indemnification Agreement was not a new agreement at all and merely acknowledged, interpreted, managed, implemented, assured, stipulated, confirmed, memorialized, or clarified a preexisting obligation.  (Opp'n Mem. at 5, 6, 7, 10, 13.)  Yet the claim advanced is said to turn on representations made in connection with or concerning the 2004 Letter Indemnification Agreement.  If such conduct can give rise to a misrepresentation claim, then essentially every contract case will include a tort claim against one party for misrepresenting its intention to be bound.  More troubling here, of course, is the idea that a Maine municipality, which by law can only enter into a contract pursuant to an open session vote, might be liable on a tort claim arising from representations by an agent about the municipality's intention to be bound.  Recognition of such a claim would

advance the very evil that Maine's Freedom of Access Act is designed to prevent. It is no doubt

for this reason that the Law Court has stated:

> Our court has been zealous in protecting the rights of property owners from
> seizure for the debts of the municipality. On numerous occasions the rule has been
> stated that a person dealing with officers or agents of a municipality does so at his
> peril, and that it is his duty to determine whether the parties with whom he is
> contracting were authorized to make the contract.

Town of Franklin, 489 A.2d at 528 (quoting Sch. Admin. Dist. 3, 185 A.2d at 747). As a matter

of law, the City's outside counsel during the prior litigation did not have the authority to bind the

City to any new contractual obligations. Nor did the City Attorney or the City Manager have the

authority to do so by expressing the opinion that the City would honor any such agreement. The

law did not allow for any new contractual obligation to be assumed by the City in this fashion

and the Railroad is chargeable with notice of this fact. By extension, the Railroad could not

justifiably rely on the representations in the 2004 Letter Indemnification Agreement as creating

any new contractual obligation binding the City to indemnify the Railroad.[12] Nor could it rely

on any alleged representations to that effect by Defendants Heitmann and Barrett.

## G.  Count VII—Declaratory Judgment

Count VII is a declaratory judgment claim. It is premised on the allegation that there

exists a justiciable controversy "regarding the validity and scope of agreements" between the

City and the Railroad. (Compl. ¶ 60.) The Railroad requests that the Court "determine the

relative rights and responsibilities of the parties under Exhibits B through E, and also under

---

[12]     The peril hazarded by those who contract with a city or town has been held to bar not only contract claims,
but also implied common law claims, such as "implied assumpsit." Portland Tractor Co. v. Anson, 134 Me. 329,
332, 186 A. 883, 884 (1936) ("No liability attached to the town on implied assumpsit or otherwise on their
unauthorized agreement.").
        The Railroad cites precedent holding that municipal officers are not at liberty to deceive others concerning
their authority. (Opp'n Mem. at 7.) However, the citation they offer in support of the proposition concerns a
criminal proceeding rather than a civil action to enforce an unauthorized agreement. State v. Deschambault, 159
Me. 223, 228-29, 191 A.2d 114, 118 (1963).

Exhibit F, discussed below. (Id. ¶ 61(A)-(D), (F).) In addition, the Railroad asks the Court to determine the "validity of the purported assignment of any claim against the Railroad by the City" and also the "validity of . . . the settlement and Consent Decree entered into between the City and Citizens [now Frontier] as it may relate to the Railroad."[13] (Id. ¶ 61(E), (G).) The gravamen of the claim, seemingly, is that Frontier cannot pursue any claim against the Railroad associated with environmental harm to Dunnett's Cove because the City could not have assigned such a claim. The Railroad seeks a declaration, in effect, that the entire proceeding against it is improper because the Consent Decree that emerged from the prior action could not have authorized Frontier to proceed against the Railroad. The assignment-as-breach theory is hollow, for reasons already indicated, and the Railroad fails to offer any legal support for its alternative "monkey-wrench" theory other than terse references to estoppel.[14] Equitable estoppel is an affirmative defense, not an affirmative cause of action, and the City is not pursuing a claim against the Railroad.[15] Buker v. Town of Sweden, 644 A.2d 1042, 1044 (Me. 1994); Waterville Homes v. Dep't of Transp., 589 A.2d 455 ,457 (Me. 1991). The Railroad's equitable estoppel

---

[13]     The Railroad requests similar relief in its breach of contract claims; *i.e.*, that the alleged breaches by the City are "possible grounds for setting aside, reconsideration of, or relief from, in whole or in part, the settlement and Consent Decree entered into between the City and Citizens" (now Frontier). (Id. ¶¶ 30, 37, 43.) The Railroad does not offer any legal authority in its opposition memorandum that would support the kind of relief requested here.

[14]     There are no estoppel claims recited in the third-party complaint. The estoppel arguments appear to be designed to preclude the motion to dismiss or to explain the Railroad's idea that it can collaterally attack the Consent Decree from the prior litigation.

