UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| FRONTIER COMMUNICATIONS CORPORATION *f/k/a* CITIZENS COMMUNICATIONS COMPANY, </br></br>Plaintiff, </br></br>v. </br></br>BARRETT PAVING MATERIALS, INC., *et al.*, </br></br>Defendants | Civil No. 1:07-cv-00113-GZS |

**RECOMMENDED DECISION ON MOTION FOR SUMMARY JUDGMENT
AND
ORDER ON MOTION FOR LEAVE TO SUPPLEMENT**

Frontier Communications Company commenced this action on August 3, 2007, seeking contribution, indemnity and recovery for costs associated with environmental remediation in Dunnett's Cove, pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601 *et seq.* Defendant UGI Utilities Inc. has filed an amended motion for summary judgment (Doc. No. 243), contending that the evidence is not sufficient to impose liability on it for pollution generated by the Bangor Gas Works between 1901 and 1928, when the stock of the Bangor Gas Light Company, which owned the facility, was held by one of UGI's corporate predecessors, American Gas Company of New Jersey. The Court referred the motion for report and recommendation in accordance with 28 U.S.C. § 636(b)(1)(B). Frontier complains that it needs a 30-day enlargement of time to supplement its memorandum because it must substitute a new expert witness on the issue of corporate

governance due to the retirement of its previous expert witness. (Doc. No. 247.)[1] Based on my review of the summary judgment record, I conclude that the instant motion presents essentially the same scenario that the Court previously addressed in respect to the motion for summary judgment filed by Centerpoint Energy Resources Corporation, which motion was granted by the Court September 22, 2009. (Order Affirming Rec. Dec., Doc. No. 164; Rec. Dec. re. Centerpoint's Mot. for Summary J., Doc. No. 152.) I recommend that the Court grant the motion for summary judgment over Frontier's objection and in spite of Frontier's motion to supplement pleadings and substitute experts (Doc. No. 247), which I now deny.

## MOTION FOR LEAVE TO SUPPLEMENT PLEADINGS AND SUBSTITUTE EXPERTS

On September 20, 2010, the same date as it filed its response to the "new" motion for summary judgment, Frontier also filed this motion requesting an additional thirty days to respond via a supplementation to its memorandum. This motion was necessitated because, on September 16, 2010, plaintiff's counsel learned that plaintiff's original corporate governance expert, Dr. George Baker, left his tenured position at the Harvard Business School and was no longer available to serve as an expert witness. (Gaythwaite Aff. ¶ 2, Doc. No. 247-1.) Frontier requested until October 20, 2010, to retain a substitute expert and submit his affidavit in support of the opposition to the pending summary judgment motion. (Id. ¶ 4.) In its reply (Doc. No. 252) Frontier indicates the substitute expert has been retained. In the original summary judgment pleadings, Frontier's twenty-seventh paragraph stated that Dr. Baker had reviewed the documents and concluded that, in his opinion, UGI's predecessor disregarded the separate

---

[1] This is not the first time Frontier has sought additional time regarding this summary judgment motion. This motion, in an earlier iteration, was originally filed at docket number 172. After Frontier's initial Rule 56(f) request, I allowed an additional period of time for narrowly focused discovery and this motion is refiled by UGI with only minor modifications from the original motion.

2

corporate identity of, and exercised extensive control over, the Bangor Gas Light Company. (Doc. No. 184, ¶ 27.) Presumably this opinion relates to the issue of piercing the corporate veil. That paragraph is not included in Frontier's response to the current motion for summary judgment, but the motion for leave to supplement does not explain why Dr. Baker's prior opinion could not have been included in the summary judgment statement of additional facts if Frontier deemed the opinion of an expert to be material in terms of defeating summary judgment. Nor does the motion explain why Frontier only learned of Dr. Baker's inability to serve as an expert witness on September 16, 2010. Frontier does not explain, or even give a hint, why Dr. Baker's departure from Harvard makes him unavailable as an expert or, more pertinently, why his prior report could not be used by Frontier to oppose this motion, if deemed necessary. Frontier does not point to any new facts or additional evidence that would materially impact Baker's prior opinion. The pleadings describe him as pursuing other projects and no longer involved in litigation related activities. If this case were on the eve of trial, and the expert truly had become unavailable, a brief continuance for the purpose of substituting an expert holding similar or identical opinions might well be in order. Based on the present record, there is no reason to allow substitution or delay ruling on the pending motion because there is no showing that an expert opinion, whether Dr. Baker's or the newly retained expert's, changes the outcome of this motion. The motion is denied.