[15]     Any reliance must be reasonable and unauthorized execution of a contract by a municipal agent does not suffice as a ground for estopping a municipality from denying it is bound by the agreement. Id. at 106; see also Peoples Heritage Bank v. Saco, 566 A.2d 745, 746 (Me. 1989) ("The Bank's estoppel and ratification arguments must fail if the City was not authorized to execute the original guaranty."). Maine law flatly prohibits a municipality from entering into a contract in the absence of public notice and an open session vote. Reliance on a contract that is null and void as a matter of Maine law is not reasonable. Although the Law Court has recognized limited exceptions to the application of equitable estoppel against a municipality, those exceptions do not pertain to "liability under illegal, void, or unauthorized contracts." A.F.A.B., Inc. v. Town of Old Orchard Beach, 639 A.2d 103, 105 (Me. 1994).

theory is not an appropriate basis for maintaining a third-party declaratory judgment claim against the City.  A judicial estoppel declaratory judgment claim is not warranted, either, because the City did not take a position in the prior litigation on the issue of whether or not the letter indemnification agreement was null and void under the Maine Freedom of Access Act.[16]  There is nothing to suggest that the City is "playing fast and loose with the courts" or seeking an unfair advantage against the Railroad.  Global Naps, Inc. v. Verizon New England Inc., 603 F.3d 71, 91 (1st Cir. 2010).

The City has chosen to disavow a null and void indemnification agreement.  This reflects a change in the City-Railroad relationship, but it does not entail an inconsistent litigation position that would abuse or call into question the integrity of the judicial process.  The City's case against Citizens in the prior action did not depend on the validity of the indemnification agreement.

Finally, the idea that the Consent Decree and Frontier's suit against the Railroad are somehow antithetical to arrangements made between the Railroad and the City is nonsensical. The Railroad's apparent assumption that the City was the master of the Consent Decree and all rights arising from it is simply false.  Litigation over the equitable allocation of environmental response costs is a matter of state and federal law, not any authority inherent in the City of Bangor.  The Railroad simply fails to articulate any viable legal theory as to why its former arrangement with the City would support setting aside the Consent Decree.  The Court should

---

[16]     The Court found that the 1996 documents did not give rise to an indemnification against third-party claims for environmental contamination, (id. ¶ 227), but that "[o]n December 30, 2003, the City and Maine Central Railroad entered into an indemnification agreement under which the City agreed to indemnify Maine Central Railroad for any recovery made by Citizens or any other third-party defendant in the case."  (Id. ¶ 238.)  A finding that they "entered into" the agreement does not preclude a legal determination that the agreement is null and void.

dismiss the declaratory judgment claim in Count VII except to the extent it requests a declaration regarding the indemnification agreement described within Count VIII.

**H.      Count VIII—The 1941 Lease**

Count VIII is another contract indemnification claim.  The contract at issue is a 1941 Land and Building Lease, Exhibit F.  According to the amended third-party complaint the City leased land from the Railroad for the purpose of storing road tar in tanks and agreed to indemnify the Railroad against any resulting claim for loss or damage.  The attached exhibit is not entirely legible.  According to the City, the Lease states that the City agreed to:

> indemnify the party of the first part [the Railroad] and save it harmless from any claim that may arise or be made for death, injury, loss or damage, however caused, to its employees or property and/or the employees or property of the party of the first part and/or to other persons or their property on or in connection with said use and occupation of said demised land.

(Mot. at 16.)  This appears to recite the language of the Lease accurately and the Railroad makes no objection concerning the fidelity of this description.  Attached to the Lease is a small map of the leased parcel.  According to the City, the parcel is more than a mile downstream from the Site that is the subject of the remediation effort.  (Id.)

The City's argument is that dismissal is in order because the Railroad "cannot possibly claim (and this Court did not find) that City-operated tanks in that distant downstream location have any 'connection with' the Penobscot River contamination relevant here."  (Id.)  In opposition, the Railroad observes:  "A motion to dismiss does not allow factual balancing on how far upstream in tidal water coal tar may or may not migrate."  (Opp'n Mem. at 19.)  The Railroad, in effect, does not object to the assertion that the parcel is more than a mile downstream.  There is a question whether the primary action against the Railroad alleges liability based on potential spills occurring at such a distance from the Dunnett's Cove Site.  Frontier's

allegations refer to the Railroad's operation of a thirty-acre rail yard stretching along the banks of Dunnett's Cove. (Compl. ¶ 67, Doc. No. 1.) It is certainly questionable whether the Railroad's third-party claim in Count VIII falls within the scope of Frontier's underlying action for response costs related to Dunnett's Cove, but that is a question that cannot be conclusively deduced from the pleadings. The City has not explained why the Railroad's theory about migrating tar cannot be maintained as matter of law, and the claim does not appear inherently implausible.[17] The language of the lease is expansive enough to call for indemnification against harm occasioned by tar spills, including harm to public land. Conceivably, the Railroad may actually wish to prove to the Court that sources situated on railway property one-mile downstream contributed to the tar plume at the Dunnett's Cove Site.

## CONCLUSION

For the reasons set forth above, I now RECOMMEND that the Court GRANT the City's motion to dismiss the Railroad's amended third-party complaint IN PART, by dismissing with prejudice Counts I through VI and all of Count VII but for the declaratory judgment claim that corresponds with the contract indemnification claim in Count VIII.

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

---

[17] The Court made findings in the prior action that would tend to rule out the migration of tar from a mile downstream. (City of Bangor v. Citizens Communications, 02-cv-183-B-S, Findings of Fact & Conclusions of Law ¶¶ 154, 183, Doc. No. 658.)

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

Date  June 25, 2010