## FACTS

The following facts are drawn from the parties' competing statements of material facts, filed in accordance with Local Rule 56, and from the record cited in support of those statements. See Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004) (outlining the mandatory procedure for establishing factual predicates needed to support or overcome a

3

summary judgment motion); Toomey v. Unum Life Ins. Co., 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining "the spirit and purpose" of Local Rule 56). The underlying statements are found in Defendant UGI's Statement (Doc. No. 245), Plaintiff 's Opposing Statement (Doc. No. 249), Plaintiff's Statement of Additional Facts (also Doc. No. 249), and Defendant's Reply Statement (Doc. No. 189).[2]

The Bangor Manufactured Gas Plant operated from 1852 until 1963 under three different corporation names: Bangor Gas Light Company (1852-1941); Bangor Gas Company (1941 to 1948); Citizens Utilities Company (1948 to 1963). (Def.'s Statement ¶ 1.) Citizens Utilities Company was a corporate predecessor of Citizens Communications Company, now known as Frontier Communications Corporation, Plaintiff herein. (Id. ¶ 2.)

The issue presented is whether the movant, UGI Utilities Inc., has liability for coal tar wastes discharged from the plant facility ("the Gas Works") during certain years of operation (1901-1928) in which a corporate predecessor of UGI owned the stock of the local corporation that owned the Gas Works.

According to corporate records, the American Gas Company of New Jersey acquired the voting stock of the Bangor Gas Light Company in April of 1901 and held the stock through March 1928. (Id. ¶¶ 4, 5.) In 1910, Bangor Gas Light Company adopted by-laws and revoked preexisting by-laws. (Id. ¶ 7.)

---

[2] Defendant has not filed a reply statement in reference to plaintiff's statement of additional material facts. The first twenty-four paragraphs of Frontier's new statement of additional facts are identical to its original statement of additional facts and I have merely referenced the defendant's original reply. As to paragraphs twenty-five through thirty-three, there are only three paragraphs that contain additional factual statements and those three paragraphs, 25-27, add the following additional facts which are deemed admitted under Local Rule 56: (1) UGI's predecessor was in the business of "acquir[ing] coal gas plants"; (2) UGI's predecessor collected $300,000 from the "sale of bonds" in Bangor; and (3) physical improvements to gas plants were paid for in part by an increase in the capital stock of the parent company. The remaining paragraphs, 28-33, either contain legal conclusions or recite factual statements pertaining to the conduct of discovery in this litigation which is seemingly meant to preserve objections to prior discovery orders. (See Order Granting, In Part, Mot. to Compel Discovery, Doc. No. 221; Order Denying Obj., Doc. No. 228; Report of Tel. Conf. and Order, Doc. No. 235.)

The State of Maine recognized the Bangor Gas Light Company as a corporate entity from 1850 through at least 1928 and thereafter. (Id. ¶ 8.) The Maine Public Utilities Commission recognized and regulated the Bangor Gas Light Company from 1915 to at least 1928 and thereafter. (Id. ¶ 9.) Bangor Gas Light Company filed annual reports with the Maine Public Utilities Commission providing all financial and operating data and identifying the officers, directors, stockholders and managers of the company for each year after 1915. (Id. ¶ 10.) Bangor Gas Light Company had corporate officers and directors from 1901 to at least 1928 and thereafter and held annual stockholder meetings. Director meetings were held when the company president thought they were needed. (Id. ¶ 11.) Bangor Gas Light Company had a local manager or superintendant of the Gas Works from 1901 to at least 1928 and thereafter. The local manager was an employee of Bangor Gas Light Company and a member of the board of directors. (Id. ¶ 12.) Bangor Gas Light Company employed foremen, gas makers, engineers, inspectors, laborers and others under the supervision of the local manager or superintendant. (Id. ¶ 13.)

Bangor Gas Light Company's financial records were independently audited from 1901 to 1928. (Id. ¶ 14.) Bangor Gas Light Company directors from 1901 to 1928 always included the local manager and usually included another local Maine resident on the five-member board. (Id. ¶ 15.)

In 1925, UGI acquired control of the voting stock of the American Gas Company of New Jersey.[3] (Id. ¶ 6.) During the course of its ownership of the capital stock of the Bangor Gas

---

[3] UGI admits for purposes of this motion that American Gas Company is a predecessor of UGI and that American Gas Company was the principal owner of the capital stock in Bangor Gas Light Company. (Pl.'s Statement of Add'l Facts ¶¶ 1, 2.)

Light Company, the American Gas Company of New Jersey issued Annual Reports to its stockholders (1901-1927) that contained general information about the operations of the American Gas Company and each of its subsidiaries including separate information for each subsidiary. (Id. ¶ 16.)

Throughout the period of time when American Gas Company of New Jersey owned the stock of Bangor Gas Light Company, the two companies had some common directors and officers but the overlap was never complete. For most of this period, at least two of the five directors were residents of Bangor, one of whom was the manager of the Bangor Gas Light Company. (Id. ¶ 17.) In 1925, UGI merged with the American Gas Company of Pennsylvania which owned all of the stock of the American Gas Company of New Jersey. Consequently, UGI became owner of the stock of American Gas Company of New Jersey and became its parent corporation. American Gas Company of New Jersey continued to be the corporate parent of Bangor Gas Light Company until 1928 when the stock of Bangor Gas Light Company was sold by American Gas Company of New Jersey. (Id. ¶ 18.)

On January 1, 1927, Bangor Gas Light Company and UGI executed an agreement for supervision of operations whereby Bangor Gas Light Company retained UGI as its general operating, construction and financial advisor for a period of five years. The agreement provided, *inter alia*, that Bangor Gas Light Company retained UGI as a "general operating, construction and financial advisor" and that during the existence of the agreement UGI would be "considered an employee of Bangor Gas Light Company." (Id. ¶ 19.) On February 28, 1928, the contract for supervision of operations of Bangor Gas Light Company by UGI was canceled. (Id. ¶ 20.)

The UGI Management Company Minutes dated January 19, 1928, reflect that on January 18, 1928, as acting Vice President of the American Gas Company, Mr. Bodine had entered into a

6

contract with Frank T. Hollswit, President of the American Commonwealth Power Corporation for the sale of the capital stock of the Bangor Gas Light Company. The contract designated March 1, 1928, or prior thereto, at the discretion of American Commonwealth Power Corporation, as the date of settlement. (Id. ¶ 21.) On February 14, 1928, at a special meeting of the American Gas Company Board of Directors, the Board approved the contract with American Commonwealth Power Corporation for the sale of Bangor Gas Light Company stock for $330,000. (Id. ¶ 22.) On March 20, 1928, the American Gas Company of New Jersey Board of Directors noted that Bangor Gas Light Company had been sold in accordance with directions of the Board on March 1, 1928. (Id. ¶ 23.)

Corporate records of American Gas Company of New Jersey list Bangor and Bangor Gas Light Company as one location within American Gas Company of New Jersey's "Gas Division." (Pl.'s Statement of Add'l Facts ¶ 3.) American Gas Company of New Jersey's corporate records indicate that American Gas Company of New Jersey approved and set the budget of Bangor Gas Light Company. (Id. ¶ 4.)

A Maine PUC report notes that between 1901 and 1905 "extensive additions and improvements were made at the gas plant . . . ." (Id. ¶ 5.) During the period that it owned the stock of Bangor Gas Light Company, American Gas Company of New Jersey "advanced" $348,641.37 to Bangor Gas Light Company for "Additions, Extensions and Improvements to property." (Id. ¶ 6.) Additions, extension and improvements included:

    A 400,000 cubic foot gas "Holder," as well as an "Exhauster" and "Scrubbing Apparatus";

    An additional "Condensing and Scrubbing Apparatus";

    An "Ammonia Concentrator and Tank";

7

"Benches and Retorts";

A "Tar and Ammonia Separator"; and

Retirement of a "Building over Tar Well."

(Id. ¶ 7.) In 1901, American Gas Company of New Jersey proposed in a letter to Bangor Gas Light Company to build a 400,000 foot holder and make certain additions to the gas plant in consideration for payment in certain bonds issued by Bangor Gas Light Company. (Id. ¶ 8; Compact Disk Ex. F002406 at p. 35 (F002441).) There is a fair inference to be drawn that the foregoing list of improvements were actually made by American Gas Company of New Jersey pursuant to that understanding.

Under Bangor Gas Light Company's 1910 corporate by-laws, the president of the Company, who was throughout American Gas Company of New Jersey's ownership a member of American Gas Company of New Jersey's board of directors and a resident of Philadelphia, PA, had discretion to call meetings of the Bangor Gas Light Company board as he thought necessary, and was not required to ever call such a meeting. (Pl.'s Statement of Add'l Facts ¶ 9.) The by-laws gave this same individual "absolute control" over the "practical management" of Bangor Gas Light Company between meetings of the board of directors. (Id. ¶ 10.) He did not, however, receive a salary from Bangor Gas Light Company. (Id. ¶ 11.)

UGI acknowledges that its predecessor entered into an "Agreement for Supervision of Operations" with Bangor Gas Light Company on or about January 1, 1927. (Id. ¶ 12.) The agreement states, among many other things, that UGI's predecessor would study the Bangor Gas Light Company's operations in order to make certain recommendations, including in regard to "all equipment, buildings, etc., to secure the best operating efficiencies . . . ." (Id. ¶ 13.)

8

American Gas Company of New Jersey's management negotiated the purchase of coal that was used by its subsidiary companies. (Id. ¶ 14.)

On a number of occasions, Bangor Gas Light Company business was conducted using American Gas Company of New Jersey stationary. For example, it appears that a dual officer of the companies, S.P. Curtis, corresponded with Morris Stroud, president of American Gas Company of New Jersey, using American Gas Company of New Jersey stationary, about recommended improvements for the Bangor Gas Works facility in order to increase production and operational efficiencies. (Id. ¶ 16; *See e.g.*, Dec. 13, 1909, Letter from Gen. Mgr. Curtis to Pres. Stroud, CD Ex. UGIII0232 at p. 139 (UGIII0304-304A).) Cash account reports for American Gas Company of New Jersey and its subsidiaries show that while American Gas Company of New Jersey typically had more than one hundred thousand dollars in cash on hand, Bangor Gas Light Company often had cash accounts in the range of approximately six hundred to thirteen hundred dollars, insufficient funds to perform the improvements recommended by General Manager Curtis. (Pl.'s Statement of Add'l Facts ¶ 17.)

In 1901, American Gas Company of New Jersey directed the transfer to American Gas Company of New Jersey of $300,000 in bonds to be issued by Bangor Gas Light Company in exchange for certain additions and improvements to the property to be made by American Gas Company of New Jersey. (Id. ¶ 18.) According to a report prepared for the Maine Public Utilities Commission in 1940, American Gas Company of New Jersey itself asserted in 1927 that only $50,000 was ever expended on improvements associated with the 1901 issuance of bonds. (Id. ¶ 19; see also CD Ex. F000001 at pp. 8, 19; but see Pl.'s Statement of Add'l Facts ¶ 6 describing advances from American Gas Co. of N.J. of more than $348,000.)

9

Throughout American Gas Company of New Jersey's ownership of Bangor Gas Light Company, a majority of Bangor Gas Light Company's officers and directors were also officers or directors of American Gas Company of New Jersey. (Pl.'s Statement of Add'l Facts ¶ 21.) After Defendant UGI's predecessor, the United Gas Improvement Company, acquired the stock of American Gas Company of New Jersey, a majority of Bangor Gas Light Company's officers were also officers of UGI's predecessor. (Id. ¶ 22.) American Gas Company of New Jersey's officers and directors were not paid by Bangor Gas Light Company for their service as officers and directors of Bangor Gas Light Company. (Id. ¶ 23.) Those American Gas Company of New Jersey officers and directors who were also officers and directors of Bangor Gas Light Company resided in Philadelphia, Pennsylvania, or in other locations, rather than in Bangor. (Id. ¶ 24.)

## DISCUSSION

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if its resolution would "affect the outcome of the suit under the governing law," and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When reviewing the record for a genuine issue of material fact, the Court must view the summary judgment facts in the light most favorable to the nonmoving party and credit all favorable inferences that might reasonably be drawn from the facts without resort to speculation. P. R. Elec. Power Auth. v. Action Refund, 515 F.3d 57, 62 (1st Cir. 2008). If such facts and inferences could support a favorable verdict for the nonmoving party, then there is a trial-worthy

controversy and summary judgment must be denied. Azimi v. Jordan's Meats, Inc., 456 F.3d 228, 241 (1st Cir. 2006).

The purpose of the pending summary judgment contest is to determine whether the facts outlined above are sufficient to demonstrate that UGI is a potentially responsible party by virtue of being an owner or operator of the Gas Works facility under CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2), for releases of hazardous substances from the Gas Works for the period during which American Gas Company of New Jersey owned Bangor Gas Light Company. This is not a foregone conclusion because ownership of the Gas Works was in Bangor Gas Light Company, a separately organized corporate subsidiary of American Gas Company of New Jersey. CERCLA imposes liability on, among others, "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of[.]" 42 U.S.C. § 9607(a)(2). The phrase "owner or operator" is defined, tautologically, as "any person owning or operating" a facility. Id. § 9601(20)(A)(ii). The Supreme Court explains:

> It is a general principle of corporate law deeply "ingrained in our economic and legal systems" that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries. Thus it is hornbook law that "the exercise of the 'control' which stock ownership gives to the stockholders . . . will not create liability beyond the assets of the subsidiary. That 'control' includes the election of directors, the making of by-laws . . . and the doing of all other acts incident to the legal status of stockholders. Nor will a duplication of some or all of the directors or executive officers be fatal." . . . [N]othing in CERCLA purports to reject this bedrock principle, and against this venerable common-law backdrop, the congressional silence is audible.

Bestfoods, 524 U.S. 51, 61-62 (1998) (quoting Douglas & Shanks, Insulation from Liability Through Subsidiary Corporations, 39 Yale L. J. 193, 193 & 196 (1929)) (additional citations omitted).

In United States v. Bestfoods, the Supreme Court addressed "whether a parent corporation that actively participated in, and exercised control over, the operations of a subsidiary may, without more, be held liable as an operator of a polluting facility owned or operated by the subsidiary." 524 U.S. at 52. The Court's answer: "no, unless the corporate veil may be pierced. But a corporate parent that actively participated in, and exercised control over, the operations of the facility itself may be held directly liable in its own right as an operator of the facility." Id. Defendant UGI argues that the evidence in the record is not sufficient to subject it to liability as an operator of the Gas Works facility because the evidence does not demonstrate that American Gas Company of New Jersey specifically controlled pollution activity at the Gas Works. UGI also argues that it cannot be liable as an owner of the facility because the corporate veil that separated American Gas Company of New Jersey from Bangor Gas Light Company should not be pierced on this record.[4] (Mem. at 8-14, Doc. No. 244.)

### 1. *Direct Operation*

In Bestfoods, the Supreme Court vacated a Sixth Circuit opinion to the effect that CERCLA liability could only be imposed on a parent in relation to a facility owned by a subsidiary if the circumstances warranted piercing of the corporate veil or a finding that the parent and the subsidiary were engaged in a joint venture. Bestfoods, 524 U.S. at 59-60, 64-67; see also United States v. Kayser-Roth Corp., 272 F.3d 89, 97-100 (1st Cir. 2001) (discussing Bestfoods, including trial court and circuit court dispositions). The Supreme Court held that the Sixth Circuit was in error because "nothing in the statute's terms bars a parent corporation from

---

[4] Three state law claims in the complaint (Counts IV, V, and VI) are not discussed by the parties in their summary judgment memoranda. There is no apparent basis to conclude that these state law claims would call for a different disposition than what I recommend for the CERCLA-related claims (Counts I, II, and III), given the need to pierce the corporate veil for each of them. For that reason, my recommendation concerning piercing the corporate veil extends to the state law claims as well.

direct liability for its own actions in operating a facility owned by its subsidiary." Bestfoods, 524 U.S. at 64-66 (citing, *inter alia*, United States v. Kayser-Roth Corp., 910 F.2d 24, 26 (1st Cir. 1990) ("a person who is an operator of a facility is not protected from liability by the legal structure of ownership")). However, for operator liability to be imposed on a corporate parent apart from a veil-piercing or joint venture analysis, the parent corporation must be directly linked to a release of pollutants, meaning that the record must disclose that the parent "manage[d], direct[ed], or conduct[ed] operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." Id. at 66-67. See also Kayser-Roth, 272 F.3d at 102. Evidence that is salient to this analysis is evidence that depicts the relationship between the parent and the facility itself, rather than the parent-subsidiary relationship. Bestfoods, 524 U.S. at 68. In this respect, the Court must be cautious not to assume, however, "that the actions of the joint officers and directors are necessarily attributable to" the parent. Id. Thus, the fact that Bangor Gas Light Company's management was controlled by employees of American Gas Company of New Jersey from 1901 through 1928 is not determinative. The district court decision under review in Bestfoods was held erroneous precisely for its reliance on the parent's control over the subsidiary's management. Id. at 68-69. Control over a subsidiary's management is an ordinary privilege of ownership, so the fact that senior employees of the parent dominate the subsidiary's management structure is not enough to find that every act of operation by the subsidiary is an act of operation by the parent. Id. at 69.

According to the Supreme Court, the ordinary presumption is that the dual officers and directors in question "change hats" when they perform management tasks for the subsidiary and are no longer to be considered employees of the parent. Id. at 69-70. In this respect, a plaintiff

13

may be able to show that a dual agent wore the parent's hat by demonstrating conduct contrary to the interest of the subsidiary yet advantageous to the parent, id. at 70 & n.13, or a plaintiff might show that an agent of the parent having no position within the subsidiary managed or directed activities at the facility, id. at 71. Ultimately, where the wearing of corporate hats is concerned, "norms of corporate behavior . . . are crucial reference points." Id. at 71.

UGI argues that operator liability cannot be demonstrated on this record because there is no evidence that American Gas Company of New Jersey operated the Gas Works facility other than through the Bangor Gas Light Company subsidiary and through legitimate advisory undertakings ("oversight") designed to assist Bangor Gas Light Company with management decisions, rather than activities designed to directly control the Gas Works facility. (Mot. at 16-19.) It also argues that the records simply will not be able to demonstrate operations by American Gas Company of New Jersey specifically related to hazardous emissions or disposals. (Id. at 14-15.) Finally, it asserts that the facts related to dual-officer personnel are not sufficient to generate a trial-worthy issue because there is nothing to suggest that any dual-officers acted against the interest of Bangor Gas Light Company in connection with the expansion or improvement of the Gas Works facility. (Id. at 19-20.)

In opposition to the motion, Frontier argues that it makes no sense to look to a documentary record from the period in question (1901-1928) and to expect that there would be any indication that American Gas Company of New Jersey specifically exercised operational control with respect to environmental policy or hazardous waste disposals, as the prevailing view at the time was that the Penobscot River was a public sewer. (Opp'n Mem. at 7, Doc. No. 248.) In Frontier's view, the proper analysis simply asks whether the evidence "suggests that UGI's predecessor made operational decisions that would have implicated the disposal of any

14

contaminated wastewater." (Id.)  In support of a finding that UGI did make such operational decisions, Frontier points to the evidence of the substantial improvements and expansions that American Gas Company of New Jersey made to the Bangor Gas Works facilities and to what it describes as American Gas Company of New Jersey's exercise of control over "operational minutiae at the Gas Works." (Id. at 8.)  The operational minutiae that Frontier points to concern budgetary matters and additions and improvements in facilities, not daily oversight of production and the handling of coal-gasification by-products.  (See id., citing Pl.'s Statement of Add'l Facts ¶¶ 4, 7, 15.)

I agree with Frontier that the record fairly demonstrates American Gas Company of New Jersey's dominance with respect to financial matters and with respect to what installations would be made at the Gas Works facility to improve or maximize Bangor Gas Light Company's business, with resounding benefits to American Gas Company of New Jersey.  However, I am not persuaded that this evidence supports the necessary finding under Bestfoods that the day-to-day operation of the Gas Works facility in terms of processing coal into gas and discharging any residuum of filth into the river was anything other than the natural result of the labors of local personnel engaged in the Bangor Gas Light Company business of running the Gas Works facility.  In the end, this kind of record is not sufficient to attribute the day-to-day workings of the Gas Works facility to American Gas Company of New Jersey because Bestfoods requires adherence to the legal fiction of corporate separateness so long as the norms of corporate conduct have been observed in relation to operations.  Here, Frontier has successfully raised a genuine issue as to whether American Gas Company of New Jersey managed, directed, or conducted operations specifically related to plant design and the installation of improved facilities that would produce hazardous waste in the course of their operation, but the officers who engaged in

15

these operations were also officers of Bangor Gas Light Company and the record does not demonstrate that their advice, oversight, or participation in relation to local management activity violated any norms of corporate law in regard to parent-subsidiary relations. Consequently, the evidence of parental control does not raise a genuine issue of material fact because the record does not demonstrate that American Gas Company of New Jersey directly operated the Gas Works facility rather than Bangor Gas Light Company.[5]

### 2. *The Veil-Piercing Approach*

If the corporate veil separating American Gas Company of New Jersey and Bangor Gas Light Company can be pierced, then UGI may be deemed the true owner (or operator) of the Gas Works facility for the period between 1901 and 1928. Bestfoods, 524 U.S. at 64 n.10. With regard to the standard that applies, there is an initial question whether this Court should incorporate state law to fashion the rule of decision. Id. at 63 n.9. As I discussed in my prior recommendation regarding Centerpoint's motion for summary judgment, there is no critical distinction between state and federal law when it comes to making the alter-ego determination. Compare Johnson v. Exclusive Props. Unlimited, 1998 ME 244, ¶¶ 7-8, 720 A.2d 568, 571 (listing 12 factors); United States v. Kayser-Roth Corp., 724 F. Supp. 15, 20 (D. R.I. 1989) (listing 7 factors and quoting In Re Acushnet River & New Bedford Harbor Proceedings, 675 F. Supp. 22, 33 (D. Mass. 1987)). The critical factor under either state or federal law is the extent

---

[5] If it were possible to establish direct-operator liability based on the participation of dual-officers in the installation of facilities and the corporate parent's provision of financing in regard to such installations, then the only rule that would prevent application of direct-operator liability to every third-party installer and financier of upgraded facilities would be a rule that limits such exposure to those parties having an ownership interest in the entity that owns and operates the facility. Such a rule would be contrary to the Supreme Court's holding in Bestfoods because it would make operator liability turn squarely on the fact of corporate parentage or controlling-shareholder status. The same could be said in relation to suppliers of raw materials. The record supports a finding that American Gas Company of New Jersey acted as a purchasing agent for its subsidiaries with respect to coal, but that does not make American Gas Company the direct operator of the facility.

to which public convenience, fairness, and equity are legitimate grounds for disregarding corporate separateness in the context of potentially overriding federal legislative policies. Alman v. Danin, 801 F.2d 1, 3 (1st Cir. 1986); Mobay Corp. v. Allied-Signal, Inc., 761 F. Supp. 345, 350-51 (D. N.J. 1991) (collecting cases and considering the question in regard to environmental remediation under CERCLA).[6]

UGI quotes my prior Recommended Decision and asserts that indirect liability cannot be imposed against it any more than it could be imposed against Centerpoint because the facts do not "demonstrate a culpable use of the subsidiary for an illegitimate purpose material to the present day remediation effort." (Mem. at 9, Doc. No. 244.) Assuming that American Gas Company of New Jersey's control over Bangor Gas Light Company was "pervasive," UGI argues that control alone is not enough and that the piece missing here is evidence that American Gas Company of New Jersey's conduct was somehow fraudulent or abusive with respect to environmental contamination. (Id. at 10-11.)[7]

Frontier asserts that the goal of environmental remediation is sufficient to pierce the corporate veil where control is demonstrated. It proposes that public convenience, fairness, and

---

[6] There are two objectives that inform the CERCLA remedial scheme:

> First, Congress intended that the federal government be immediately given the tools necessary for a prompt and effective response to the problems of national magnitude resulting from hazardous waste disposal. Second, Congress intended that those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created.

Dedham Water Co. v. Cumberland Farms Dairy, Inc., 805 F.2d 1074, 1081 (1st Cir. 1986) (quoting United States v. Reilly Tar & Chem. Corp., 546 F. Supp. 1100 (D. Minn. 1982)).

[7] UGI also argues that Frontier, as the successor of the corporation that actually owned the Gas Works, should not be permitted to obtain a remedy that requires its own corporate veil to be pierced. (Mot. for Summary J. at 11-12.) I addressed this issue in my prior Recommended Decision on Centerpoint's motion and explained there why I am not persuaded that the law bars such a remedy in a case of this nature. (Rec. Dec. on Def. Centerpoint's Mot. for Summary J. at 17-20, Doc. No. 152.)

17

equity call for parent companies to contribute toward cleanup costs generated by subsidiaries so that corporate form cannot be used by deliberate polluters to escape liability and because the reality is that corporate parents like American Gas Company of New Jersey (and their shareholders) often profit more from the enterprise of the subsidiary than does the subsidiary itself. At least where pollution is a natural consequence of the subsidiary's business activity, Frontier believes that a parent corporation has a legal obligation to help remediate the environmental harm. (Pl.'s Opp'n Mem. at 10-11.) In my view, this is an eminently reasonable policy position. However, I am not persuaded that the Supreme Court's obeisance to the common law of corporate limited liability as "deeply ingrained in the U.S. economic and legal systems" or as "bedrock" or "venerable"—notwithstanding the CERLCA context—bodes well at all for that policy perspective unless and until Congress decides to advance that position through the legislative process. Bestfoods, 524 U.S. at 61-62 (characterizing CERCLA as silent on the issue). In the absence of such a rule, there is no way of shortcutting the requirement of proof that the corporate form was employed to work a fraud or comparable injustice or inequity.

      The record in this case is sufficient to support a finding that one of UGI's corporate predecessors (American Gas Company of New Jersey) essentially pulled all of the corporate strings when it came to the finances and the set up of Bangor Gas Light Company's business and productive facilities. However, the record does not demonstrate actual operation of the facility on an ongoing, day-to-day, or even intermittent basis by personnel lacking a legitimate relationship with Bangor Gas Light Company. Without such evidence, the finder of fact cannot draw a legitimate inference that American Gas Company of New Jersey misused or abused its power over Bangor Gas Light Company to defraud or injure, which I described in the previous Recommended Decision on Centerpoint's motion as "a culpable use of the subsidiary for an

illegitimate purpose material to the present-day remediation effort." (Rec. Dec. re. Centerpoint's Mot. for Summary J. at 20.) There does appear to be some question about whether American Gas Company of New Jersey rendered services of a value comparable to the value of the bonds (or the value of the payments generated by the bonds) Bangor Gas Light Company issued to it in 1901. However, there is nothing to suggest that this issue respecting corporate finance undermined Bangor Gas Light Company's ability to meet any foreseeable liabilities associated with its operations or otherwise turned it into a non-viable enterprise dependent on its parent in order to carry on the day-to-day operation of the facilities. In this regard, it is also important to note that, by all appearances at least, Bangor Gas Light Company was a viable enough enterprise to attract different investors in 1928 when the American Gas & Power Company acquired all of the shares of the local corporation, not to mention subsequent transfers of ownership to sophisticated corporate parents. Based on the existing record, summary judgment should enter for UGI.

## CONCLUSION

Frontier's Motion for Leave to Supplement Pleadings and Substitute Expert is DENIED (Doc. No. 247). For the reasons set forth above, I RECOMMEND that the Court GRANT Defendant UGI's Amended Motion for Summary Judgment (Doc. No. 243).

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

October 19, 2010